No 24-2036

# In the
# United States Court of Appeals
# for the Ninth Circuit

MICHELLE NGUYEN, ET AL.,
*Plaintiffs- Appellees,*

*v.*

ROB BONTA, IN HIS OFFICIAL CAPACITY AS THE CALIFORNIA ATTORNEY GENERAL, ET AL.,
*Defendants- Appellants.*

On Appeal from the United States District Court
for the Southern District of California
No. 3:20-cv-02470-WQH-MMP
Hon. William Q. Hayes

**PLAINTIFFS-APPELLEES' RESPONSE TO DEFENDANTS-APPELLANTS' EMERGENCY MOTION FOR STAY PENDING APPEAL**

Raymond M. DiGuiseppe
THE DIGUISEPPE LAW FIRM, P.C.
116 N. Howe St., Ste. A
Southport, NC  28461
(910) 713-8804
law.rmd@gmail.com

*Counsel for Plaintiffs-Appellees*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1(a), Appellees certify as follows:

Michelle Nguyen, Dominic Boguski, Jay Medina, Frank Colletti, John Phillips, and Darin Prince are individuals.

PWGG, L.P. is a California Limited Partnership that has no parent corporation and no stock, so no publicly held corporation owns more than ten percent of its stock.

North County Shooting Center, Inc. is a California Corporation. It has no parent corporation and no publicly held corporation owns more than ten percent of its stock.

Firearms Policy Coalition, Inc. is a nonprofit organization. It has no parent corporation and no stock, so no publicly held corporation owns more than ten percent of its stock.

San Diego County Gun Owners PAC is a nonprofit organization. It has no parent corporation and no stock, so no publicly held corporation owns more than ten percent of its stock.

Second Amendment Foundation, Inc. is a nonprofit organization. It has no parent corporation and no stock, so no publicly held corporation owns more than ten percent of its stock.

# TABLE OF CONTENTS

Page

INTRODUCTION  1

FACTUAL BACKGROUND  2

STANDARD FOR STAY PENDING APPEAL  3

ARGUMENT  4

I.    The State Cannot Make Any Sort of "Strong Showing" On The Merits.  4

A.    Plaintiffs' Conduct Is Presumptively Protected By The Text Of The Second Amendment.  4

B.    California Cannot Sidestep Its Burden Under the Label of A "Condition And Qualification On The Commercial Sale Of Arms."  6

C.    The District Court Correctly Found The OGM Law Is Inconsistent With The Nation's Historical Tradition Of Firearm Regulation.  8

1.    The State's Plea For Leniency Through "Nuance" Is Improper And Beside The Point In Any Event.  9

2.    Fire-Safety Laws Controlling Storage, Inspection, and Transport of Gunpowder Are Plainly Not Analogous.  11

3.    Restrictions on the Sale of Firearms to Native Americans Are Clearly Inappropriate Comparators.  12

4.    The "Deadly Weapons" Restrictions Are Wholly Different And Appeared Too Late In Any Event.  13

## TABLE OF CONTENTS (continued)

**Page**

**ARGUMENT I.C. (continued)**

    5.    **The Taxing and Licensing Regulations Also Cannot Establish Any Sort of Relevantly Similar Analogue.**  16

  **II.**    **The State Faces No Irreparable Injury.**  16

  **III.**    **The Balance Of Equities Favors Plaintiffs.**  18

**CONCLUSION**  20

**CERTIFICATE OF COMPLIANCE**  21

**CERTIFICATE OF SERVICE**  22

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Al Otro Lado v. Wolf*, 952 F.3d 999 (9th Cir. 2020) ........................ 18

*Am. Trucking Ass'ns v. City of Los Angeles*, 559 F.3d 1046 (9th Cir. 2009) ........ 19

*Baird v. Bonta*, 81 F.4th 1036 (9th Cir. 2023) ........................ 10, 19

*Cal. Chamber of Com. v. Council for Educ. & Rsch. on Toxics*
29 F.4th 468 (9th Cir. 2022) ........................ 19

*Coalition for Economic Equity v. Wilson*, 122 F.3d 718 (9th Cir. 1997) ........ 17

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ........................ *passim*

