No. 24-2036

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

_____

MICHELLE NGUYEN, ET AL.,

*Plaintiffs-Appellees*,

v.

ROB BONTA, IN HIS OFFICIAL CAPACITY AS THE
CALIFORNIA ATTORNEY GENERAL, ET AL.,

*Defendants-Appellants.*

_____

**On Appeal from the United States District Court
for the Southern District of California**
No. 3:20-cv-02470-WQH-MMP
The Honorable William Q. Hayes, Judge

_____

## APPELLANTS' OPENING BRIEF

_____

ROB BONTA
*Attorney General of California*
THOMAS S. PATTERSON
*Senior Assistant Attorney General*
ANTHONY R. HAKL
*Supervising Deputy Attorney General*

JERRY T. YEN
*Deputy Attorney General*
  1300 I Street, Suite 125
  P.O. Box 944255
  Sacramento, CA 94244-2550
  Telephone: (916) 210-7836
  Fax: (916) 324-8835
  Email: Jerry.Yen@doj.ca.gov
*Attorneys for Defendants-Appellants Rob
Bonta and Allison Mendoza, in their
official capacities*

May 13, 2024

# TABLE OF CONTENTS

**Page**

Introduction ................................................................................. 1

Jurisdictional Statement ............................................................. 3

Statement of the Issues ............................................................... 4

Addendum of Statutory Provisions ............................................. 4

Statement of the Case ................................................................. 4

     A.    California's Law Limiting Sales from Licensed Dealers
          to One Gun Within a 30-Day Period ........................... 4

     B.    Procedural History ................................................... 7

Summary of the Argument ......................................................... 9

Standard of Review .................................................................... 11

Argument .................................................................................... 11

I.     The Text of the Second Amendment Does Not Presumptively
      Protect a Right to Unlimited Firearm Purchases Within a 30-
      day Period ........................................................................ 13

II.    Plaintiffs Fail to Rebut the Presumption that the Challenged
      Laws Are a Lawful Regulation on the Commercial Sale of
      Firearms .......................................................................... 17

III.   California's Law Is Consistent with This Nation's Historical
      Tradition of Firearm Regulation ....................................... 20

     A.    This Case Implicates *Bruen*'s "More Nuanced" Approach
          to the Historical Inquiry ......................................... 21

     B.    California's Law Is Consistent with the Historical
          Tradition of Regulating the Sale of Weapons to Ensure
          Dangerous Individuals Do Not Obtain Them ........... 24

     C.    The District Court's Historical Analysis Was Flawed ........... 32

Conclusion .................................................................................. 35

Statement of Related Cases ........................................................ 37

i

## TABLE OF CONTENTS
### (continued)

**Page**

Certificate of Compliance ............................................................. 38

# TABLE OF AUTHORITIES

**Page**

C<small>ASES</small>

*Antonyuk v. Chiumento*
  89 F.4th 271 (2d Cir. 2023) ..................................................... 34

*Baird v. Bonta*
  __ F. Supp. 3d __, 2023 WL 9050959 (E.D. Cal. Dec. 29, 2023) .......... 27

*City & Cnty. of San Francisco v. Garland*
  42 F.4th 1078 (9th Cir. 2022) .................................................. 11

*Clark v. Cmty. for Creative Non-Violence*
  468 U.S. 288 (1984)............................................................. 13

*District of Columbia v. Heller*
  554 U.S. 570 (2008).................................................... *passim*

*Gazzola v. Hochul*
  88 F.4th 186 (2d Cir. 2023) .................................................. 18

*Hirschfeld v. Bureau of Alcohol, Firearms, Tobacco & Explosives*
  5 F.4th 407 (4th Cir. 2021) ............................................. 18, 19

*McCullen v. Coakley*
  573 U.S. 464 (2014)............................................................. 21

*McDonald v. City of Chicago*
  561 U.S. 742 (2010)............................................................. 14

*McRorey v. Garland*
  __ F. 4th __, 2024 WL 1825398 (5th Cir. Apr. 26, 2024) .............. *passim*

*New York State Rifle & Pistol Ass'n v. Bruen*
  597 U.S. 1 (2022)...................................................... *passim*

*Pena v. Lindley*
  898 F.3d 969 (9th Cir. 2018) ................................................. 18

iii

## TABLE OF AUTHORITIES
### (continued)

**Page**

*Schaffer ex rel. Schaffer v. Weast*
 546 U.S. 49 (2005)..................................................................... 13

*Silvester v. Harris*
 843 F.3d 816 (9th Cir. 2016) ..................................................... 19

*State v. Christen*
 958 N.W.2d 746 (Wis. 2021) ..................................................... 28

*Teixeira v. County of Alameda*
 873 F.3d 670 (9th Cir. 2017) ............................................. *passim*

*United States v. Alaniz*
 69 F.4th 1124 (9th Cir. 2023) .................................................... 20

*United States v. Duarte*
 __ F.4th __, 2024 WL 2068016 (9th Cir. May 9, 2024) ......................... 12

*United States v. Holton*
 639 F. Supp. 3d 704 (N.D. Tex. 2022) ..................................... 24

*United States v. James*
 677 F. Supp. 3d 329 (D.V.I. 2023) .......................................... 18

*United States v. King*
 646 F. Supp. 3d 603 (E.D. Pa. 2022)....................................... 14

*United States v. Perez-Garcia*
 96 F.4th 1166 (9th Cir. 2024) .................................... 20, 34, 35

*United States v. Serrano*
 651 F. Supp. 3d 1192 (S.D. Cal. 2023) ................................... 24

CONSTITUTIONAL PROVISIONS

United States Constitution
 Second Amendment.......................................................... *passim*

# TABLE OF AUTHORITIES
## (continued)

Page

Fourteenth Amendment ............................................................ 23

**STATUTES**

**Federal**

United States Code, Title 18
  § 922(t) ...............................................................................5

United States Code, Title 28
  § 1291 ..................................................................................3
  § 1331 ..................................................................................3

**Alabama**

1867 Ala. Code 169, § 10 ......................................................... 30

An Act to Suppress the Use of Bowie Knives, 1837 Ala. Laws
  7, § 2 ................................................................................. 30

**California**

Cal. Stats. 1999, Chapter 128 (A.B. 202), § 2 ................................4

Cal. Stats. 2009, Chapter 334 (S.B. 175), § 2 ................................5

Cal. Stats. 2010, Chapter 711 (S.B. 1080), § 6 ..............................5

Cal. Stats. 2019, Chapter 737 (S.B. 61), §§ 5, 6 ...........................5

Cal. Stats. 2022, Chapter 711 (A.B. 1080), §§ 19, 20 .....................6

Cal. Stats. 2023, Chapter 246 (A.B. 1483), § 2 ..............................7

California Penal Code
  § 12072(a)(9) ......................................................................5
  § 12072(c)(6) ......................................................................5
  § 16520 ..............................................................................6
  § 27535 ................................................................... *passim*

v

# TABLE OF AUTHORITIES
### (continued)

Page

§ 27535(a) ................................................................7
§ 27535(b) ................................................................7
§ 27535(b)(7) ................................................................7
§ 27535(b)(8) ................................................................7
§ 27535(b)(11) ................................................................7
§ 27540(f) ................................................................ *passim*
§ 28220 ................................................................ *passim*