*Doe #1 v. Trump*, 957 F.3d 1050 (9th Cir. 2020) ........................ 4

*Duncan v. Becerra*, 265 F. Supp. 3d 1106 (S.D. Cal. 2017) ........ 19

*Elrod v. Burns*, 427 U.S. 347 (1976) ........................ 19

*Espinoza v. Mont. Dep't of Revenue*, 591 U.S. 464 (2020) ........ 14

*Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011) ........ 5, 19

*Frein v. Pa. State Police*, 47 F.4th 247 (3d Cir. 2022) ........ 6

*Indep. Living Ctr. of S. Cal., Inc. v. Maxwell-Jolly*
572 F.3d 644 (9th Cir. 2009) ........................ 17

*Index Newspapers LLC v. United States Marshals Serv.*
977 F.3d 817 (9th Cir. 2020) ........................ 4

*Junior Sports Mags., Inc. v. Bonta*, 80 F.4th 1109 (9th Cir. 2023) ........ 19

*Koons v. Reynolds*, 649 F. Supp. 3d 14 (D. N.J. 2023) ........ 19

*Maryland Shall Issue, Inc. v. Moore*, 86 F.4th 1038 (4th Cir. 2023) ........ 6

*McDonald v. City of Chicago*, 561 U.S. 742 (2010) ........ 6, 18

*Melendres v. Arpaio*, 695 F.3d 990 (9th Cir. 2012) ........ 18

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022) ........ *passim*

*Nken v. Holder*, 556 U.S. 418 (2009) ........................ 3, 4

## TABLE OF AUTHORITIES (continued)

**Page**

**Cases**

*Rodriguez v. Robbins*, 715 F.3d 1127 (9th Cir. 2013)                17

*Sierra Club v. Trump*, 929 F.3d 670 (9th Cir. 2019)                4

*Teixeira v. Cnty. Of Alameda*, 873 F.3d 670 (9th Cir. 2017)                5

*Teter v. Lopez*, 76 F.4th 938 (9th Cir. 2023)                15

*Tyler v. Hillsdale Cnty. Sheriff's Dep't*, 837 F.3d 678 (6th Cir. 2016)                8

*United States v. Harrison*, 654 F. Supp. 3d 1191 (W.D. Okla. 2023)                5, 18

*United States v. Marzzarella*, 614 F.3d 85 (3rd Cir. 2010)                8

*United States v. Rahimi*, 61 F.4th 443 (5th Cir. 2023)                12, 13

*Zepeda v. INS*, 753 F.2d 719 (9th Cir. 1983)                17

**Constitutions**

United States Constitution

    First Amendment                6, 13

    Second Amendment                *passim*

    Fourteenth Amendment                13

**Statutes**

California Penal Code § 27535                1, 2, 3

California Penal Code § 27540                1

**Other Resources**

Mark W. Smith, *'Not all History is Created Equal': In the Post-*Bruen *World, the Critical Period for Historical Analogues Is When the Second Amendment Was Ratified in 1791, and not 1868*, SSRN (Oct. 1, 2022)                5, 14

v

# INTRODUCTION

California is one of only four states in the Nation that prohibits its law-abiding residents from purchasing more than one handgun in a 30-day period. In fact, only five states have *ever* imposed such a restriction in our Nation's history and none did so before 1975. It should come as no surprise, then, that California cannot meet its burden of establishing that this modern outlier statute is "consistent with this Nation's historical tradition of firearm regulation." *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 17 (2022).

In a comprehensive opinion, the district court enjoined enforcement of California Penal Code §§ 27535 and 27540(f), which prohibit law-abiding citizens from purchasing more than one firearm within a thirty-day period (commonly known as the "one-gun-a-month" or "OGM" law).[1] The district court carefully analyzed each of the claimed historical analogues California identified and correctly concluded that the OGM law is not consistent with the Nation's historical tradition of firearm regulation. *See generally* Order, Dist. Ct. Dkt. 41, *Nguyen v. Bonta*, No. 3:20-cv-2470 (S.D. Cal. March 11, 2024) ("Op.").

California now asks this Court to nevertheless issue a stay of the injunction

---

[1] When Plaintiffs initially filed this case the 30-day restriction applied only to handguns. The law has since been amended twice and now covers all firearms and extends to "a combination of firearms, completed frames or receivers, or firearm precursor parts." Cal. Penal Code § 27535(a).