Sacramento, Cal., Ordinance No. 84: Prohibiting the Carrying
  of Concealed Deadly Weapons (1876), *reprinted in* Charter
  and Ordinances of the City of Sacramento 173 (R.M.
  Clarken ed., 1896) ................................................................ 27

**Connecticut**

1646 Conn. Court Orders, J. Hammond Trumbull, *Public
  Records of the Colony of Connecticut* (1850) ........................................ 24

Act of December 1775, Charles J. Hoadly, *Public Records of
  the Colony of Connecticut* ........................................................ 30

**District of Columbia**

 27 Stat. 116 (1892), Chapter 159, § 5 ........................................ 28

**Florida**

1838 Fla. Laws. 24 ................................................................ 30

**Georgia**

1837 Ga. Acts, ch. 90 ................................................................ 29

1866 Ga. Law 27, § 3 ................................................................ 30

**Kansas**

Scandia, Kan., Ordinance No. 79: An Ordinance Relating to
  Crimes and Punishments (1893), *reprinted in* Scandia
  Journal, Jan. 5, 1894 ................................................................ 27

## TABLE OF AUTHORITIES
### (continued)

Page

**Massachusetts**

Act of 1651, *The Colonial Laws of Massachusetts* 126 (1887) .................. 29

**Missouri**

An Act to Tax Guns and Pistols in the County of Washington,
 1867 Miss. Laws 327, § 1 .......................................................... 30

An Act to Prevent the Carrying of Concealed Weapons and for
 Other Purposes, 1878 Miss. Laws 175, § 2 ............................ 28

**New Jersey**

Ordinances of Jersey City Passed by the Board of Aldermen
 Since May 1, 1871, An Ordinance in Relation to the
 Carrying of Dangerous Weapons, § 3 (1873) ......................... 26

**New York**

1652 N.Y. Laws 11, E.B. O'Callaghan, *Law & Ordinances of
 New Netherland, 1638-1674* (1867) ....................................... 25

Ordinances of the Mayor, Aldermen and Commonalty of the
 City of New York, in force January 1, 1881, art. 27, § 265,
 (Elliott F. Shepard & Ebenezer B. Shafer eds., 1881) (New
 York, New York) .................................................................... 27

**North Carolina**

1856-1857 N.C. Sess. Laws 34, Chapter 34, § 23 ......................... 30

**South Carolina**

1893 S.C. Acts 426, § 2 ................................................................. 30

**Tennessee**

1879 Tenn. Pub. Act 135-136, Chapter 96, § 1 ...................... 29, 30

1838 Tenn. Acts, ch. 137 .............................................................. 29

# TABLE OF AUTHORITIES
## (continued)

Page

### <u>Virginia</u>

1676 Va. Acts 20, William Waller Hening, *The Statutes at Large: Being a Collection of All the Laws of Virginia, from the First Session of the Legislature, in the Year 1619* (1823) ................ 25

### COURT RULES

Ninth Circuit Rule 28-2.7 ................................................................. 4

### OTHER AUTHORITIES

Jacob D. Charles, *On Sordid Sources in Second Amendment Litigation*, 76 Stan. L. Rev. Online (2023) .............................................. 26

William Baude & Stephen E. Sachs, *Originalism & the Law of the Past*, 37 L. & Hist. Rev. 809 (2019) ................................................. 26

# INTRODUCTION

California limits the purchase of firearms from licensed dealers to one purchase every thirty days because of the threat that bulk firearm purchases pose to public safety:  the law addresses the risk that straw purchasers will illegally traffic them to individuals otherwise prohibited from possessing or acquiring firearms.  This sales limitation, which is typically referred to as the one-gun-a-month or OGM law, does not impose any ceiling on the total number of firearms that a resident may accumulate over time.  California residents authorized to possess firearms may collect as many firearms as they would like subject to the one-gun-a-month regulation, which has limited the bulk purchases of handguns for over two decades.

The challenged law therefore does not infringe the right to "keep" or "bear" "Arms" and does not violate the Second Amendment.  The text of the Second Amendment does not presumptively protect a right to purchase an unlimited number of firearms from a licensed dealer within a 30-day period.  The law is also a "condition[] and qualification[] on the commercial sale of arms," which makes the law among those "presumptively lawful regulatory measures" that governments may adopt consistent with the Second Amendment.  *District of Columbia v. Heller*, 554 U.S. 570, 626-627 & n.26 (2008).

1

Even if the law implicated presumptively protected conduct, it is "consistent with the Nation's historical tradition of firearm regulation." *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 24 (2022). As an initial matter, "a more nuanced approach" to the analogical inquiry described in *Bruen* is required in this case. *Id.* at 27. Technological advances have made firearms significantly easier to manufacture and thus less expensive and more widely available for purchase than in the founding and Reconstruction eras. That widespread availability has given rise to societal concerns regarding straw purchases and firearms trafficking, which did not exist during the founding and Reconstruction eras to the same extent they exist today. Nonetheless, throughout history, legislatures have regulated firearms transactions to ensure that firearms did not end up in the hands of those who could not lawfully possess them. California's restrictions impose comparable (or lesser) burdens to those historical precursors, and are comparably justified.

The district court's contrary conclusion cannot be squared with the text of the Second Amendment or the historical analysis *Bruen* requires. According to the district court, the Second Amendment presumptively protects the ability to "acquir[e] multiple handguns and/or semiautomatic centerfire rifles within a 30-day period from a licensed dealer."

1-ER-018–019.  But the text of the Second Amendment does not support such a reading.  And as to *Bruen*'s historical inquiry, the district court effectively required a "historical twin," imposing a "regulatory straightjacket" on the States that *Bruen* explicitly forswore.  *Bruen*, 597 U.S. at 30.  In fact, under the district court's misunderstanding of *Bruen*'s historical analysis, it appears that no regulation placing any temporal or quantity limit on the sale of firearms would ever be viewed as "consistent with the Nation's historical tradition of firearm regulation."  *Id.* at 24.  That result would be at odds with *Bruen* and the Second Amendment.  This Court should reverse the district court's judgment.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction over plaintiffs' federal constitutional claims under 28 U.S.C. § 1331.  On March 11, 2024, the district court found California Penal Code Sections 27535 and 27540(f) unconstitutional. 1-ER-027.  On March 28, 2024, the district court entered judgment and enjoined California from enforcing those provisions.  1-ER-003.[1]  The Attorney General appealed the next day.  2-ER-266–267.  This Court has jurisdiction under 28 U.S.C. § 1291.

---

[1] This Court stayed the injunction pending appeal.  C.A. Dkt. 9.

3

## STATEMENT OF THE ISSUES

Whether California's law limiting purchases of firearms from licensed dealers to one gun per 30-day period, as set forth in California Penal Code Sections 27535 and 27540(f), comports with the Second Amendment.