1

pending its appeal. California falls short of the "demanding" standard required to justify such a stay. The State has not made a "strong showing" that it will prevail on the merits; it failed to meet its burden under *Bruen* before the district court, and it will fail to meet its burden in this Court for the same reasons. No matter how much "nuance" one might apply to the effort, no "relevantly similar" historical analogues could ever be identified that would demonstrate the OGM law as falling within the Nation's historical tradition of firearms regulation.

The remaining factors decidedly weigh against entering a stay. California has failed to establish the "irreparable harm" necessary to warrant relief. The State cannot suffer any harm in being prevented from enforcing an unconstitutional law. On the other hand, a stay would irreparably harm Plaintiffs and all those similarly situated law-abiding Californias whom they represent, by continuing the deprivation of their Second Amendment protected rights that the OGM law has perpetuated for over two decades, and the public interest is always served by preventing such a violation of constitutional rights. This Court should deny California's motion.

## FACTUAL BACKGROUND

Since 2000, California has prohibited the typical, law-abiding citizen from making any "application to purchase more than one handgun within any 30-day period." § 27535(a) (effective through July 1, 2021). The State has since expanded the OGM law so that now covers all firearms and extends to "a combination of

2

firearms, completed frames or receivers, or firearm precursor parts." § 27535(a).

Beginning with South Carolina in 1975, only five States have ever enacted laws restricting the number of firearms that individuals can purchase in a month—or any other restrictions regulating the frequency or quantity of firearm purchases a person make can over a period of time. California is one of four States (along with Maryland, New Jersey, and Virginia) that currently impose any such restrictions. California's law is the most restrictive.

California had the opportunity to submit multiple rounds of summary judgment briefing supported by no fewer than four historical experts. The district court rightly rejected the State's arguments and evidence, granting summary judgment in Plaintiffs' favor on the Second Amendment claim. The State failed to meet its burden under *Bruen* to demonstrate the existence of "a well-established and representative historical *analogue*" to the modern OGM law. The district court stayed its judgment enjoining enforcement of the OGM law for 30 days so that California could pursue an appeal in this Court.

## STANDARD FOR STAY PENDING APPEAL

To warrant a stay of a district court's judgment, the State must make a "strong showing" that it is likely to succeed on the merits, that it will be irreparably injured absent a stay, and that the balance of equities weighs in favor of granting a stay. *Nken v. Holder*, 556 U.S. 418, 434 (2009). Of these factors "[t]he first two . . . are

3

the most critical." *Id.* "The bar for obtaining a stay [pending appeal] is higher than the *Winter* standard for obtaining injunctive relief"—in particular, this "demanding standard" requires the State "show 'that irreparable injury is likely to occur during the period before the appeal is decided.'" *Index Newspapers LLC v. United States Marshals Serv.*, 977 F.3d 817, 824 (9th Cir. 2020) (quoting *Doe #1 v. Trump*, 957 F.3d 1050, 1059 (9th Cir. 2020)). "'A stay is not a matter of right, even if irreparable injury might otherwise result'"—hence the importance of a "strong showing" on the merits. *Sierra Club v. Trump*, 929 F.3d 670, 687 (9th Cir. 2019) (quoting *Nken*, 556 U.S. at 433). The State fails to meet any of these factors, so a stay should be denied.

## ARGUMENT

### I. The State Cannot Make Any Sort of "Strong Showing" On The Merits.

#### A. Plaintiffs' Conduct Is Presumptively Protected By The Text Of The Second Amendment.

So long as Plaintiffs' proposed course of conduct falls within the Second Amendment's plain text, "the Constitution presumptively protects that conduct" and the State bears the burden of proving its restriction is consistent with this Nation's historical tradition of firearm regulation. *Bruen*, 597 U.S. at 24. The textual inquiry is straightforward here. Plaintiffs and the class of similarly situated individuals they represent are law-abiding Californians who seek to purchase two or more firearms within a 30-day period for lawful purposes, including self-defense. The Supreme Court has already defined the Second Amendment's key terms. "The people"

4

includes "all Americans, and "Arms" includes "all instruments that constitute bearable arms[,]" including handguns. *District of Columbia v. Heller*, 554 U.S. 570, 580–82, 584 (2008); *Bruen*, 597 U.S. at 28, 31.