## ADDENDUM OF STATUTORY PROVISIONS

An addendum of pertinent statutory provisions has been filed with this brief.  Ninth Cir. R. 28-2.7.

## STATEMENT OF THE CASE

### A.   California's Law Limiting Sales from Licensed Dealers to One Gun Within a 30-Day Period

In 1999, the California Legislature passed California Penal Code Section 27535 stating that "[n]o person shall make an application to purchase more than one pistol, revolver, or other firearm capable of being concealed upon the person within any 30-day period."  Cal. Stats. 1999, ch. 128 (A.B. 202), § 2.  The Legislature also enacted California Penal Code Section 27540(f), which stated that "[n]o pistol, revolver, or other firearm capable of being concealed upon the person shall be delivered whenever the dealer is notified by the Department of Justice that within the preceding 30-day period the purchaser has made another application to purchase a pistol,

revolver, or other firearm capable of being concealed upon the person." *Id*.[2]

As the Legislature explained, the law was designed "to stop one gun

purchaser from buying several firearms and transferring a firearm to another

person who does not have the legal ability to buy a gun him/herself.  Such a

transfer is referred to as a 'straw transaction.'"  2-ER-165.  Without a limit

on the frequency with which handguns could be purchased, it would be

easier for "straw purchasers to acquire guns for another person or for street

dealers to acquire guns legitimately." *Id*.  For instance, by acquiring guns

from another person, straw purchasers would evade the background checks

that vendors must perform for each transaction.  *See* § 28220; 18 U.S.C.

§ 922(t).  Thus, the Legislature found that the law would "curtail the illegal

gun market, disarm criminals, and save lives."  2-ER-165.

　　　In 2019, California amended the law to cover semiautomatic centerfire

rifles and the amended law took effect on July 1, 2021.  Cal. Stats. 2019,

ch. 737 (S.B. 61), §§ 5, 6.  In amending the law, the Legislature observed

that "[m]ore and more shootings [were] occurring with long guns," and that

---

[2] In 2009, the phrase "pistol, revolver, or other firearm capable of being concealed upon the person" was replaced with "handgun."  Cal. Stats. 2009, ch. 334 (S.B. 175), § 2.  Section 27535 was originally Section 12072(a)(9), and Section 27540(f) was originally Section 12072(c)(6).  They were renumbered in 2010.  Cal. Stats. 2010, ch. 711 (S.B. 1080), § 6.

the amendment would "reduce[] the likelihood of accidental or intentional homicides," including by preventing the illegal transfer of guns to prohibited persons. 2-ER-171.

Effective January 2024, the law was modified further to cover any "firearm," not just the handguns and semiautomatic center rifles that were previously covered. Cal. Stats. 2022, ch. 711 (A.B. 1080), §§ 19, 20. A "firearm" is defined as "a device, designed to be used as a weapon, from which is expelled through a barrel, a projectile by the force of an explosion or other form of combustion" and includes "the frame or receiver of the weapon, including both a completed frame or receiver, or a firearm precursor part." Cal. Penal Code § 16520.[3] California Penal Code Section 27535 now provides that "[a] person shall not make an application to purchase more than one firearm within any 30-day period. This subdivision does not authorize a person to make an application to purchase a combination of firearms, completed frames or receivers, or firearm precursor parts within the same 30-day period." § 27535(a). Similarly, a licensed firearms dealer is prohibited from delivering a firearm if the purchaser has "made another application to purchase a handgun, semiautomatic centerfire

---

[3] All subsequent statutory references are to the California Penal Code, unless otherwise noted.

6

rifle, completed frame or receiver, or firearm precursor part" within the preceding 30-day period. § 27540(f).

There are exceptions carved out of the law. For example, certain private party transactions conducted through a licensed dealer, transactions conducted through a law enforcement agency, and transactions to replace a firearm that the owner has reported lost or stolen are exempt from the restrictions. § 27535(b)(7), (8), (11).[4] Peace officers, licensed private security businesses, and licensed gun collectors, among others, are also exempt from the limitations imposed under Section 27535. § 27535(b).

## B.   Procedural History

Plaintiffs filed this lawsuit in December 2020, raising facial Second Amendment and Equal Protection challenges to California Penal Code Sections 27535 and 27540(f). 2-ER-261; 2-ER-263–264. Plaintiffs comprise four individuals (collectively, "Individual Plaintiffs"); two firearm retailers and their respective owners; and three organizations focused on the Second Amendment (Firearms Policy Coalition, San Diego County Gun

---

[4] Effective January 1, 2025, the only private party transactions that will be exempted from the OGM law are transactions where the seller is required under state law or court order to relinquish all firearms and where the seller is transferring the firearms due to the death of the owner. Cal. Stats. 2023, ch. 246 (A.B. 1483), § 2.

Owners PAC, and Second Amendment Foundation). 2-ER-225–229. The

Individual Plaintiffs contend that they desire to purchase two or more

handguns and two or more semiautomatic centerfire rifles in a single

transaction, seek a declaratory judgment that the challenged laws violate

their Second Amendment rights, and request an injunction prohibiting the

Attorney General from enforcing the law. 2-ER-245–249; 2-ER-263–264.

In 2022, the parties filed initial cross-motions for summary judgment.

Dkts. 23, 29.[5] Following the Supreme Court's decision in *Bruen*, the district

court ordered supplemental briefing to address the application of *Bruen* to

the summary judgment motions. Dkt. 38. The district court subsequently

granted summary judgment to Defendants on the equal protection claim, but

otherwise denied the parties' motions and authorized additional expert

discovery "concerning whether the challenged law is consistent with the

Nation's historical tradition of firearm regulation." Dkt. 49 at 11.

After completion of discovery, the parties filed renewed cross-motions

for summary judgment. Dkts. 59, 60. The district court held a hearing,

Dkt. 68, and on March 11, 2024, issued an order denying Defendants'

---

[5] Unless otherwise noted, "Dkt." refers to the district court docket
below in No. 3:20-cv-02470. Pincites to district court docket entries are to
the pagination included in the ECF header for the docket entry.

8

motion and granting Plaintiffs' motion, Dkt. 69; 1-ER-027.  The district court concluded that the text of the Second Amendment presumptively protects the right to acquire multiple firearms within a 30-day period (1-ER-019); held that the law was not a "longstanding" regulation akin to the presumptively lawful regulations recognized in *Heller* (1-ER-014–016); and concluded that the historical regulations cited by the State were not "relevantly similar" to the challenged law (1-ER-021–026).

The district court entered judgment enjoining California from enforcing Sections 27535 and 27540(f), but stayed enforcement of the judgment for thirty days.  1-ER-003.  The Attorney General appealed and sought a stay pending appeal.  2-ER-266–267; C.A. Dkt. 6.  A motions panel of this Court stayed the injunction pending appeal and expedited briefing and argument.  C.A. Dkt. 9.