The State cannot succeed in their claim that the OGM law "does not implicate conduct" covered under the Second Amendment because the law "only requires individuals to wait 30 days before purchasing an additional firearm." Mot. at 10. The district court correctly recognized that the Second Amendment "necessarily encompasses ancillary rights, including a right to acquire arms, because the right to keep and bear arms for self-defense recognized by *Heller* and *Bruen* 'wouldn't mean much without the ability to acquire arms.' " Op. at 15 (citing *Teixeira v. Cnty. Of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017) (quoting *Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011) (cleaned up)). And "nothing in the text of the of the Second Amendment suggests that the Second Amendment right is limited to possession and acquisition of a single firearm, or that the acquisition of additional firearms is inherently subject to additional limitations—if anything, the usage of the term 'arms' in plural suggests the opposite." *Id.*

The State's argument boils down to the simplistic claim that when conduct protected by the Second Amendment is burdened rather than prohibited—*i.e.*, having to wait to purchase a second firearm rather than being barred entirely from purchasing any firearm—the Second Amendment does not "cover" the conduct. The

5

district court correctly explained that *Bruen* and *Heller* have already rejected this argument. Op. at 15–16 (citing *Bruen*, 597 U.S. at 31, and *Heller*, 554 U.S. at 629). No one would ever suggest the First Amendment is not implicated merely because a law burdens speech rather than prohibits it. And *Bruen* instructed that courts should not treat the Second Amendment as a "a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees." 597 U.S. at 70 (quoting *McDonald v. City of Chicago*, 561 U.S. 742, 780 (2010)); *id*. at 24 (*Bruen*'s text-and-history test "accords with how we protect other constitutional rights"). Any other conclusion also would be contrary to the plain text of the Second Amendment, which states that the right to keep and bear arms shall not be *infringed*. At the Founding, to "infringe" meant not only to destroy but also to hinder. *Maryland Shall Issue, Inc. v. Moore*, 86 F.4th 1038, 1044 n.8 (4th Cir. 2023), reh'g en banc granted 2024 WL 124290 (4th Cir. Jan. 11, 2024). Undoubtedly, imposing a 30-day purchase ban against law-abiding citizens "hinders" their right of acquisition. *See Frein v. Pa. State Police*, 47 F.4th 247, 254 (3d Cir. 2022) ("The government may not 'infringe[ ]' on this right." This would include even " 'hinder[ing]' a person's ability to hold on to his guns."). Because the OGM law restricts conduct covered by the Second Amendment, that conduct is "presumptively protected." *Bruen*, 597 U.S. at 24.

### B. California Cannot Sidestep Its Burden Under the Label of A "Condition And Qualification On The Commercial Sale Of Arms."

The State tries to avoid its burden by classifying the OGM as a "condition" or

6

"qualification" on the "commercial sale of arms," in an effort to transform the law into a "presumptively lawful regulatory measure" under *Heller*. 554 U.S. at 626–27. *Bruen* has rejected this approach too, however, and clarified that all regulations on Second Amendment rights must survive the full breadth of its text-and-history test.

The Court's analysis in *Bruen* illustrates that regulations generically falling within *Heller*'s list of "presumptively lawful regulatory measures" are not exempt from this test. Indeed, *Heller*'s list includes "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings," 554 U.S. at 626, yet *Bruen* demonstrates that the government's designation of a new and different place as "sensitive" does not create a legal presumption in its favor. Rather, the government must still demonstrate, just as with any other firearm regulation, that sensitive place restrictions are consistent with the Nation's history of firearm regulations. *See Bruen*, 597 U.S. at 30 (courts should "use analogies to those historical regulations of "sensitive places" to determine that modern regulations prohibiting the carry of firearms in new and analogous sensitive places are constitutionally permissible").

The district court thus correctly held that a "full text-and-history analysis" of the OGM law under *Bruen* was necessary, particularly where a regulation like this one is not "longstanding" but rather a creature of the twentieth century. Op. at 9–14. In rejecting the State's bid to avoid its burden of justifying the OGM law, the district

court explained: " 'If there were somehow a categorical exception' for all regulations that could be characterized as conditions and qualifications on the commercial sale of firearms, 'it would follow that there would be no constitutional defect in prohibiting the commercial sale of firearms' entirely, which is an 'untenable' result." Op. 11 (quoting *United States v. Marzzarella*, 614 F.3d 85, 92 n.8 (3rd Cir. 2010)).