## SUMMARY OF THE ARGUMENT

Under *Bruen*, the threshold inquiry is whether plaintiffs have carried their burden to establish that the Second Amendment presumptively protects a right to purchase an unlimited number of firearms from licensed firearms dealers over a 30-day period.  They have not.  Plaintiffs failed to establish that the text of the Second Amendment's operative clause—which provides a right of the "People" to "keep" and "bear" "Arms," U.S. Const. amend.

9

II—covers their proposed course of conduct. *Bruen*, 597 U.S. at 32 (citation omitted).

The challenged laws also operate as a condition on the commercial sale of firearms, not as a functional prohibition on the possession or acquisition of arms. In particular, after the purchase of a firearm from a licensed firearms dealer, an individual need only wait 30 days to purchase another firearm from a licensed dealer. This does not deny any individual's right to "keep" or "bear" arms, and *Heller* deemed such regulations "presumptively lawful." 554 U.S. 570, 626-627 (2008). And plaintiffs have not overcome that presumption of lawfulness.

Even if it were necessary to reach *Bruen*'s historical inquiry, California's law is consistent with "the Nation's historical tradition" of regulations designed to limit certain individuals from acquiring arms. *Bruen*, 597 U.S. at 17. In conducting the historical inquiry, this Court must apply the "more nuanced approach" that *Bruen* requires where modern-day statutes address "regulatory challenges" that were not confronted by earlier generations. *Id*. at 27. Throughout history, manufacturing, cost, and distribution limitations restricted the commercial availability of firearms. Today, mass production and modern-day distribution networks have rendered firearms less expensive and more widely available for purchase

10

than in the founding and Reconstruction eras.  Those advances have given rise to societal concerns regarding straw purchases and firearms trafficking that did not exist to the same extent during earlier periods.  Applying the nuanced approach, the historical regulations presented by the State reflect a broad tradition of regulations aimed at preventing individuals perceived to pose a danger to the public from obtaining weapons.  California's law is consistent with that historical tradition.  Those historical regulations are relevantly similar to the law in terms of both burden and justification:  they imposed regulatory requirements on firearms transactions that were intended to prevent firearms from being transferred to those who could not lawfully possess them.  And the challenged law imposes no greater burden on the right to armed self-defense than the historical precursors.

## STANDARD OF REVIEW

The Court reviews "the legal conclusions supporting declaratory judgments and permanent injunctions granted at summary judgment de novo."  *City & Cnty. of San Francisco v. Garland*, 42 F.4th 1078, 1084 (9th Cir. 2022).

## ARGUMENT

Under the *Bruen* framework, the standard for evaluating Second Amendment claims is "centered on constitutional text and history."  *New*

11

*York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 22 (2022).  The initial inquiry is whether "the Constitution presumptively protects" plaintiffs' purposed course of conduct.  *Id.* at 24.  If so, "[t]he government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation."  *Id.*

Consistent with Supreme Court precedent, "the Second Amendment allows for a 'variety' of gun regulations."  *Id.* at 80 (Kavanaugh, J., concurring) (quoting *Heller* 554 U.S. at 646).  Certain regulations are presumptively lawful, and *Bruen* did not change that:  "nothing in our opinion should be taken to cast doubt on . . . laws imposing conditions and qualifications on the commercial sale of arms."  *Id.* at 81 (Kavanaugh, J., concurring) (quoting *Heller*, 554 U.S. at 626-627, 627 n.26).[6]  A proper

---

[6] A recent decision of this Court calls into question whether *Bruen* requires courts to conduct a historical inquiry for regulations that fall within *Heller*'s "presumptively lawful" list.  *See United States v. Duarte*, __ F.4th __, 2024 WL 2068016, at *7-8 (9th Cir. May 9, 2024); *but see id.* at *25-26 (Smith, J., dissenting) ("Nothing in the Supreme Court's decision in *Bruen* reflects a retreat from the Court's statement in *Heller* that [certain regulations] are 'presumptively lawful.'").  At issue in *Duarte* was the relevance of *Heller*'s inclusion of "prohibitions on the possession of firearms by felons" in its list—which is not at issue here, and in any event, similar issues are under consideration in *United States v. Rahimi*, No. 22-915 (argued Nov. 7, 2023).  To the extent this Court understands *Duarte* to eliminate any "presumptively lawful" regulations, the Attorney General preserves the argument for potential further review.

application of the *Bruen* framework confirms that California's law limiting the number of arms that may be acquired in a 30-day period is consistent with the Second Amendment.

## I. THE TEXT OF THE SECOND AMENDMENT DOES NOT PRESUMPTIVELY PROTECT A RIGHT TO UNLIMITED FIREARM PURCHASES WITHIN A 30-DAY PERIOD

The threshold question under the *Bruen* framework is whether plaintiffs have carried their burden to establish that the Second Amendment—which protects "the right of the people to keep and bear Arms"—covers the right to purchase an unlimited number of firearms within a 30-day period. *Bruen*, 597 U.S. at 31-32; *see id.* at 24; *cf. Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 56-57 (2005); *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 n.5 (1984). They have not.

To answer that question, the Court considers "the normal and ordinary meaning of the Second Amendment" as well as its "historical background." *Bruen*, 597 U.S. at 20 (internal quotation marks omitted). The right to "keep arms" refers to possessing arms, and the right to "bear arms" refers to carrying arms "for a particular purpose—confrontation." *Heller*, 554 at 583-584. *Bruen* distinguished the treatment of prohibitions on "keeping" and "bearing" from other firearm regulations. *See McRorey v. Garland*, __ F. 4th __, 2024 WL 1825398, at *3-4 (5th Cir. Apr. 26, 2024) (citations

13

omitted).  Indeed, the regulation challenged in *Bruen* made it "virtually impossible for most New Yorkers" "to carry a gun outside the home for self-defense," 597 U.S. at 76 (Alito, J., concurring), and therefore effectively "nullif[ied] half of the Second Amendment's operative protections"—*i.e.*, the right to "bear" arms, *id.* at 32.  Similarly, *Heller* and *McDonald* invalidated restrictions that "totally ban[ned] handgun possession in the home."  *Heller*, 554 U.S. at 628-629; *see also McDonald v. City of Chicago*, 561 U.S. 742, 750-751 (2010) (plurality opinion).

     In contrast to the laws challenged in *Heller*, *McDonald*, and *Bruen*, which effectively operated as a restraint on the ability of most law-abiding citizens to "keep" firearms for self-defense or to "bear" "arms" outside the home, California's law places no limit on the number of firearms that law-abiding citizens can "keep," nor does it prevent them from "bear[ing]" arms.  To be sure, the ability to purchase a firearm can sometimes implicate the right to keep and bear arms, *see Teixeira v. County of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017) (en banc), and that is why courts "prohibit[] shoehorning restrictions on purchase into functional prohibitions on keeping," *McRorey*, 2024 WL 1825398, at *5.  "But such an implication is not the same thing as being covered by the plain text of the amendment." *Id.*; *see also United States v. King*, 646 F. Supp. 3d 603, 607 (E.D. Pa. 2022)

14

("the Court looks at the Second Amendment's plain text; it does not consider 'implicit' rights [such as an impicit right to buy and sell firearms] that may be lurking beneath the surface of the plain text"). Plaintiffs do not (and cannot) contend that the law operates as a "functional prohibition[] on keeping." *McRorey*, 2024 WL 1825398, at *5; *see* 2-ER-130–131; 2-ER-139–140; 2-ER-148–149 (some of the Individual Plaintiffs admitting that they have arms and can acquire more).