Certainly, in recognizing the existence of valid "conditions [or] qualifications on the commercial sale of arm," *Heller* "did not invite courts onto an analytical off-ramp to avoid constitutional analysis." *Tyler v. Hillsdale Cnty. Sheriff's Dep't*, 837 F.3d 678, 686–87 (6th Cir. 2016). Following *Bruen*, *Heller*'s list of "presumptively lawful" regulations should be understood as a set of regulations the Court assumed would prove constitutional to some extent, *after the proper historical analysis was completed*. *Bruen* twice emphasized the legal presumption that actually applies in its test: "[W]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct," and "only" after conducting the necessary historical analysis, where the government bears the burden, "may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'" 597 U.S. at 17, 24 (citation omitted).

## C. The District Court Correctly Found The OGM Law Is Inconsistent With The Nation's Historical Tradition Of Firearm Regulation.

California likewise cannot meet its burden of demonstrating the OGM law is consistent with the Nation's historical tradition of firearm regulation.

### 1.   The State's Plea For Leniency Through "Nuance" Is Improper And Beside The Point In Any Event.

California also seizes on *Bruen*'s statement that a "more nuanced" historical approach may be appropriate for cases involving "unprecedented societal concerns or dramatic technological changes." Mot. 13; *Bruen*, 597 U.S. at 27. The State claims that "[d]uring the founding era and Reconstruction Era, firearms were not generally available for bulk purchases, and thus firearms trafficking was not as much of a concern as it is today." Mot. 13. The thrust of the State's argument is that firearms were too expensive for the average person to buy in "bulk" during these historical eras—a proposition called into question by the very sources cited by the State.

But "firearms trafficking" is not a "dramatic technological change." Nor is it even the claimed "societal problem" at issue here; rather, the claimed concern is firearms violence, and the OGM targets "trafficking" as an asserted *contributor* to such violence by treating everyone as a would-be trafficker. In *Bruen*, New York was similarly addressing the problem of handgun violence; New York's law targeted widespread handgun carriage as a purported contributor to such violence. 597 U.S. at 27.  "[W]hen a challenged regulation addresses a general societal problem that has persisted since the 18th century," any historical analogues must be "distinctly similar." *Id*. at 26. Here, just as in *Bruen*, the "historical analogies . . . are relatively simple to draw" such that no "nuanced approach" is necessary. *Id.* at 27.

Ultimately, the State's plea for "nuance" is aimed at tilting the analysis back

toward the two-step interest-balancing test that *Bruen* rejected based on general notions of the police power or public safety. The Court left no room for doubt that this is inappropriate: "To justify its regulation, [California] may not simply posit that the regulation promotes an important interest." *Bruen*, 597 U.S. at 17. And courts may not "engage in independent means-end scrutiny under the guise of an analogical inquiry." *Id.* at 39 n.7.

In any event, the district court nevertheless indulged the State's plea for a "more nuanced approach" by considering "distinctly [un]similar" regulations. Indeed, any analogical comparators here will be quite different since limitations on the number of firearms that may be purchased are such a new invention. Yet the district court dutifully analyzed whether these alleged comparators could pass the "nuanced" analogical test. That is, it considered whether each historical law was "relevantly similar" to the OGM law, based on "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Bruen*, 597 U.S. at 29. "[W]hether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are 'central' considerations when engaging in an analogical inquiry." *Id.* (citations omitted). To carry its burden, California was required to "identify a well-established and representative" tradition of analogous regulation. *Id.* at 30 (citation omitted); *see also Baird v. Bonta*, 81 F.4th 1036, 1040–41 (9th Cir. 2023) (the government must

10

show that the modern "regulation is identical or closely analogous" to historical analogues that were "broadly in effect").

The district court properly held that California failed to meet its burden because the purported analogues identified by the State fall far short of demonstrating a historical tradition that would justify any limitation on the quantity or frequency of firearm purchases by law-abiding, responsible people, let alone a tradition sufficient to justify the OGM law itself. Op. 18–24.