     In addition, the "historical background" of the Second Amendment confirms this analysis. *Bruen*, 597 U.S. at 20. At the founding and for decades after, firearms were craft items that required significant time and labor to produce, and were prohibitively expensive for many. *See infra* pp. 22-23. Limitations in retail and distribution networks at the time meant that vendors often kept small inventories at hand and no one would have understood the Second Amendment in light of those practical limitations to include some right to acquire as many firearms as they would like within a 30-day period. That history informs the original public meaning of the Second Amendment right—and suggests that California's restrictions do not cross any constitutional line reflected in the text of the Second Amendment.

     Moreover, even though the ability to acquire firearms is an ancillary right necessary to keep and bear arms for self-defense, it is not an

unconditional right. *See Teixeira*, 873 F.3d at 677-678; *cf. Bruen*, 597 U.S. at 21 ("the right secured by the Second Amendment is not unlimited" (quoting *Heller*, 554 U.S. at 626)). The imposition of reasonable conditions, such as waiting for completion of a background check or licensing requirements, do not impede an individual's right to "keep" or "bear" arms once those conditions have been satisfied. *See McRorey*, 2024 WL 1825398, at *5. So it is here. California's law does not prevent anyone from acquiring firearms for self-defense, keeping them for those purposes, and bearing the firearms for confrontation. *See* 2-ER-131; 2-ER-140; 2-ER-148; 2-ER-157–158 (Individual Plaintiffs admitting that they are able to purchase a firearm subject to the limitations in the challenged laws). Once an individual purchases a firearm within California, that person may acquire another firearm from a licensed firearm dealer just 30 days later and so on.

The district court's contrary reasoning cannot be reconciled with the text of the Second Amendment or the Supreme Court precedents construing it. The district court reasoned that the challenged law implicates the text of the Second Amendment because "the Second Amendment right is [not] limited to possession and acquisition of a single firearm or that the acquisition of additional firearms is inherently subject to additional limitations—if anything the usage of the term 'arms' in plural suggests the

16

opposite." 1-ER-018. But even if it were assumed that the text of the Second Amendment includes the right to keep and bear more than one singular arm, California's law does not inhibit any person from possessing multiple firearms; individuals may acquire as many firearms as they would like as long as they wait 30 days before buying the next one.

In sum, the proposed course of conduct—purchasing more than one firearm from a licensed dealer within a 30-day period—does not prevent law-abiding citizens from "keep[ing]" or "bear[ing]" arms and thus does not bar conduct that is presumptively protected by the plain text of the Second Amendment. Accordingly, under *Bruen*, plaintiffs' Second Amendment challenge fails at the threshold stage of the *Bruen* inquiry.

## II.  PLAINTIFFS FAIL TO REBUT THE PRESUMPTION THAT THE CHALLENGED LAWS ARE A LAWFUL REGULATION ON THE COMMERCIAL SALE OF FIREARMS

Sections 27535 and 27540(f) are also a "presumptively lawful regulatory measure[]" that governments may adopt consistent with the Second Amendment because it simply imposes a "condition[] and qualification[] on the commercial sale of arms." *Heller*, 554 U.S. at 626-627 & n.26; *see also Bruen*, 597 U.S. at 81 (Kavanaugh, J., concurring). Presumptively lawful restrictions on commercial sales generally "go to *where* and *when* such [] sales can take place" as opposed to "*what* can be

17

sold." *Pena v. Lindley*, 898 F.3d 969, 1009 (9th Cir. 2018) (Bybee, J.,

concurring in part and dissenting in part), *abrogated on other grounds by*

*Bruen*, 597 U.S. 1. And as the Fourth Circuit noted, "a law's substance, not

its form, determines whether it qualifies as a condition on commercial

sales." *Hirschfeld v. Bureau of Alcohol, Firearms, Tobacco & Explosives*, 5

F.4th 407, 416 (4th Cir. 2021) (citation omitted), *vacated on other grounds*,

14 F.4th 322 (4th Cir. 2021). In other words, a commercial regulation is

considered a "condition on commercial sales" if it does not operate as a

"functional prohibition" or total ban on acquiring or possessing a gun. *See*

*id*. at 417; *see also Gazzola v. Hochul*, 88 F.4th 186, 195-196 (2d Cir. 2023)

(determining that the challenged commercial laws were presumptively

lawful conditions because they were not "so restrictive that [they] threaten[]

a citizen's right to acquire firearms"); *United States v. James*, 677 F. Supp.

3d 329, 343 (D.V.I. 2023) (stating that a statute is a commercial regulation

when it targets transfer of a firearm).

  Under that standard, California's limitation on the number of firearms

that may be purchased in a 30-day period is one such presumptively lawful

"condition[] and qualification[] on the commercial sale of arms." The law

regulates *when* licensed firearms dealers may sell a firearm to someone who

previously purchased one from a licensed dealer. § 27540(f). More

18

specifically, once an individual has purchased a firearm from a licensed firearms dealer, that person only has to wait 30 days to purchase another firearm from a licensed dealer. Thus, the law does not operate as a functional prohibition on acquiring arms or as a total ban. *See Hirschfeld*, 5 F.4th at 416; *McRorey*, 2024 WL 1825398, at *3, *6 (ruling that background checks preceding firearm sales are presumptively constitutional and would be subject to *Bruen's* historical framework only if operated as a "*de facto* prohibition on possession*"); *cf. Teixeira*, 873 F.3d at 680 (holding that plaintiff lacked a Second Amendment claim due to the absence of allegations that zoning ordinance "meaningfully inhibit[ed]" his ability to acquire a firearm); *cf. Silvester v. Harris*, 843 F.3d 816, 829 (9th Cir. 2016) (Thomas, C.J., concurring) (10-day waiting period after firearms purchase is a presumptively lawful condition on sales), *abrogated on other grounds by Bruen*, 597 U.S. 1.

The district court acknowledged that the challenged law operates as a condition on commercial sales, but it read *Heller* to impose a requirement that any condition or qualification on sale must be "longstanding" before it may be considered presumptively lawful. 1-ER-015; 1-ER-016–017. But that understanding of *Heller* is at odds with *Heller* itself, which considered

19

firearm possession bans on felons and the mentally ill to be longstanding even though they were not enacted until the 1960s. *See* 554 U.S. at 626-627.