### 2. Fire-Safety Laws Controlling Storage, Inspection, and Transport of Gunpowder Are Plainly Not Analogous.

California first argued that a handful of 18th- and 19th-century gunpowder regulations are analogous to the OGM law. *Bruen* demands more to constitute a "well-established and representative" historical tradition of regulation of any kind. 597 U.S. at 30. But even if California could catalogue similar gunpowder laws in *every* state at the Founding, such fire-safety laws are not "relevantly similar" to the OGM law. These historical regulations fail both the "how" and "why" metrics. The gunpowder regulations and OGM law do not impose "comparable" burdens on Second Amendment rights. As the district court correctly held, the gunpowder laws had a markedly different purpose (to prevent accidental fires and explosions) and did not impose a comparable burden because they "contain[ed] no temporal limitation on the acquisition of gunpowder, but simply limit the quantity . . . that may be stored or transported. *See* Op. 18–19. Further, these regulations come too

11

late anyway. *See Bruen*, 597 U.S. at 37 ("we have generally assumed that the scope of the protection applicable to the Federal Government and States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791").

### 3. Restrictions on the Sale of Firearms to Native Americans Are Clearly Inappropriate Comparators.

California illustrates how bare the historical record is by turning to a few colonial laws restricting the sale of firearms and ammunition to Native Americans, claiming that these laws are comparable because they "limit[ed] the access to firearms by dangerous individuals." Mot. 14.

The district court rightly acknowledged that because these laws were discriminatory, they are inappropriate analogues and certainly should not be used as reference tools to restrict rights in the modern day. Op. 20. Moreover, at the time, Native Americans were not considered to be among "the People" protected under the Constitution, and thus Colonial Era laws aimed at them are no guide as to how the Constitution should be interpreted to apply to "the People" today. "Laws that disarmed slaves, Native Americans, and disloyal people may well have been targeted at groups excluded from the political community—*i.e.*, written out of 'the people' altogether—as much as they were about curtailing violence or ensuring the security of the state. Their utility as historical analogues is therefore dubious, at best." *United States v. Rahimi*, 61 F.4th 443, 457 (5th Cir. 2023); *Range v. U.S. Att'y Gen.*, 69 F.4th 96, 105 (3d Cir. 2023) (discounting the government's attempt to analogize

historical "restrictions based on race and religion" to "disarm certain groups of people" in part because they would be "unconstitutional under the First and Fourteenth Amendments"); *see also United States v. Harrison*, 654 F. Supp. 3d 1191, 1216 (W.D. Okla. 2023) ("Indians . . . were . . . generally not considered to be a part of the political community protected by the Second Amendment."). The State should have followed the example set by the United States Department of Justice and disavowed reliance on such invidiously discriminatory laws. Tr. Of Oral Argument, *United States v. Rahimi*, No. 22-915, 7:3–16 (Nov. 7, 2023).

Even taking these purported analogues at face value, however, they still flunk *Bruen*'s essential analogue test because, clearly, "laws restricting the sale of arms to Native Americans impose neither a quantity nor time limitation similar to that of the OGM law." Op. 20–21 (emphasis added).

### 4. The "Deadly Weapons" Restrictions Are Wholly Different And Appeared Too Late In Any Event.

California also identified a few mid- and late-19th century laws prohibiting the sale of specific categories of weapons (such as spears, metal knuckles, slots, and certain knives), which the State claims are analogous based on a general interest in preserving "public safety."

For starters, many of these regulations come too late in time to be probative on the scope of the Second Amendment. Again, appropriate historical analogues must stem from the Founding era, centering on 1791. "Constitutional rights are

enshrined with the scope they were understood to have when the people adopted them." *Heller*, 554 U.S. at 634–35; *see also Bruen*, 597 U.S. at 34. Thus, "not all history is created equal," and courts must be careful not to overweigh historical evidence that long predates or postdates the Founding. *Bruen*, 597 U.S. at 34; *see also* Mark W. Smith, *'Not all History is Created Equal': In the Post-*Bruen *World, the Critical Period for Historical Analogues Is When the Second Amendment Was Ratified in 1791, and not 1868*, SSRN (Oct. 1, 2022), https://bit.ly//3CMSKjw.

Thus, "to the extent later history contradicts what the text [of the Second Amendment] says, the text controls." *Bruen*, 597 U.S. at 36; *see also id.* at 82–83 (Barrett, J., concurring) (noting that "freewheeling reliance on historical practice from the mid-to-late 19th century to establish the original meaning" of the Second Amendment is improper). And the Court's precedents teach that even extensive history will not move the needle if it long post-dates the Founding. *See, e.g.*, *Espinoza v. Mont. Dep't of Revenue*, 591 U.S. 464, 482 (2020) (finding unpersuasive "more than 30" provisions of state law from the "second half of the 19th Century" because they were not grounded in Founding era practices regarding the Free Exercise Clause). At most, the Supreme Court has looked to 19th century evidence as "mere confirmation of what the Court thought had already been established" at the Founding. *Bruen*, 597 U.S. at 36–37.