## III. CALIFORNIA'S LAW IS CONSISTENT WITH THIS NATION'S HISTORICAL TRADITION OF FIREARM REGULATION

Even if the Court were to hold (or assume) that the challenged law covers conduct presumptively protected by the Second Amendment, the law is consistent with "the historical tradition" of firearms regulation. *Bruen*, 597 U.S. at 19; *see id.* at 24. The historical analysis required by *Bruen* is not meant to impose "a regulatory straightjacket." *Id.* at 30. The government is required to establish that the challenged regulation falls within a historical tradition of laws that are "relevantly similar," in the sense that it "impose[s] a comparable burden on the right of armed self-defense" that "is comparably justified." *Id.* at 29; *see also United States v. Perez-Garcia*, 96 F.4th 1166, 1181 (9th Cir. 2024). There is no need to identify "a historical *twin*" or "a dead ringer" for purposes of that "analogical inquiry." *Bruen*, 597 U.S. at 30. And when the challenged regulation "implicat[es] unprecedented societal concerns or dramatic technological changes," "a more nuanced approach" is required because "[t]he regulatory challenges" of today are "not always the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868." *Id.* at 27; *see also United States v.*

*Alaniz*, 69 F.4th 1124, 1129-30 (9th Cir. 2023).  Applying that framework

here, California's law is plainly constitutional.

### A.    This Case Implicates *Bruen*'s "More Nuanced" Approach to the Historical Inquiry

The "nuanced approach" described in *Bruen* is appropriate here.  597

U.S. at 27.  When legislatures charged with protecting the safety of their

communities enact laws addressing novel firearms technologies or societal

concerns, it stands to reason that there will be no historical precursors

addressing those exact same technologies and concerns.  *Cf. McCullen v.*

*Coakley*, 573 U.S. 464, 481 (2014) (governments do not "regulate for

problems that do not exist").  Without "a nuanced approach," *Bruen*'s

"analogical inquiry" would unduly constrain legitimate regulatory efforts in

precisely the way that the Supreme Court warned against.  *Bruen*, 597 U.S.

at 27-28, 29.  In this case, a more nuanced analogical approach is required.

During the founding and Reconstruction eras, firearms were made by hand,

in a time consuming and laborious process.  Because they could not be mass

produced or distributed quickly, they were not widely available for bulk

purchase.  While legislatures still established regulations to prevent firearms

from ending up in the hands of those who could not lawfully possess them,

large-scale firearms trafficking and straw purchasing simply did not present the same concern that it does today.

Modern firearms manufacturing also differs dramatically from the manufacturing and distribution technologies available at the founding. During the eighteenth century, "producing a muzzle-loading musket or rifle" required a "great deal of time" and a "varied skill set." 2-ER-049. Producing the barrel alone required two men with blacksmithing skills to work for several days. *Id.* The most "demanding job" was making the lock mechanism necessary for firing; it "required an ability to work with both iron and steel." 2-ER-049–050. And even when those initial components were complete, additional work was necessary to "rough out and finish" a gun's wooden stock, and to cast, fit, and mount other brass components on the firearm. 2-ER-050. A founding-era gunsmith with adequate assistants and the ability to outsource the most intricate components would have been able to make only two or three muskets a week. *Id.*

Given the difficulty of producing firearms, most gunsmiths spent their time repairing firearms instead of making new ones. 2-ER-055; 2-ER-056; 2-ER-059; 2-ER-060; 2-ER-072. An accounting book from a Massachusetts gunsmith indicates that he made only three new guns during a 20-year period from 1768-1788, while performing 452 repairs on existing firearms.

2-ER-050–051. And because firearms were essentially artisanal goods that required significant labor and materials, they were prohibitively expensive for many early Americans. *See* 2-ER-076–077.[7]

By the time the Fourteenth Amendment was ratified, manufacturing advances increased the availability and lowered the cost of some firearms. 2-ER-113–114. But existing distribution networks still did not allow for the kinds of bulk firearms purchases that are possible today. 2-ER-113. Firearms were sold to the public through local general stores that dealt in a "vast array" of products, "ranging from nails, flour, farm implements and lumber to guns and ammunition." 2-ER-114–115. Those stores were far from modern-day stores; retailers often only had one room to display their products, and kept relatively small inventories for non-necessities. 2-ER-115. Those who wished to buy new firearms had to place orders well in advance and then wait for their order to arrive. 2-ER-115–116. Considering these practical limitations, Americans during this time generally did not acquire guns in bulk. 2-ER-100; 2-ER-118. As a result,

---

[7] This is confirmed by contemporaneous probate records showing that a majority of individuals owned either one gun or no gun at all. 2-ER-054–055. And the minority of those estates with more than one firearm were largely Southern plantation owners who used multiple firearms to control their source of wealth (rather than to engage in self-defense). 2-ER-057–058.

23

governments during the founding and Reconstruction simply did not have to confront the social problems created by the immediate commercial availability of firearms for large purchases.

**B.    California's Law Is Consistent with the Historical Tradition of Regulating the Sale of Weapons to Ensure Dangerous Individuals Do Not Obtain Them**

Applying the more nuanced approach, California's law is consistent with our Nation's historical tradition of firearm regulation.  Throughout the founding and Reconstruction eras, legislatures regulated "where and to whom individuals could sell guns" and many of those regulations served two primary goals: "(1) controlling and tracing the sale of firearms and (2) ensuring dangerous individuals did not obtain firearms."  *United States v. Holton*, 639 F. Supp. 3d 704, 711-712 (N.D. Tex. 2022); *see also United States v. Serrano*, 651 F. Supp. 3d 1192, 1212 (S.D. Cal. 2023).  Those historical precursors are "relevantly similar" to the challenged law.

This tradition dates back to before the founding era.  From the start, colonial legislatures "controlled the [conditions] of firearms trade." *Teixeira*, 873 F.3d at 685; *see id.* at 685 n.18.  Several States restricted the time, place, and manner at which individuals could sell firearms, and to whom they could be sold.  For instance, Connecticut banned the sale of firearms by its residents outside the colony in 1646.  *See* 1 J. Hammond

24

Trumbull, *Public Records of the Colony of Connecticut* 137-39, 145-46 (1850). In 1676, Virginia authorized the sale of firearms and ammunition only to "his majesties loyal[] subjects inhabiting this colony." 2 William Waller Hening, *The Statutes at Large: Being a Collection of All the Laws of Virginia, from the First Session of the Legislature, in the Year 1619* 403 (1823). A 1652 New York law outlawed "Illegal Trade in Powder, Lead and Guns" by "Private persons". E.B. O'Callaghan, *Law & Ordinances of New Netherland, 1638-1674* 128 (1867).

Colonial legislatures also restricted settlers' commerce with Indian tribes. "[U]nder a Virginia law, any person found within an Indian town or more than three miles from an English plantation with arms or ammunition above and beyond what he would need for personal use would be guilty of the crime of selling arms to Indians, even if he was not actually bartering, selling, or otherwise engaging with the Indians." *Teixeira*, 873 F.3d at 685 (citing Acts of Assembly, Mar. 1675-76, 2 William Waller Hening, at 336–37 (1823)); *see also id.* (discussing other firearm sale restrictions enacted in response to the perceived threat posed by Native tribes)[8]; 2-ER-078–082

---

[8] The district court suggested that it may not be "permissible to rely on [these] laws" because they involve "race or ethnicity-based classifications" and "would be unconstitutional today." 1-ER-023 (citations

25

(citing Virginia, Connecticut, New York, Pennsylvania, Maryland, and federal laws).