But even so, the district court rightly held that these regulations, too, failed

*Bruen*'s test: The historical regulations "impose a different burden," because they targeted "concealable" weapons that were "specifically 'associated with interpersonal violence and crime,'" whereas the OGM law "burdens a broader class of arms" in that it extends to all firearms. Op. 22. Furthermore, the district court recognized that these historical regulations may be tied to a tradition of prohibiting "dangerous and unusual weapons"—and the OGM law goes much further and encompasses all arms in "common use." Op. 22–23; *see also Teter v. Lopez*, 76 F.4th 938, 951–53 (9th Cir. 2023), reh'g en banc granted, opinion vacated, 93 F.4th 1150 (9th Cir. 2024) (concluding that historical laws prohibiting the sale or possession of "deadly weapons" were "outliers," as the "vast majority" of historical regulations prohibited solely the concealed carry of such weapons).

Finally, California's argument that the historical laws are sufficient analogues merely because they address generic "public safety concerns," Mot. 15, fundamentally distorts the test. *Bruen* was very clear in cautioning against defining the analogical inquiry at such a high level: "[B]ecause '[e]verything is similar in infinite ways to everything else,' one needs 'some metric enabling the analogizer to assess which similarities are important and which are not.'" 597 U.S. at 29 (citations omitted). If California could satisfy *Bruen*'s "why" test by invoking public safety every gun law would be considered analogous no matter how different the means, which would fly in the face of the analogical inquiry *Bruen* mandates.

15

### 5. The Taxing and Licensing Regulations Also Cannot Establish Any Sort of Relevantly Similar Analogue.

Finally, California identified two categories of regulations it claimed are analogous because they "served to limit the availability and ownership of firearms." Specifically, the State identified two laws that required a license to trade firearms with Native Americans, two laws that required a license to sell certain firearms, and a few 19th century laws that taxed the sale of firearms and other deadly weapons.

The district court quickly—and correctly—disposed of these categories of regulations: They "are not 'relevantly similar' to the OGM law because they placed no limit on the quantity or frequency with which one could acquire firearms." Op. 23. Furthermore, the licensing regulations "imposed no burden on the acquisition of firearms" because they "regulated only the seller." *Id.*

Indeed, a smattering of licensing and taxation laws tell us nothing about the constitutionality of the OGM law. Not only are such commercial regulations fundamentally different in kind from restrictions on the frequency or quantity of firearms purchased over time, but a small subset of laws is also not sufficiently widespread to be "well-established." *See Bruen*, 587 U.S. at 46 (doubting that three colonial restrictions are enough to establish a tradition of banning public carry).

In sum, California has no chance of succeeding on the merits of its appeal.

## II. The State Faces No Irreparable Injury.

California fails to establish sufficient irreparable injury to warrant a stay

16

"during the period before the appeal is decided." *Doe #1*, 957 F.3d at 1059. The State claims that the mere fact of a court enjoining a duly enacted law causes it irreparable injury. Mot. 16. Not so. The State "cannot reasonably assert that it is harmed in any legally cognizable sense by being enjoined from constitutional violations." *Zepeda v. INS*, 753 F.2d 719, 727 (9th Cir. 1983); *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013) (holding that the government "cannot suffer harm from an injunction that merely ends an unlawful practice").

The State relies on *Coalition for Economic Equity v. Wilson*, 122 F.3d 718, 719 (9th Cir. 1997), to argue that it "necessarily suffers irreparable injury whenever an enactment of its people or their representatives in enjoined." Mot. 16. This Court long ago rightly distanced itself from this language in *Wilson*, noting it was dicta and cautioning it should not be used to override the *Winter* analysis when the validity of a statute is at issue: Even though "a state may suffer an abstract form of harm whenever one of its acts is enjoined," this "is not dispositive of the balance of harms analysis." *Indep. Living Ctr. of S. Cal., Inc. v. Maxwell-Jolly*, 572 F.3d 644, 658 (9th Cir. 2009). "If it were, then the rule requiring 'balance' of 'competing claims of injury,' would be eviscerated. Federal courts instead have the power to enjoin state actions, in part, because those actions sometimes offend federal law provisions, which, like state statutes, are themselves 'enactments of its people or their representatives.' " *Id.*; *see also Latta v. Otter*, 771 F.3d 496, 500 & n.1 (9th Cir.