As firearms commerce continued to develop through the Reconstruction era, legislatures continued to enact laws designed to prevent firearms from ending up in the hands of those who were not law abiding, responsible citizens. For instance, many jurisdictions developed licensing schemes to keep dangerous individuals from carrying concealed firearms in public. *See, e.g.*, Ordinances of Jersey City Passed by the Board of Aldermen Since May 1, 1871, at 87, An Ordinance in Relation to the Carrying of Dangerous Weapons, § 3 (1873) (authorizing Municipal Court of Jersey City to issue permits to carry listed weapons to individuals who are "temperate, of adult age, and capable of exercising self-control");

---

omitted). Although these Native American laws would be unconstitutional today and the Attorney General disapproves of their particularly odious application in the past, they can still confirm traditions of firearm regulation. *See* William Baude & Stephen E. Sachs, *Originalism & the Law of the Past*, 37 L. & Hist. Rev. 809, 813 (2019) ("Present law typically gives force to past doctrine, not to that doctrine's role in past society."); *see also* Jacob D. Charles, *On Sordid Sources in Second Amendment Litigation*, 76 Stan. L. Rev. Online 30, 37 (2023) ("Without a full picture of past laws—the prosaic and prejudiced alike—courts risk impermissibly narrowing the range of legislative options the ratifiers understood to be consistent with the right to keep and bear arms."). This Court has considered such laws in the past to determine the historical scope of the Second Amendment. *See Teixeira*, 873 F.3d at 685.

Ordinances of the Mayor, Aldermen and Commonalty of the City of New

York, in force January 1, 1881, art. 27, § 265, at 214-216 (Elliott F. Shepard

& Ebenezer B. Shafer eds., 1881) (New York, New York) (permit may issue

if the applicant "is a proper and law-abiding person"); Sacramento, Cal.,

Ordinance No. 84: Prohibiting the Carrying of Concealed Deadly Weapons

(1876), *reprinted in* Charter and Ordinances of the City of Sacramento 173

(R.M. Clarken ed., 1896) (concealed carry permit may be granted to "any

peaceable person whose profession may require him to be out at late hours

of the night"); Scandia, Kan., Ordinance No. 79: An Ordinance Relating to

Crimes and Punishments (1893), *reprinted in* Scandia Journal, Jan. 5, 1894,

at 8 (concealed carry permit may be granted to any person "engaged in a

lawful occupation and of good moral character").[9]  Those licensing and

permitting requirements are "part of the historical tradition of firearm

regulation" and, sought to "circumscribe[]" the right to keep and bear arms

"to preserve the peace and public safety."  *Baird v. Bonta*, __ F. Supp. 3d __,

2023 WL 9050959, at \*36 (E.D. Cal. Dec. 29, 2023).

---

[9] Rewritten copies of these ordinances and other similar ordinances
can be found in the appendix to the Brief for Patrick J. Charles as Amicus
Curiae Supporting Neither Party, *Bruen*, 597 U.S. 1 (2022) (No. 20-843),
2021 WL 3145961.

States also passed laws forbidding the sale of firearms to intoxicated individuals because of the concern for impulsive firearm violence. *See State v. Christen*, 958 N.W.2d 746, 766 (Wis. 2021) (Hagerdon, J., concurring) (citing An Act to Prevent the Carrying of Concealed Weapons and for Other Purposes, 1878 Miss. Laws 175, § 2). Those laws, like the challenged law here, served as a mechanism for States to prevent dangerous persons from acquiring and possessing firearms. Some states went even further and banned the carry of firearms while intoxicated, which similarly served as a mechanism for States to prevent such individuals from carrying arms. *See id.* (citing 2 Gen. Stats. of the State of Kan. 353 (1897)). These laws, viewed "as a whole," aimed to "curtail the reckless handling of firearms" to promote public safety. *Id.*

Legislatures also began to "require[] firearm dealers to register and track their sales." 2-ER-111. Beginning in 1881, Illinois required every dealer to keep a register of all sales of deadly weapons "capable of being secreted upon the person." 2-ER-111–112. The District of Columbia adopted a similar requirement in 1892, which required dealers to maintain "a written register of the name and residence of every purchaser, barterer, hirer, borrower, or done of any such weapons." 27 Stat. 116 (1892), ch. 159, § 5.

28

In certain instances, governments even outlawed the sale of entire classes of weapons that were particularly associated with interpersonal violence, to prevent them from ending up in criminal hands. 2-ER-101. For example, to protect citizens from the prevalent use of deadly weapons, Georgia and Tennessee passed statutes making it unlawful to sell certain kinds of knives, pistols, and swords. 2-ER-105–106, 2-ER-108 (citing 1837 Ga. Acts, ch. 90; 1838 Tenn. Acts, ch. 137; 1879 Tenn. Pub. Act 135-136, ch. 96, § 1). Vermont, New York, Kentucky, Florida, Illinois, Massachusetts, North Dakota, and Oklahoma prohibited the sale of slung shots and metal knuckles. 2-ER-107. These laws were generally upheld as appropriate exercises of the State's police powers. 2-ER-109–110.

What is more, all of these laws existed alongside numerous vendor licensing, taxation, and other regulations, which States and colonial legislatures enacted even though they limited "the [immediate] availability and use" of weapons and ammunition "for private, every day purposes." 2-ER-102. To take one example, colonial and State regulations closely controlled commerce in gunpowder, including by requiring manufactures and vendors to obtain a special license before they could sell it. *See*, *e.g.*, Act of 1651, *The Colonial Laws of Massachusetts* 126 (1887) (requiring individuals to obtain "[l]icense . . . from some two of the Magistrates" to

29

export gunpowder); Act of December 1775, Charles J. Hoadly, *Public Records of the Colony of Connecticut* 191 (similar).  States also adopted similar licensing requirements for firearms dealers throughout the nineteenth century.  *See, e.g.*, 1838 Fla. Laws. 24 (prohibiting anyone from selling certain weapons unless they paid a tax and received a "written certificate"); 1893 S.C. Acts 426, § 2 (license required for the sale of pistols); William J. Novak, *The People's Welfare, Law and Regulation in Nineteenth Century America* 91 (discussing an Alabama statute requiring a license for "dealers in firearms"); 2-ER-108 (citing 1879 Tenn. Pub. Acts 135-136, ch. 96, § 1).

States also imposed taxes on the sale of firearms and other deadly weapons.  *See, e.g.*, An Act to Suppress the Use of Bowie Knives, 1837 Ala. Laws 7, § 2 (imposing a $100 tax on each Bowie knife sold in the state); An Act Entitled "Revenue," 1856-1857 N.C. Sess. Laws 34, ch. 34, § 23, pt. 4 (taxing pistols); An Act to authorize the Justices of the Inferior Courts of Camden, Glynn and Effingham counties to levy a special tax for county purposes, and to regulate the same, 1866 Ga. Law 27, § 3 (taxing each gun, pistol, musket, or rifle over the number of three owned on a plantation); An Act to Tax Guns and Pistols in the County of Washington, 1867 Miss. Laws 327, § 1 (taxing each gun or pistol owned in the county); 1867 Ala. Code

30

169, § 10 (taxing all pistols and revolvers in the possession of private individuals).