17

2014) (noting "[i]ndividual justices, in orders issued from chambers, have expressed the view that a state suffers irreparable injury when one of its laws is enjoined," but "[n]o opinion for the Court adopts this view" (citations omitted)). California fails to make the "demanding" showing of irreparable harm necessary for relief.

## III.    The Balance Of Equities Favors Plaintiffs.

Given that California fails to satisfy the first two stay factors, a stay must be denied, and this Court need not even address the balance of the equities. *See Al Otro Lado v. Wolf*, 952 F.3d 999, 1007 (9th Cir. 2020) (this factor is "reached only '[o]nce an applicant satisfies the first two factors' [citation]"). But even assuming *arguendo* that California meets the first two stay factors, it still cannot prevail on the final factor. The State merely asserts speculative arguments about public safety, Mot. 16–18, but the Supreme Court has twice rejected the argument that vindication of Second Amendment rights should be treated differently because of an alleged public safety rationale. *See, e.g.*, *McDonald*, 561 U.S. at 783 (The Second Amendment is "not the only constitutional right that has controversial public safety implications"); *accord Bruen*, 597 U.S. at 17 n.3. Unfounded assumptions about public safety provide no basis to perpetuate an unconstitutional law.

Plaintiffs are certain to suffer irreparable harm if the judgment is stayed: "[i]t is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.' " *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir.

18

2012) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)); *see also Junior Sports Mags., Inc. v. Bonta*, 80 F.4th 1109, 1120 (9th Cir. 2023) ("[W]hen a party has established likelihood of success on the merits of a constitutional claim— particularly one involving a fundamental right—the remaining *Winter* factors favor enjoining the likely unconstitutional law"). Because "constitutional violations cannot be adequately remedied through damages [such violations] therefore generally constitute irreparable harm." *Am. Trucking Ass'ns v. City of Los Angeles*, 559 F.3d 1046, 1059 (9th Cir. 2009). This principle applies with equal force to Second Amendment violations. *E.g.*, *Baird*, 81 F.4th at 1044 ("*Winter*'s well-settled standards . . . apply to Second Amendment claims like any other constitutional claim"); *Ezell*, 651 F.3d at 699–700; *Duncan v. Becerra*, 265 F. Supp. 3d 1106, 1135 (S.D. Cal. 2017) ("Loss of . . . the enjoyment of Second Amendment rights constitutes irreparable injury."); *Koons v. Reynolds*, 649 F. Supp. 3d 14, 42–44 (D. N.J. 2023) (collecting cases holding that Second Amendment deprivations constitute irreparable harm).

Moreover, "[i]t is always in the public interest to prevent the violation of a party's constitutional rights." *Cal. Chamber of Com. v. Council for Educ. & Rsch. on Toxics*, 29 F.4th 468, 482 (9th Cir. 2022) (cleaned up). California cannot purport to further the public interest by trampling its citizens' constitutional rights. The Second Amendment "is the very product of an interest balancing by the people and

it surely elevates above all other interests the right of law-abiding, responsible citizens to use arms for self-defense." 597 U.S. at 26 (cleaned up). This Court should not credit California's bald assertions about the public interest to justify a stay; doing so risks sanctioning the same interest balancing *Bruen* rejected. *See id.* at 18–19.

## CONCLUSION

California's motion for a stay pending appeal should be denied.

Respectfully submitted,

<u>s/ Raymond M. DiGuiseppe</u>

Raymond M. DiGuiseppe
THE DIGUISEPPE LAW FIRM, P.C.
116 N. Howe St., Ste. A
Southport, NC 28461
(910) 713-8804
law.rmd@gmail.com

*Counsel for Plaintiffs-Appellees*

April 15, 2024

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the length limits permitted by Ninth Circuit Rule 27-1(1)(d) because this brief is fewer than 20 pages, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5), and the type style requirements of Fed. R. App. P. 32(a)(6), because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Times New Roman type.

Dated: April 15, 2024

s/ Raymond M. DiGuiseppe
Raymond M. DiGuiseppe

## CERTIFICATE OF SERVICE

I hereby certify that on April 15, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the CM/ECF system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

s/ Raymond M. DiGuiseppe
Raymond M. DiGuiseppe