California's law is consistent with that historical tradition of firearm regulation, aimed at limiting possession of arms by those deemed unvirtuous or dangerous.  Considered as a whole, this history demonstrates that founding and Reconstruction era legislatures would not have believed it beyond the power of the government to require firearm purchasers to comply with a 30-day waiting period in between firearm transactions conducted directly with licensed firearms dealers.  Rather, the law is supported by "relevantly similar" historical precursors.  Those precursors imposed comparable burdens:  they imposed administrative requirements that restricted firearm transactions, constrained the immediate availability of firearms to purchasers, and limited the ability of individuals to sell (and consequently purchase) firearms.  If anything, the challenged provisions are *less* burdensome than other restrictions imposed throughout history—for instance, laws which banned entire classes of weapons to prevent their use in criminal activity.  Finally, these historical laws were comparably justified by the need to prevent firearms from ending up in the hands of those believed to present particular threats to public safety.  The one-gun-a-month

31

requirements act as a backstop to enforce similar disqualifications on firearm possession.

### C.    The District Court's Historical Analysis Was Flawed

In reaching a different conclusion about the constitutionality of California's law, the district court employed a flawed historical analysis. Although the district court acknowledged *Bruen*'s directive that States need not identify "a historical twin" (1-ER-019), its analysis effectively required the State to provide "a dead ringer for historical precursors," *Bruen*, 597 U.S. at 30.  For example, the district court discounted the regulations identified by the Attorney General because they did not impose "temporal limit[s]" on its acquisition; imposed "neither a quantity nor time limitation;" and set aside the restrictions on the sale of deadly weapons because they imposed a  "flat ban" as opposed to a "restriction on the frequency." 1-ER-022; 1-ER-024; 1-ER-025; 1-ER-026.

That analysis conflicts with *Bruen*'s central premise that the State need not proffer a "dead ringer" and may draw analogies to "relevantly similar" laws that arose in different contexts but imposed comparable burdens.  597 U.S. at 3, 27-28, 29.  And as described above, a court must view the historical record with additional nuance, where, as here, a challenged law implicates "dramatic technological changes" that give rise to "regulatory

32

challenges" that did not confront earlier generations. *Id*. at 27. The record reflects that throughout much of American history, manufacturing and distribution limitations made it difficult for firearm owners to purchase firearms in bulk within relatively brief periods of time. *See supra* pp. 22-23. Given that historical reality, it is unsurprising that legislatures did not impose many temporal or quantity based restrictions on firearms purchases.

Taking things even further, the district court distinguished the historical regulations identified by the State based on a misunderstanding of those regulations and the challenged laws. In particular, the district court purported to distinguish restrictions on firearm sales to Native Americans because they "targeted only a narrow subset of the population perceived as dangerous." 1-ER-023. In reality, those restrictions targeted colonists and prohibited them from selling firearms to Native Americans. *See* 2-ER-078–082 (citing Virginia, Connecticut, New York, Pennsylvania, Maryland, and federal laws).

In any event, the district court set aside even those regulations that employed the same types of limitations as the challenged law. The district court set aside a regulation cited in *Teixeira*, 873 F.3d at 685, prohibiting the carrying of more than one gun and ten charges of powder when traveling near any Native town or more than three miles away from an English

33

plantation. 1-ER-024. While acknowledging that the regulation imposed both a quantity and temporal limitation and "comes closest to the [challenged] law," the district court set it aside, on the ground that the State could not rely on a "solitary statute." *Id*. However, the historical evidence should not be isolated. It should be examined "as a whole" to "determin[e] whether it establishes a tradition of permissible regulation." *Perez-Garcia*, 96 F.4th at 1191; *see also Antonyuk v. Chiumento*, 89 F.4th 271, 303 (2d Cir. 2023) ("it is [] not dispositive whether *comparable* historical regulations exist in significant numbers"). As described above, the historical record reflects an enduring tradition of regulating commerce in firearms to prevent dangerous weaponry from ending up in the hands of those believed to present particular risks to public safety. California's restrictions are "relevantly similar" to the regulations imposed under that historical tradition.

Finally, the district court distinguished the historical taxing and licensing regulations from the challenged law because they "regulated only the seller." 1-ER-026. But the challenged law also regulates the seller. § 27540(f) (prohibiting the dealer from delivering a firearm when an individual has purchased a firearm within the preceding 30 days).

34

Instead of considering the Nation's historical regulations as a whole, the district court isolated each historical regulation and essentially "ask[ed] if it differ[ed] from the challenged regulation in some way." *Perez-Garcia*, 96 F.4th at 1191. This "divide-and-conquer approach" is not the proper standard when conducting the *Bruen* historical analysis and "misses the forest for the trees." *Id*. Indeed, under the district court's view of history and *Bruen*, it appears that no temporal or quantity regulation on the commercial sale of firearms would be "consistent with the Nation's historical tradition." *Bruen*, 597 U.S. at 24. That is exactly the kind of "regulatory straightjacket" that the Supreme Court disclaimed. *Id.* at 30.

## CONCLUSION

The judgment of the district court should be reversed, and this Court should remand for entry of judgment in favor of the Attorney General.

35

Dated:  May 13, 2024          Respectfully submitted,


ROB BONTA
Attorney General of California
THOMAS S. PATTERSON
Senior Assistant Attorney General
ANTHONY R. HAKL
Supervising Deputy Attorney General

*/S/ JERRY T. YEN*

JERRY T. YEN
Deputy Attorney General
*Attorneys for Defendants-Appellants Rob
Bonta and Allison Mendoza, in their official
capacities*

## STATEMENT OF RELATED CASES

To the best of our knowledge, there are no related cases.

Dated:  May 13, 2024                Respectfully submitted,

                                    ROB BONTA
                                    Attorney General of California
                                    THOMAS S. PATTERSON
                                    Senior Assistant Attorney General
                                    ANTHONY R. HAKL
                                    Supervising Deputy Attorney General

                                    */S/ JERRY T. YEN*

                                    JERRY T. YEN
                                    Deputy Attorney General
                                    *Attorneys for Defendants-Appellants Rob*
                                    *Bonta and Allison Mendoza, in their official*
                                    *capacities*

37

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)**     24-2036

I am the attorney or self-represented party.

**This brief contains** 7,495 **words,** including 0 words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

(●) complies with the word limit of Cir. R. 32-1.

( ) is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

( ) is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

( ) is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

( ) complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

    [ ] it is a joint brief submitted by separately represented parties.
    [ ] a party or parties are filing a single brief in response to multiple briefs.
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

( ) complies with the length limit designated by court order dated [          ].

( ) is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature**   s/ Jerry T. Yen          **Date**   May 13, 2024

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*