**No. 24-2036**

# In the
# United States Court of Appeals
# for the Ninth Circuit

◆

MICHELLE NGUYEN, et al.*,*

*Plaintiffs–Appellees,*

v.

ROB BONTA, IN HIS OFFICIAL CAPACITY AS
THE CALIFORNIA ATTORNEY GENERAL, et al.,

*Defendants–Appellants.*

◆

On Appeal from the United States District Court
for the Southern District of California
Case No. 3:20-cv-02470-WQH-MMP
The Honorable William Q. Hayes

◆

**APPELLEES' ANSWER BRIEF**

◆

RAYMOND M. DIGUISEPPE
THE DIGUISEPPE LAW FIRM, P.C.
116 N. Howe Street, Suite A
Southport, NC 28461
Telephone: (910) 713-8804
Email: law.rmd@gmail.com

*Counsel for Plaintiffs-Appellees*

## CORPORATE DISCLOSURE STATEMENT

Plaintiffs-Appellees submit this corporate disclosure and financial interest statement pursuant to Federal Rule of Appellate Procedure 26.1.

Second Amendment Foundation, Inc., has no parent corporation, nor is there any publicly held corporation that owns more than 10% of its stock.

Firearms Policy Coalition, Inc., has no parent corporation, nor is there any publicly held corporation that owns more than 10% of its stock.

North County Shooting Center, Inc., has no parent corporation, nor is there any publicly held corporation that owns more than 10% of its stock.

San Diego County Gun Owners PAC has no parent corporation, nor is there any publicly held corporation that owns more than 10% of its stock.

PWGG, L.P., has no parent corporation, nor is there any publicly held corporation that owns more than 10% of its stock.

/s/ *Raymond M. DiGuiseppe*
*Counsel for Appellees*

i

# TABLE OF CONTENTS

INTRODUCTION............................................................................1

STATEMENT OF JURISDICTION...............................................2

ISSUE PRESENTED....................................................................3

STATEMENT OF THE CASE........................................................3

SUMMARY OF ARGUMENT.........................................................6

STANDARD OF REVIEW.............................................................8

ARGUMENT................................................................................8

    I.    The Conduct Banned Under the OGM Law is Undoubtedly Covered Under the Text of the Second Amendment.......................................................11

        A.    The Conduct Falls Squarely Within the Plain Text.................................................................13

        B.    The OGM Law is Presumptively *Un*lawful.........18

    II.    The State Falls Far Short of Carrying Its Burden to Prove the Required Historical Basis for the OGM Law..................................................................25

        A.    The Relevant Historical Period Under *Bruen*.....26

        B.    The Standards for "Relevant Similarity"............31

        C.    No Leniency or other "Nuance" is Appropriate, as the OGM Law Must Bear the Full Brunt of *Bruen*.................................................................32

ii

# TABLE OF CONTENTS

**ARGUMENT II. (continued)**

    D.    **The State's Purported Analogues Fall Far Short**............................................................40

        1.    **The Prevailing General Traditions**............41

        2.    **Restrictions on Trade with Native Americans**..................................45

        3.    **Loyalty Oath and Allegiance Conditions**....48

        4.    **Permits to Carry**.........................................49

        5.    **Public Intoxication**...................................50

        6.    **"Deadly Weapons" Restrictions**.................51

        7.    **Gunpowder Storage Regulations**...............53

        8.    **Taxing and Licensing Conditions**...............54

        9.    **Registration and Tracking**.........................55

    E.    **Individually or Collectively, No Viable Historical Analogue Exist to Rescue the OGM Law**.............57

# TABLE OF CITED AUTHORITIES

**Cases**

*Caliber One Indem. Co. v. Wade Cook Financial Corp.*
    491 F.3d 1079 (9th Cir. 2007)....................................................8

*District of Columbia v. Heller*
    554 U.S. 570 (2008)...........................................*passim*

iii

# TABLE OF AUTHORITIES

*Gamble v. United States*
  587 U.S. 678 (2019)……………………………………………27, 28

*Heller v. District of Columbia*
  670 F.3d 1244 (D.C. Cir. 2011)………………………………30

*Khan v. State Oil Co.*
  93 F.3d 1358 (7th Cir. 1996)……………………………27, 28

*Maryland Shall Issue, Inc. v. Moore*
  86 F.4th 1038 (4th Cir. 2023)………………………………14

*McDonald v. City of Chicago*
  561 U.S. 761, 765 (2010)…………………………18, 27, 31, 32, 34, 35

*McRorey v. Garland*
  99 F.4th 831 (5th Cir. 2024)………………………………...18

*N.Y. Rifle & Pistol Ass'n, Inc. v. Bruen*
  597 U.S. 1 (2022)……………………………………………*passim*

*Pena v. Lindley*
  898 F.3d 969 (9th Cir. 2018)………………………………20

*State Oil Co. v. Khan*
  522 U.S. 3 (1997)……………………………………………28

*Teixeira v. County of Alameda*
  873 F.3d 670 (9th Cir. 2017)………………………………16, 25

*Thunder Studios v. Kazal*
  13 F.4th 736 (9th Cir. 2021)………………………………...15

*Tyler v. Hillsdale County Sheriff's Department*
  837 F.3d 678 (6th Cir. 2016)………………………………22

iv

# TABLE OF AUTHORITIES

*United States v. Alaniz*
    69 F.4th 1124 (9th Cir. 2023)……………………………………………40

*United States v. Diaz*
    876 F.3d 1194 (9th Cir. 2017)……………………………………………44

*United States v. Chester*
    628 F.3d 673 (4th Cir. 2010)……………………………………………22

*United States v. Duarte*
    __ F.4th __, 2024 WL 2068016 (9th Cir. May 9, 2024)………*passim*

*United States v. Perez-Garcia*
    96 F.4th 1166 (9th Cir. 2024)……………………………………23, 57

**Constitutional Provisions**

U.S. Const. amend. I ................................................................15

U.S. Const. amend. II ..............................................................*passim*

U.S. Const. amend. XIV ................................................23, 26

**Statutes and Regulations**

18 U.S.C. § 922……………………………………………………22, 23

28 U.S.C. § 1291……………………………………………………3

28 U.S.C. §1331……………………………………………………2

28 U.S.C. § 1343……………………………………………………2

28 U.S.C. § 2201……………………………………………………2

28 U.S.C. § 2202……………………………………………………2

# TABLE OF AUTHORITIES

42 U.S.C. § 1983............................................................................2

42 U.S.C. § 1988............................................................................2

Cal. Pen. Code § 16520...................................................................3

Cal. Pen. Code § 27535.......................................................2, 3, 4, 5

Cal. Pen. Code § 27540.....................................................2, 3, 5, 21

Indian Trade and Intercourse Act (1790)......................................47

## Other Authorities

C. Sunstein, On Analogical Reasoning, 106 Harv. L. Rev. 741, 773 (1993)
Cramer, Clayton E., *Colonial Firearms Regulation* (2016)..................31

James Lindgren and Justin L. Heather*, Counting Guns in Early America*,
43 Wm. & Mary L. Rev. 1777 (2002)................................................43

Joseph G.S. Greenlee, *Disarming the Dangerous: The American
Tradition of Firearm Prohibitions*, 16 Drexel L. Rev. 1 (2024)..............23

Joseph G.S. Greenlee, *The Right to Train: A Pillar of the Second
Amendment*, William & Mary Bill of Rights Journal (2022-2023).........43

Mark W. Smith, *"Not All History Is Created Equal": In the Post-*Bruen
*World, the Critical Period for Historical Analogues Is When the Second
Amendment Was Ratified in 1791, and Not 1868* (Oct. 1, 2022)............27

Nicholas J. Johnson, *et al.*, *Firearms Law and the Second Amendment:
Regulation, Rights, and Policy* (3d ed. 2021)....................................42

Randolph Roth, *American Homicide* 27 (2009)................................36

# TABLE OF AUTHORITIES

Solomon K. Smith, "*Firearms Manufacturing, Gun Use, and the Emergence of Gun Culture in Early North America*".....................39, 45

Stephen P. Halbrook, *The Arms of All The People Should Be Taken Away*, Independent Institute (1989)......................................................49

Stephen Halbrook, *The Right to Bear Arms in the First State Bills of Rights: Pennsylvania, North Carolina, Vermont, and Massachusetts*, Verm. L. Rev. (1985).......................................................41, 42, 43

## INTRODUCTION

This action against California's "one-gun-per-month" or "OGM" law, as it is colloquially known, has been pending for almost four years. Since then, Plaintiffs have been waiting for relief from the law's purchase ban that unconstitutionally prohibits them from purchasing multiple firearms in any 30-day period. That relief finally came in March of this year when the district court issued its opinion granting summary judgment for Plaintiffs, holding that the OGM law is unconstitutional and must be enjoined under *N.Y. Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022).

That was not the end of the litigation road, however, as the State commenced this appeal, seeking to overturn the district court, and obtaining a stay of the injunction against the OGM law pending the appeal. So, not only does this saga of an unconstitutional regime continue, but on appeal the State advances even broader, farther-reaching arguments about its supposed power to continuously enforce this law. *See generally* Appellant's Opening Brief ("AOB"). The State's rationale in support of these arguments is not just untenable constitutionally, but it is alarming. Accepting the State's rationale in

1

support of the OGM law would gut the protections of the Second Amendment elucidated by *Bruen* and allow the State to enforce not just the OGM law, but all manner of firearms regulations based on justifications that have nothing to do with our Nation's tradition of firearms regulation. Instead, California would have the test revert right back to the prohibited interest-balancing analysis that the *Bruen* Court so emphatically repudiated. The district court was correct. This law and its unconstitutional enforcement must come to an end.

## STATEMENT OF JURISDICTION

The district court had subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343 in that this action arises under the Constitution and laws of the United States, specifically the Second Amendment to the United States Constitution, and relief is sought under 28 U.S.C. §§ 2201, 2202 and 42 U.S.C. §§ 1983 and 1988. The district court granted Plaintiffs' motion for summary judgment, entered judgment in their favor, and enjoined enforcement of California Penal Code Sections 27535 and 27540(f)—stayed pending the State's appeal to this Court. 1-ER-003. The State filed a notice of appeal the following day. 2-ER-266–267. This

Court has jurisdiction over the appeal under 28 U.S.C. § 1291, because the State is appealing a final judgment of the district court.

## ISSUE PRESENTED

Whether California's law prohibiting the commercial sale and purchase of more than one handgun and/or semiautomatic centerfire rifle within any 30-day period, as provided in California Penal Code Sections 27535 and 27540(f), violates the Second Amendment.

## STATEMENT OF THE CASE

This action was commenced in December of 2020, challenging the constitutionality of the restrictions under California Penal Code Sections 27535 and 27540(f) prohibiting the commercial sale and purchase of more than one handgun, semiautomatic centerfire rifle, or any combination of the same, within any 30-day period. 2-ER-261; 2-ER-263–264.[1] The prohibition applies to ordinary, law-abiding citizens in California with limited exceptions not applicable here. *Id.*; *see* Cal. Pen. Code

---

[1] Since then, the law has been expanded, effective January 1, 2024, to apply to any "firearm," Cal. Stats. 2022, ch. 711 (A.B. 1080), §§ 19, 20, defined under California Penal Code section 16520 as any "device, designed to be used as a weapon, from which is expelled through a barrel, a projectile by the force of an explosion or other form of combustion," including "the frame or receiver of the weapon, including both a completed frame or receiver, or a firearm precursor part."

§ 27535(b)(7), (8), (11).[2] Plaintiffs are four individuals who desire to commercially purchase more than one handgun, semiautomatic centerfire rifle, or a combination of the same, within a 30-day period ("Individual Plaintiffs"); three organizational entities whose California-resident members seek to do the same (and who count Individual Plaintiffs as members); and two firearm retailers and their respective owners who desire to engage in such transactions with their customers. 2-ER-225–229; 2-ER-245–249; 2-ER-263–264.

After an initial round of cross-motions for summary judgment in 2022, the district court ordered supplemental briefing in light of the Supreme Court's intervening opinion in *Bruen*. Dkt. Nos. 23, 29, 38.[3] The court ultimately granted summary judgment in favor of the State on the equal protection challenge but denied both parties' motions as to the Second Amendment and reopened discovery to afford the State an

---

[2] Effective January 1, 2025, certain exceptions for "private party" transactions will be narrowed so as to exempt only private transactions compelled by court order or required to transfer a firearm due to the death of its owner. Cal. Stats. 2023, ch. 246 (A.B. 1483), § 2.

[3] "Dkt." refers to the district court docket unless otherwise indicated.

4

opportunity to develop evidence that the OGM law "is consistent with the Nation's historical tradition of firearm regulation." Dkt. No. 49 at 11.

The parties then brought renewed cross-motions for summary judgment. Dkt. Nos. 59, 60. After conducting a hearing on the matter, Dkt. No. 68, the court issued an order denying the State's motion and granting Plaintiffs' motion, Dkt. No. 69; 1-ER-027. The court concluded that "Plaintiffs' proposed conduct is presumptively protected because it is covered by the plain text of the Second Amendment," 1-ER-19, and that the State failed to satisfy its burden of "producing a 'well-established and representative historical analogue' to the OGM law," 1-ER-26 (quoting *Bruen*, 597 U.S. at 30), compelling judgment in Plaintiffs' favor.

The district court entered judgment accordingly, enjoining California from enforcing Sections 27535 and 27540(f), although staying enforcement of the judgment for 30 days pending the State's appeal. 1-ER-003. After the State filed its appeal, 2-ER-266–267; C.A.9 Dkt. No. 6, a motions panel of this Court stayed the injunction pending appeal and expedited briefing and argument, C.A.9 Dkt. No. 9.

## SUMMARY OF ARGUMENT

It's plain as day that the text of the Second Amendment covers the conduct prohibited under the OGM law's purchase ban. It is equally clear that this law cannot be classified as a "presumptively lawful" condition on commercial sales but is rather a presumptively *un*lawful ban against the otherwise lawful purchase activity of law-abiding citizens like Plaintiffs seeking to acquire protected arms for lawful purposes.

A proper historical analysis confirms beyond a shadow of a doubt that the OGM law is in fact unconstitutional. Especially given the patently unconstitutional nature of this law, the State is not entitled to any sort of special treatment or leniency under the *Bruen* framework—in the form of a "more nuanced approach" or otherwise. But even granting it such leeway, as the district court did in assuming a "more nuanced approach" applies, the result is the same: the OGM law finds no support anywhere in the historical record, much less can the State carry its burden of proving that the OGM law is consistent with this Nation's tradition of firearms regulation.

In fact, the vast majority of the purported historical analogues that the State proffers in support of this law fail to even satisfy the threshold

6

qualifications because they come too late in time to be relevant under *Bruen*. Further, all of them fail as proper analogues on their substance. Not one of them bears any resemblance—much less a "relevantly similar" relationship—to the OGM law, whether viewed individually or collectively. This is true in both the "how" and the "why" of the laws, which are far removed from the OGM law in their purposes and effects.

It's no wonder that the OGM law finds no historical companion. It's entirely unprecedented in the relevant history of our Nation, with the first such law not appearing until the 1970s. The reason for its complete absence from the annals is clear: the Founding generation never would have countenanced anything like it. Nor should we, because "The Second Amendment 'is the *very product* of an interest balancing by the people' and it 'surely elevates above all other interests the right of law-abiding, responsible citizens to use arms' " for self-defense. *Bruen*, 597 U.S. at 26 (quoting *District of Columbia v. Heller*, 554 U.S. 570, 635 (2008)). The district court was right to grant judgment in favor of the Plaintiffs, and it should be affirmed.

## STANDARD OF REVIEW

On appeal, "[w]e review de novo the district court's ruling on cross-motions for summary judgment." *Caliber One Indem. Co. v. Wade Cook Financial Corp.*, 491 F.3d 1079, 1082 (9th Cir. 2007).

## ARGUMENT

The gist of the State's argument remains the same as it was below: the proposed conduct—ordinary law-abiding citizens purchasing from licensed dealers more than one handgun or semiautomatic centerfire rifle in any 30-day period for self-defense and other lawful purposes—is subject to constitutional prohibition under the OGM law because: (1) this conduct is not covered under the plain text of the Second Amendment; (2) a prohibition of this conduct is a " 'presumptively lawful regulatory measure[]' " that California "may adopt consistent with the Second Amendment," *Heller*, 554 U.S. at 626-27 & n.26 (2008); and (3) "[e]ven if the Court were to hold (or assume) that the challenged law covers conduct presumptively protected by the Second Amendment, the law is consistent with 'the historical tradition' of firearms regulation," *Bruen*, 597 U.S. at 19. AOB at 1-20.

The first two points the State makes in support of its position collapse into one, as both rest on the (alarming) notion that the government may freely impose any manner or extent of restrictions on the ability of law-abiding citizens to acquire and possess firearms in California so long as the regulatory regime does not create "a functional prohibition on the possession or acquisition of arms." AOB 1, 10, 14, 18. Anything short of that, so the State's rationale goes, is "presumptively lawful" because it "does not deny any individual's right to 'keep' and 'bear' arms" and, indeed, doesn't even implicate the Second Amendment, which only expressly secures *that* conduct against government interference— i.e., the " 'keeping' and 'bearing' " of arms. *Id.* at 9, 13, 18. Under this rationale, the constitutionality of the OGM law is self-proving and thus naturally comes out unscathed, as the State tell us, because it's enough to say, "California residents authorized to possess firearms may collect as many firearms as they would like *subject to the one-gun-a-month regulation*," i.e., "once an individual has purchased a firearm from a licensed firearms dealer, that person only has to wait 30 days to purchase another firearm from a licensed dealer." AOB at 1, 18 (italics added).

9

The State's third point, that the OGM law is nevertheless "consistent with 'the historical tradition' of firearms regulation," rests on a sweepingly broad concept of "historical tradition"—one that captures all manner of regulations ever designed or intended to "prevent[] individuals perceived to pose a danger to the public from obtaining weapons," to "prevent firearms from being transferred to those who could not lawfully possess them," and—in its broadest conception—anything designed or intended to "limit certain individuals from acquiring arms." AOB at 2, 10-11. The State claims it is entitled to build its case for the existence of "relevantly similar" historical analogues around this concept, and that this Court is required to accept them as adequate under *Bruen*, because changes in the "manufacturing, cost, and distribution" of firearms since the Founding era have given rise to "unprecedented societal concerns or dramatic technological changes" that compel a "more nuanced" approach in analyzing the OGM law. AOB at 2, 10-11, 20-23.

The State accordingly marshals evidence of historical regulations nothing like the OGM law—for it is undisputed that no limitations on the frequency or quantity of firearm purchases existed until the 1970s—and whose purported similarity to the OGM law, at best, meet only the least

10

common denominator of the State's articulated "historical tradition." That is, the whole case for the existence of proper analogues relies on regulations designed or intended to prevent acquisition of firearms by "individuals otherwise prohibited from possessing or acquiring," AOB 1, and some of which do not even share that generic connection to the OGM law (like gunpowder storage regulations and sales taxes), *id*. at 24-32.

The State's strained analysis is untenable under *Bruen* and falls far short of justifying the OGM law's entirely unprecedented 30-day purchase ban which finds no support within the historical record. The district court got it right in holding that Plaintiffs' proposed conduct is presumptively protected under the Second Amendment and the State has failed to carry its burden of proving the OGM law is consistent with this Nation's historical tradition of firearm regulation. It should be affirmed.

## I. The Conduct Banned Under the OGM Law is Undoubtedly Covered Under the Text of the Second Amendment.

The Second Amendment undoubtedly protects the ancillary right to acquire arms, for otherwise its protection of the right to keep and bear arms would be meaningless and could be erased by regulating the market for firearms out of existence.

11

"The test that we set forth in *Heller* and apply today requires courts to assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding." *Bruen*, 597 U.S. at 26. So applied, "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Id.* at 17. Then, the government must "justify its regulation" of the conduct. *Id.* It cannot "simply posit that the regulation promotes an important interest." *Id.* "Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.* Importantly, courts may not "engage in independent means-end scrutiny under the guise of an analogical inquiry," because this test "requires judges to apply faithfully the balance struck by the founding generation to modern circumstances." *Id.* at 29 n.7. "The Second Amendment 'is the very *product* of an interest balancing by the people[.]" *Id.* at 26. It is this balance "that demands our unqualified deference," *id.*, not "the determinations of legislatures" or "the evolving product of federal judges," *id.* at 29 n.7.

Thus, "[w]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that

conduct." *Bruen*, 597 U.S. at 17. As this Court recently put it, "[i]f the Second Amendment's plain text protects the person, his arm, and his proposed course of conduct, it then becomes the Government's burden to prove that the challenged law is consistent with this Nation's historical tradition of firearm regulation." *United States v. Duarte*, __ F.4th __, 2024 WL 2068016 at *2 (9th Cir. May 9, 2024).

### A. The Conduct Falls Squarely Within the Plain Text.

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. amend. II. The textual analysis under *Bruen* "focus[es] on the 'normal and ordinary' meaning of the Second Amendment's language." *Bruen*, 597 U.S. at 20 (quoting *Heller*, 554 U.S. at 576-77). As the district court found, "[a]s an initial matter, the parties do not dispute that Plaintiffs are 'people' protected by the Second Amendment or that the weapons at issue are subject to Second Amendment protection as 'arms.' " 1-ER-18.

The Supreme Court has already made clear that the plain language "extends, prima facie, to all instruments that constitute bearable arms" today, *Bruen*, 597 U.S. at 29, that the definition of "arms" "covers modern

instruments that facilitate armed self-defense," *id.*, and that the "right to keep and bear arms" covers " 'the right to possess and carry weapons in case of confrontation,' " *id.* at 32 (quoting *Heller*, 554 U.S. at 2134), even though it does not *expressly* say so. The right to keep and bear arms must also protect the right to acquire firearms—because firearms can be neither kept nor borne without acquiring them first. Thus, the right to keep and bear arms is *infringed* when the ability to acquire firearms is restricted.

The State attempts to evade the fact that a law restricting someone from acquiring a firearm necessarily "infringes" the right to keep and to bear arms by noting that nothing in the text draws a frequency/quantity distinction with respect to the acquisition of firearms for purposes of keeping and bearing them. But that flips the analysis on its head. The Second Amendment declares that the right it protects "shall not be infringed." This does not mean, as the State interprets it, that anything short of a total deprivation of the right avoids even triggering the text of the Amendment. Quite the opposite. Founding era dictionaries reveal that "infringe" "contemplate[s] burdens that fall short of total deprivations." *Maryland Shall Issue, Inc. v. Moore*, 86 F.4th 1038, at n.8

14

(4th Cir. 2023), *reh'g en banc granted, op. vacated*, 2024 WL 124290 (4th Cir. 2023) (collecting dictionary definitions and "other sources that the Supreme Court has used to interpret" the Second Amendment). As such, "Second Amendment scrutiny is not exclusively reserved for laws that wholly or effectively prohibit firearm possession" (or purchase). *Id.*

One cannot demand the Second Amendment *expressly* declare a right to purchase multiple arms within a 30-day period any more than one could demand that the right of "free speech"—which the Supreme Court has "repeatedly compared the right to keep and bear arms," *Bruen*, 597 U.S. at 24—spell out all the forms of speech it protects. *See, e.g.*, *Thunder Studios v. Kazal*, 13 F.4th 736, 745 (9th Cir. 2021) (free speech includes "emails and tweets"). Indeed, the plain language of the Second Amendment secures "the right of the people to keep and bear *Arms*," U.S. CONST. amend. II (emphasis added)—plural.

Even if there were some question about the scope of the plain text in this case, the State actually concedes that "the ability to acquire firearms is an ancillary right necessary to keep and bear arms for self-defense," AOB at 15, and with that, it concedes the essential point: "the Second Amendment's plain text covers" the proposed course of conduct,

15

*Bruen*, 597 U.S. at 17, which concerns the commercial acquisition of more than one of the firearms targeted under the OGM law within a 30-day period, *see* Dkt. No. 67-1, Nos. 1-8 (undisputed facts). Straightaway then, it's clear that "the Constitution presumptively protects that conduct" and the burden shifts to the State to "justify its regulation" of the conduct. *Bruen*, 597 U.S. at 17. As the district court put it, "the right to 'keep' arms necessarily encompasses ancillary rights, including a right to acquire arms, because the 'right to keep and bear arms for self-defense' recognized by *Heller* and *Bruen* 'wouldn't mean much' without the ability to acquire arms." 1-ER-18 (quoting *Teixeira v. County of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017)). Thus, "nothing in the text of the Second Amendment suggests that the Second Amendment right is limited to possession and acquisition of a single firearm," nor "that the acquisition of additional firearms is inherently subject to additional limitations." *Id.* Rather, the court correctly reasoned, "the usage of the term 'arms' in plural suggests the opposite." *Id.*

Yet, the State denies the obvious, claiming no protection exists because the text only applies to "keeping" and "bearing" firearms and the OGM law "places no limit on the number of firearms that law-abiding

16

citizens can 'keep,' nor does it prevent them from 'bear[ing]' arms," as they "may collect as many firearms as they would like subject to the one-gun-a-month regulation." AOB 1, 14.[4] This is not a *textual* argument at all: it ignores the "plain text"—in particular "Arms" in the plural. And the State's focus on the *effects* of the 30-day purchase ban in relation to the rights at stake conflates the textual analysis with the historical analysis under the *Bruen* framework, because the nature and degree of the burden imposed by the OGM law is relevant only to the latter. *See Bruen*, 597 U.S. at 29 (in determining whether the challenged regulation is "relevantly similar" to the government's proffered historical analogues,

---

[4] In denying textual coverage below, the State claimed that ordinary Californians the retain ability to acquire and own multiple guns within 30 days *despite* the OGM's purchase ban, given the exception for "private party" transfers. *See* District Court Dkt. No. 61 at 2. Of course, it is no answer to simply say that the law does not cut off all other possible means to acquire more than one firearm in a 30-day period. *See Heller*, 554 U.S. at 629 ("It is no answer to say, as petitioners do, that it is permissible to ban the possession of handguns so long as the possession of other firearms (i.e., long guns) is allowed."). But the State has now abandoned this argument, because the OGM law is about to be expanded yet again by eliminating the private party exception. *See* AOB at 7 n.4 ("Effective January 1, 2025, the only private party transactions that will be exempted from the OGM law are transactions where the seller is required under state law or court order to relinquish all firearms and where the seller is transferring the firearms due to the death of the owner.").

*Heller* and *McDonald* point toward at least two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense"). The district court rightly recognized the State's error as well, observing:

> To the extent that the nature of the regulation's burden may be properly considered, the Supreme Court has cautioned that such consideration must be subsumed within the subsequent analysis of whether the regulation is consistent with the Nation's historical tradition of firearm regulation.

1-ER-19 (citing *Bruen*, 597 U.S. at 29 & n.7).[5]

## B. The OGM Law is Presumptively *Un*lawful.

The State tries to skate around what the "plain text" compels with the claim that the OGM law is entitled to "presumptively lawful" status, which rests on the same basic rationale as the State's textual argument— that so long as a firearms regulation does not "operate as a functional

---

[5]    The Fifth Circuit's opinion in *McRorey v. Garland*, 99 F.4th 831 (5th Cir. 2024) that the State cites for general support, AOB at 13-14, does not help the State here. *McRorey* recognized that "the Second Amendment extends protection to acquisition." *Id*. at 838 n.18. The court nevertheless held that allowing up to ten days before a person could take possession of a firearm to allow for the completion of a background check was constitutional. But allowing delay as an incidental effect of conducting a background check is a far cry from mandating delay for the sake of delay—that is precisely the type of "abusive" law that "directly" targets Second Amendment rights that even *McRorey* does not countenance. *See id*. at 838.

prohibition on acquiring arms or as a total ban" on "keeping" and "bearing" firearms, it is a presumptively valid regulation. AOB 10, 18-19. And, because the OGM law concerns "the commercial sale of arms," it should be considered "among those 'presumptively lawful regulatory measures' that governments may adopt consistent with the Second Amendment." AOB at 1 (quoting *Heller*, 554 U.S. at 626-27 & n.26). Although the State uses the adverb "*presumptively*" in advocating for "presumptively lawful" status, that is name only: accepting the rationale of its argument would mean all regulations that do not "operate as a functional prohibition on acquiring arms or as a total ban" are *conclusively* constitutional. After all, the State's essential rationale is that such regulations do not even *implicate* the Second Amendment, as discussed above, so they could never *violate* it under this rationale. The district court rightly rejected any such framework as "inconsistent with *Bruen*, which repudiates any consideration of 'how close the law comes to the core of the Second Amendment right and the severity of the law's burden on that right.' " 1-ER-15 (quoting *Bruen*, 597 U.S. at 18).

Indeed, at the outset, it is clear the OGM law is not even entitled to a *presumption* of lawfulness. Besides the claim that this law doesn't

19

"operate as a functional prohibition on acquiring arms or as a total ban," the State's only other argument here is that "[p]resumptively lawful restrictions on commercial sales generally 'go to *where* and *when* such [] sales can take place' as opposed to '*what* can be sold,'" as with the OGM law. AOB at 17-18 (quoting *Pena v. Lindley*, 898 F.3d 969, 1009 (9th Cir. 2018) (Bybee, J., concurring in part and dissenting in part)).

However, As Judge Bybee's opinion explains, "what constitutes a condition and qualification on commercial sales" must relate to "rules of *general* applicability"—i.e., "*ordinary* conditions on commercial sales generally" that go to "the cost of doing business," like "sales taxes," "commercial licenses," "zoning restrictions," and other "health and safety rules imposed on a commercial site"—because such rules "cover a broad range of activities and, hence, must have broad popular acceptance and support." *Pena*, 898 F.3d at 1008-09 (emphasis added). There is nothing "general," "ordinary," or of broadly popular acceptance or support about the historically nascent OGM law, which to this day appears in only a small handful of states. And it's certainly not enough to say that the OGM law concerns *when* commercial firearm sales occur. If it were, the State could enact a purchase ban limiting the number of commercial purchases

20

to one per year, or even one per decade, simply because the regulation goes to "when" the sale may occur. Judge Bybee's opinion cautioned against creating any presumption of "broad construction" that "would serve to restrict rights guaranteed by the Bill of Rights." *Id.* at 1010.

The fallout in applying such an overly "broad construction" is evident in any attempted application of this presumption to the OGM law: this is not a mere "condition" on the commercial *sale* of the protected arms—it is a *ban* on their *sale and purchase* by law-abiding citizens, which persists for 30 days and for no reason other than that the law-abiding citizen previously purchased *one* such arm—and that is, *either* a handgun or a semiautomatic centerfire rifle. Cal. Pen. § 27540(g).

Moreover, even with the label of a "presumptively lawful regulatory measure," the upshot is just that the OGM is *presumed* to be lawful; it does not *evade* the necessary scrutiny under *Bruen*, as the State suggests. *Pena*, 898 F.3d at 1005-08 (outlining case law of the federal circuits recognizing that any presumption of lawfulness arising under the general category of "conditions on commercial sales" is, like any other presumption, subject to rebuttal, since otherwise *any* "condition" could be attached, no matter how destructive to the right of armed self-defense).

21

Otherwise, courts would be "treat[ing] *Heller's* listing of 'presumptively lawful regulatory measures,' for all practical purposes, as a kind of 'safe harbor,' " and doing so " 'approximates rational-basis review, which has been rejected by *Heller*.' " *Tyler v. Hillsdale County Sheriff's Department*, 837 F.3d 678, 686 (6th Cir. 2016) (quoting *United States v. Chester*, 628 F.3d 673, 679 (4th Cir. 2010)). *Heller* "did not invite courts onto an analytical off-ramp to avoid constitutional analysis" or insulate firearms regulations from constitutional scrutiny. *Id.* at 686-87.

In fact, as the State (obliquely) acknowledges in a footnote, this Court recently rejected reliance on the discussion in *Heller* concerning "presumptively lawful" measures even in the specific context of a ban on "the possession of firearms by felons," which was one of the "presumptively lawful" categories of listed in this aspect of *Heller*. *Duarte*, 2024 WL 2068016 (9th Cir. May 9, 2024) (addressing a challenge to 18 U.S.C. § 922(g)(1)'s prohibition on the possession of firearms as applied to those convicted of non-violent felonies). " 'Simply repeat[ing] *Heller's* language' about the 'presumptive[ ] lawful[ness]' of felon firearm bans will no longer do after *Bruen*." *Id.* at *7 (quoting *Pena*, 898 F.3d at 1007 n.18). "*Bruen* expressly 'require[s] courts to assess whether'

22

§ 922(g)(1), [*Bruen*, 597 U.S.] at 26, 142 S. Ct. 2111, like 'any regulation infringing on Second Amendment rights[,] is consistent with this nation's historical tradition of firearm regulation,'" *id.* *7 (quoting *United States v. Perez-Garcia*, 96 F.4th 1166, 1175 (9th Cir. 2024) (citations omitted)).

Further, to the extent any such presumption is to be applied, the *Duarte* court emphasized that the regulation must be "longstanding," meaning it must be consistent with the same sort of historical tradition of regulation that was analyzed in *Heller* and in *Bruen*. *Duarte*, 2024 WL 2068016 at *7 n.3; *id.* (noting that " 'Founding era history is paramount' because, as the Court recognized in *Bruen*, 'not all history is created equal' and '[c]onstitutional rights are enshrined with the scope they were understood to have when the people adopted them') (quoting Joseph G.S. Greenlee, *Disarming the Dangerous: The American Tradition of Firearm Prohibitions*, 16 DREXEL L. REV. 1, 73 (2024)). The district court's reasoning in this case is fully in accord: "the position that a purely twentieth century regulation can be considered 'longstanding' in the absence of any relevant historical analogue at the time of the ratification of the Bill of Rights and/or Fourteenth Amendment is at odds with *Bruen*." 1-ER-16 (citing *Bruen*, 597 U.S. at 66 n.28).

23

In fact, "[h]ad the Court in *Bruen* endorsed simply deferring to *Heller's* 'presumptively lawful' footnote, the outcome of that case would have been much different." *Duarte*, 2024 WL 2068016 at *7. " '[L]aws forbidding the carrying of firearms in sensitive places' were another one of the categories of longstanding ... and 'presumptively lawful regulatory measures' that *Heller's* footnote mentioned." *Id.* (quoting *Heller*, 554 U.S. at 626–27). Yet "the *Bruen* Court rejected, as having 'no historical basis,' the argument that New York [could] effectively declare the island of Manhattan a 'sensitive place' where public carry could be categorically banned," despite "New York's 'attempt[ ] to characterize [its] proper-cause requirement as a [longstanding] sensitive-place' regulation under *Heller*." *Id.* (quoting *Bruen*, 597 U.S. at 30–31). Among the other reasons that the OGM law is not entitled to any presumption of lawfulness and that any such presumption is swiftly rebutted, it is indisputably not "longstanding" since it long "postdat[es] the 19th century." *Id.* Thus, just as the district court explained in its opinion, "[c]aselaw within this Circuit and elsewhere establish that the OGM law would not qualify as 'longstanding' even under the pre-*Bruen* approach," the notion that "a purely twentieth century regulation could be considered longstanding

24

absent some relevant historical analogue" is "inconsistent with *Bruen* itself," and "the first OGM law nationally was not passed until 1975, and California's law was passed in 1999," thus foreclosing the State's attempt to insulate the OGM law from constitutional scrutiny. 1-ER-16-17.

Instead, the OGM law is subject to " 'a full textual and historical review,' " 1-ER-17 (quoting *Teixeira*, 873 F.3d at 683), and under the test "set forth in *Heller* and appl[ied]" in *Bruen*. *Bruen*, 597 U.S. at 26. It's no wonder that the State goes to such lengths to avoid such scrutiny of this law, as the OGM law's 30-day purchase ban finds no constitutional basis anywhere in our Nation's tradition of firearm regulation.

## II. The State Falls Far Short of Carrying Its Burden to Prove the Required Historical Basis for the OGM Law.

To justify a regulation as "consistent with the Second Amendment's text and historical understanding," the government must demonstrate by "analogical reasoning" the existence of "a proper analogue." *Bruen*, 597 U.S. at 28. At the outset, the vast majority of the historical regulations that the State proffers as "proper analogues" hail from the mid to late 1800s, several are limited to a small number of unique or unusual laws, and several others are isolated to a few municipalities across the colonies. AOB 24-32 (apart from a 1646 and a 1652 law restricting firearms trade

with Native Americans, one gunpower storage law from 1651, and one "loyalty oath" law from 1676, the State cites various regulations enacted between 1837 and 1900, the bulk of which were enacted between the 1860s and 1890s). And even with all that, they have not cited *any* regulation that would have imposed an arbitrary limitation on how often individuals could acquire firearms. That is fatal to the State's case.

### A. The Relevant Historical Period Under *Bruen*

"[W]hen it comes to interpreting the Constitution, not all history is created equal." *Bruen*, 597 U.S. at 34. Foremost, " '[c]onstitutional rights are enshrined with the scope they were understood to have when the people adopted them.' " *Id.* (quoting *Heller*, 554 U.S. at 634-35). While "[s]trictly speaking," the States are explicitly "bound to respect the right to keep and bear arms because of the Fourteenth Amendment," adopted in 1868, "we have generally assumed that the scope of the protection applicable to the Federal Government and States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791." *Id.* at 37. Again, the standard established in *Bruen* "requires judges to apply faithfully the balance struck *by the founding generation* to modern circumstances" in deciding Second Amendment claims. *Id.* at 29 n.7

26

(emphasis added); *see also* Mark W. Smith, *"Not All History Is Created Equal": In the Post-*Bruen *World, the Critical Period for Historical Analogues Is When the Second Amendment Was Ratified in 1791, and Not 1868* (Oct. 1, 2022), available at https://bit.ly/3CMSKjw.

While "there is an ongoing scholarly debate" over whether the understanding of the Second Amendment in 1791 or 1868 should be considered primary, that issue need not be resolved when "the public understanding of the right to keep and bear arms in both 1791 and 1868 was, for all relevant purposes, the same with respect to" the rights at stake. *Bruen*, 597 U.S. at 38. What is more, while *Bruen* flagged this scholarly debate for possible future Supreme Court consideration, lower courts are bound to look to 1791 given the Court's repeated holdings that (1) 1791 is the key date for interpreting the Bill of Rights against the federal government, *see, e.g.*, *Gamble v. United States*, 587 U.S. 678, 702 (2019), and (2) that incorporated provisions of the Bill of Rights have the same meaning when applied against the states as applied against the federal government, *see, e.g.*, *McDonald*, 561 U.S. at 765; *Khan v. State Oil Co.*, 93 F.3d 1358, 1363 (7th Cir. 1996) (lower courts must follow Supreme Court holdings until overruled by the Supreme court), *vacated*

*by State Oil Co. v. Khan*, 522 U.S. 3, 20 (1997) (overruling but noting that the "Court of Appeals was correct in applying [*stare decisis*] . . . for it is this Court's prerogative alone to overrule one of its precedents").

As for periods of time other than those surrounding the Founding Era, some may bear a degree of secondary significance while others may have little to no bearing. English common law prevailing at the time the Constitution "was framed and adopted" may have some relevance, *Bruen*, 597 U.S. at 39, but anything that "long predates" 1791 or 1868 is generally suspect because it may not accurately "illuminate the scope of the right," *id.* at 34. The period "immediately after its ratification through the end of the 19th century" can be a "critical tool of constitutional interpretation," but "we must also guard against giving postenactment history more weight than it can rightly bear." *Id.* at 35. The main purpose of consulting such evidence is to *confirm* the public understanding of the right to keep and bear arms at the time Second Amendment was adopted. *Id.* at 36-37 (quoting *Gamble*, 587 U.S. at 701-02) (the mid-to-late 19th century evidence considered in *Heller* "was 'treated as mere confirmation of what the Court thought had already been established' "); *Heller*, 554 U.S. at 600-01 ("Our interpretation is confirmed by analogous arms-

28

bearing rights in state constitutions that preceded and immediately followed adoption of the Second Amendment.").

Standing alone, evidence from the mid-to-late 19th century "do[es] not provide as much insight into its original meaning as earlier sources." *Bruen*, 597 U.S. at 36. Similarly, "late-19th-century evidence cannot provide much insight into the meaning of the Second Amendment when it contradicts earlier evidence." *Id.* at 66. Laws from this period that "conflict with the Nation's earlier approach to firearm regulation, are most unlikely to reflect 'the origins and continuing significance of the Second Amendment' and we do not consider them 'instructive.'" *Id.* at 67 (quoting *Heller*, 554 U.S. at 614, and referring specifically to the time period of 1861 to 1890); *id.* at 82-83 (Barrett, J., concurring) ("[T]oday's decision should not be understood to endorse freewheeling reliance on historical practice from the mid-to-late 19th century to establish the original meaning of the Bill of Rights.").

Nor does "20th-century historical evidence" that "contradicts earlier evidence" "provide insight into the meaning of the Second Amendment." *Bruen*, 597 U.S. at 66 n.28. The same goes for any other "later history" that "contradicts what the text says," because " 'post-

ratification adoption or acceptance of laws that are *inconsistent* with the original meaning of the constitutional text obviously cannot overcome or alter that text.' " *Id.* at 36 (quoting *Heller v. District of Columbia*, 670 F.3d 1244, 1274 n.6 (D.C. Cir. 2011) (Kavanaugh, J., dissenting)).

It follows all of the State's proffered analogues from the mid to late 1800s necessarily fail as valid comparisons right out of the gate. *See Bruen*, 597 U.S. at 82 (Barrett, J., concurring) ("[I]f 1791 is the benchmark, then New York's appeals to Reconstruction-era history would fail for the independent reason that this evidence is simply too late..."). This includes all the purported analogues involving: (1) permit-to-carry schemes (Jersey City 1871; Sacramento City 1876; New York City 1881; Scandia, Kansas 1893), AOB at 26-27, Addendum A-49 & A-53; (2) prohibitions against carrying arms in public while intoxicated (Kansas 1868; Mississippi 1878), AOB at 28; (3) registration and tracking requirements (Illinois 1881; District of Columbia 1892; Birmingham, Alabama 1900), AOB 28; (4) sales restrictions on "deadly weapons" (Vermont 1849; New York 1849; Kentucky 1855; Florida 1868; Illinois 1881; Massachusetts 1882; North Dakota 1883, Oklahoma 1890), AOB 29; and (5) licensing and taxation conditions on weapons (Alabama 1837;

30

Florida 1838; North Carolina 1856; Georgia 1866 (applicable in three counties); Mississippi 1867 (applicable in one county); Tennessee 1879; South Carolina 1893), AOB 30. This makes up the bulk of the whole lot— all but four of the State's proffered laws to be exact. And, as detailed below, besides being too late, these all fail for lack of relevant similarity.

## B.    The Standards for "Relevant Similarity"

For regulations *within* the relevant time period, the analogue must be " 'relevantly similar.' " *Bruen*, 597 U.S. at 28-29 (quoting C. Sunstein, *On Analogical Reasoning*, 106 HARV. L. REV. 741, 773 (1993)). It "may be analogous enough to pass constitutional muster" even if it's not "a historical *twin*" or a "dead ringer" for the modern regulation, but it must be "well-established and representative." *Id.* at 30; *accord Duarte*, 2024 WL 2068016 at *4 ("To meet its burden, the Government must 'identify a well-established and representative historical analogue' to the challenged law.") (quoting *Bruen*, 597 U.S. at 30). *Bruen* did not "provide an exhaustive survey of the features that render regulations relevantly similar," but "*Heller* and *McDonald* point toward at least two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Bruen*, 597 U.S. at 29. "[W]hether modern and

31

historical regulations impose a comparable burden on the right of armed self-defense [the 'how'] and whether that burden is comparably justified [the 'why'] are '*central*' considerations when engaging in an analogical inquiry," because "individual self-defense is 'the *central component*' of the Second Amendment right." *Id.* (quoting *McDonald*, 561 U.S. at 767). In other words, under the required analogical reasoning, the two " 'central considerations' " are "whether 'how' the proffered historical analogue burdened the Second Amendment right, and 'why' it did so, are both sufficiently comparable to the challenged regulation." *Duarte*, 2024 WL 2068016 at *4 (quoting *Bruen*, 597 U.S. at 28, 29).

## C. No Leniency or other "Nuance" is Appropriate, as the OGM Law Must Bear the Full Brunt of *Bruen*.

The State seeks to justify this law by tying it to a sweepingly broad concept of "historical tradition" that, on one level or another, could conceivably be used to justify virtually all firearm regulations—i.e., all those ever designed or intended to "prevent[] individuals perceived to pose a danger to the public from obtaining weapons," to "prevent firearms from being transferred to those who could not lawfully possess them," or to "limit certain individuals from acquiring arms." AOB at 2, 10-11. The proxy for the State's claim to such leniency is the discussion in *Bruen*

32

about the *possible* need for a "more nuanced approach" in cases "implicating unprecedented societal concerns or dramatic technological changes." AOB at 2, 20 (citing *Bruen*, 597 U.S. at 27). Specifically, the court noted that some cases "implicating unprecedented societal concerns or dramatic technological changes *may* require a more nuanced approach" since "regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791 or the Reconstruction generation 1868." *Bruen*, 597 U.S. at 27 (italics added).

In advocating for favorable treatment under this purported rubric, the State does not venture to explain exactly how a "more nuanced" approach is to be framed or applied, but *Bruen* itself made clear that even in applying this "nuanced approach," the State still needs to come forward with historical regulations that are "relevantly similar" to the challenged law. The State's view of the test is quite different. Its position appears to be that governments can and should prevail under *Bruen* so long as they can show the law at issue was enacted contemporaneously with the "problem" they seek to regulate, *irrespective* of the contours of the relevant history under *Bruen*. *See* AOB at 21. But any such "approach" would gut the essential protections that the Constitution and

33

the Bill of Rights were designed to secure. Ultimately, it would require courts to focus on the government's stated policy justifications in support of the challenged law, taking us right back to prohibited interest-balancing. *See Bruen*, 597 U.S. at 29 n.7 (quoting *Heller*, 554 U.S. at 635) (courts may not "engage in independent means-end scrutiny under the guise of an analogical inquiry" but must instead "apply faithfully the balance struck by the founding generation to modern circumstances" because "the Second Amendment is the 'product of an interest balancing *by the people*' ").

Surely, the *Bruen* Court meant no such thing for purposes of any "more nuanced" approach that may be applied. Indeed, at no point did the Court untether the required analogical analysis from the relevant historical period for any such purposes. In fact, the analytical foundation of this discussion regarding nuances was the Court's earlier explanation that " 'historical analysis can be difficult; it sometimes requires resolving threshold questions, and making nuanced judgments about which evidence to consult and how to interpret it.' " *Bruen*, 597 U.S. at 25 (quoting *McDonald*, 561 U.S. at 803-04). It then distinguished the historical analysis as superior to any form of interest-balancing:

34

> [R]eliance on history to inform the meaning of constitutional text—especially text meant to codify a *pre-existing* right—is, in our view, more legitimate, and more administrable, than asking judges to 'make difficult empirical judgments' about 'the costs and benefits of firearms restrictions,' especially given their 'lack [of] expertise' in the field.

*Id.* (quoting *McDonald*, 561 U.S. at 790-91).

Thus, the government doesn't get a free pass or a watered-down test in cases "implicating unprecedented societal concerns," as the State suggests.[6] Moreover, the reality is this case does not involve any "unprecedented societal concerns" so as to even invoke the "nuanced approach" aspect of *Bruen*. The basic problem that the OGM law purports to address is to keep firearms out of the hands of those who cannot legally own or possess them, as the State reiterates in setting up its very broad characterization of the "historical tradition" to which it tries to marry the OGM law. AOB at 2, 10-11. That problem is as old as

---

[6]     Although the State refers to "dramatic technological changes" in its discussion of the "more nuanced" approach, it limits the basis of its claim for lenient treatment to the existence of "unprecedented societal concerns" stemming from changes in the dynamics of "manufacturing, cost, and distribution" of firearms over time. AOB at 2, 10-11; *id.* (arguing that these changes have "given rise to societal concerns" and " 'regulatory challenges' that were not confronted by earlier generations"). In any event, for the same reasons, there is no free pass or watered down test based on the mere existence of "dramatic technological changes."

35

the hills in the history of firearms regulation, as the State itself highlights in showcasing all the 17th century regulations designed to disarm Native Americans during early colonial times. 2-ER-69, 2-ER-77-83 (McCutchen Report) at ¶¶5, 16, 17, 18, 19, 20, 21, 22, 23. Nor is the general problem of firearm violence anything new or unprecedented. *Bruen*, 597 U.S. at 26 (firearm violence is "a general societal problem that has persisted since the 18th century"). In fact, for most of the 17th century, the "peacetime murder rate for adult colonists . . . ranged from 100 to 500 or more per year per 100,000 adults, ten to fifty times the rate in the United States" in 2009. Randolph Roth, American Homicide 27 (2009) available at https://www.hoplofobia.info/wp-content/uploads/2020/07/2009-Randolph_Roth-American_Homicide.pdf.

Indeed, in its quest to spare the OGM law the full brunt of the historical test here, the State's focus on this aspect of the *Bruen* opinion can only further portend the law's inevitable constitutional demise. As the Supreme Court explained in this context, "when a challenged regulation addresses a general societal problem that has persisted since the 18th century," as is the case here, "the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that

the challenged regulation is *inconsistent* with the Second Amendment." 597 U.S. at 26-27 (italics added). "Likewise, if earlier generations addressed the societal problem, but did so through materially different means, that also could be evidence that a modern regulation is unconstitutional." *Id.* We see that here too. The State's own evidence spotlights that the Founding generation dealt with the same basic problems, in particular disarming Native Americans by criminalizing sales to or trades with them as "illegal arms trading," i.e., *"trafficking,"*[7] leading to "Native violence." 2-ER-80-83 (McCutchen) at ¶¶ 20-23.

Yet, nowhere among the battery of laws discussed in the State's brief, in its expert reports, or in the resources cited by the experts does anything like the OGM law appear. The *only* thing we see among it all is a single law that dealt with the problem through the "materially different means" by solely prohibiting colonists from carrying "more than one gun and ten charges of powder" at times when they were traveling "within any Indian town or three miles without the English plantations," for the purpose of reducing the potential for illegal trading with the Natives. 2-

---

[7] "Trafficking" simply means "the practice of dealing or trading in a commodity or service, often an illegal one." https://www.dictionary.com/browse/trafficking

ER-79 (McCutchen) at ¶19 (citing a VA law from 1676). We see *no* general restrictions on *either* the frequency or the quantity of firearms law-abiding citizens could commercially acquire. Instead, as discussed further below, not only was the Founding generation not subjected to quantity or frequency over time regulations, but the colonies almost universally *required* firearm ownership. Cramer, Clayton E., *Colonial Firearms Regulation* (2016) at 1, https://ssrn.com/abstract=2759961.

Lastly, the State's focus in this context on *economic* factors and *market* conditions during the Founding era and Reconstruction era, which may have limited the free citizenry's ability to acquire "multiple firearms in single transactions," *see* AOB at 10-11, 15, 21-23, is also misguided as it certainly no cause for special treatment either. Even if it's true that "firearms were not widely available for bulk purchase" during the Founding and Reconstruction eras because features of the industry and economy rendered them largely cost-prohibitive, AOB at 21, that cannot somehow transmogrify the OGM law into a regulation that tackles an "unprecedented" problem so as to warrant relaxed standards.[8]

---

[8] Further, the thrust of this assertion is that firearms were too expensive for the average person to buy "in bulk." 2-ER-100, 2-ER-113-

It's not even true anyway, as the free citizenry were readily able to acquire multiple firearms at any given time given the lack of any restrictions on the frequency or quantity of firearm acquisitions during the relevant period, as discussed further below. In any event, conditions of an *economic* nature can in no way speak to the relevant inquiry. All that can matter here are *government regulations* imposed on the right to keep and bear arms—i.e., government-imposed limitations on the frequency and/or quantity of acquisition by ordinary law-abiding citizens in the absence of which they would otherwise remain free of any such limitations. *Bruen*, 597 U.S. at 28-29 (the question is "whether a

---

119 (Rivas Report) at ¶¶ 8, 25-29; 2-ER-69-70, 2-ER-72, 2-ER-75, 2-ER-84-85 (McCutchen) at ¶¶5-6, 9, 12, 26. The State's own sources rebut the notion that firearms were generally cost-prohibitive. *See e.g.*, 2-ER-69-70 (McCutchen) at ¶ 6 & n. 2 (citing O. Ned Eddins, "Trade Guns," *Peach State Archaeological Society*) (settlers, trappers, and hunters in this era recognized "Indian trade guns" as "inexpensive game getter[s]"); *id.* at ¶8 n. 9 (citing Solomon K. Smith, "*Firearms Manufacturing, Gun Use, and the Emergence of Gun Culture in Early North America*" at 3) (it was "relatively quick and inexpensive to produce individual guns" "by the end of seventeenth century"). And, of course, *anything* bought "in bulk" could be cost-prohibitive for anyone, *see* https://www.merriam-webster.com/dictionary/bulk ("bulk" means "being in large quantities or not divided into separate units"), whereas here the concern is over the OGM law's prohibition against the commercial purchase of merely *more than one* of the subject firearms within any given 30-day period.

historical regulation is a proper analogue for a distinctly modern firearm regulation" such that the latter is "consistent with this Nation's historical tradition of firearm regulation"). Ultimately, the only thing "unprecedented" in this case is the OGM law *itself*, and a law like this must bear the full brunt of the historical test under *Bruen*.[9]

### D. The State's Purported Analogues Fall Far Short.

Having set the record straight that regardless of whether the challenged regulation is designed to address "unprecedented societal concerns or dramatic technological changes," "determining whether a historical regulation is a proper analogue for a distinctly modern firearm regulation" *still* "requires a determination of whether the two regulations are 'relevantly similar,' " just the same, *Bruen*, 597 U.S. at 28-29,[10] we

---

[9]     The State's citation to *United States v. Alaniz*, 69 F.4th 1124, 1128 (9th Cir. 2023) in this context, AOB at 20-21, is inapt: that case concerned sentencing enhancements for those convicted of perpetrating violent crime with a firearm, whereas the OGM law imposes its purchase ban against *law-abiding* citizens who seek to make the prohibited purchases for lawful purposes and who have not even been shown to pose any kind of risk to society much less been convicted of any crimes.

[10]     The district court recognized this as well in correctly holding that, even "assum[ing] that a 'more nuanced approach' applies" for purposes of the historical analysis, "to meet their burden, Defendants must produce historical regulations that are 'relevantly similar' to California's OGM law." 1-ER-21 (quoting *Bruen*, 597 U.S. at 27-28).

can review the State's proffered analogues through the right lens. Again, the bulk of the proffered analogues fail right out of the gate because they come too late in time to serve as relevant comparators. But even assuming they can or should be considered for these purposes, they all fall far short of the minimal similarity threshold.

### 1. The Prevailing General Traditions

As the backdrop to review of the historical record for the existence of "relevantly similar" analogues to the OGM law's quantity-over-time firearm purchase restrictions, the general tradition of permitting the free citizenry to live unbounded by any such restrictions is surely significant. During the Founding era, "[t]here was not a law on the books in any of the states which interfered with the keeping or bearing of arms by free citizens, and this right was understood and deemed fundamental despite the lack of a state bill of rights." Stephen Halbrook, *The Right to Bear Arms in the First State Bills of Rights: Pennsylvania, North Carolina, Vermont, and Massachusetts*, VERM. L. REV. at 318 (1985), available at https://www.stephenhalbrook.com/law_review_articles/state-bills.pdf. "No colony or state restricted arms possession by males who were too

young or too old for the militia, nor by females." SER-20 (NICHOLAS J. JOHNSON, ET AL., FIREARMS LAW AND THE SECOND AMENDMENT: REGULATION, RIGHTS, AND POLICY 188 (3d ed. 2021)). Again, to the contrary, the colonies almost universally *required* firearm ownership. Cramer, *Colonial Firearms Regulation* at 1, https://ssrn.com/abstract=2759961.

Consistent with a largely unregulated right to keep and bear arms, people in the colonies commonly offered for sale and sought for purchase multiple firearms in single transactions. "Symbolic of the times, the following newspaper advertisement began to appear regularly: 'WANTED immediately, a quantity of good HORSE PISTOLS AND CARBINES, for which ready money, and a liberal price, will be given . . . Has a quantity of Muskets. . . to sell.' " Halbrook, *The Right to Bear Arms* at 266 (quoting Pennsylvania Evening Post (Philadelphia), July 23, 1776, at 366). Another example of "the unquestioned freedom to have arms" during the Founding era was a sales advertisement for "100 Pair Horsemens Pistols." *Id.* at 304 (citing the Independent Chronicle, June 29, 1780, at 4, col. 3). Naturally then, the free citizenry was readily able to and did acquire multiple firearms at any given time, which they

42

commonly owned, possessed, and publicly carried during the relevant period. "Vermont's founding fathers" "carried a gun and a brace of pistols on their persons as a common practice." Halbrook, *The Right to Bear Arms* at 291-92.[11]

In fact, "[p]istols in the pocket and an arsenal at home were options available to every free citizen." *The Right to Bear Arms* at 295. " 'Arms and military stores are free merchandise, so that any who have property and choose to sport with it, may turn their gardens into parks of artillery, and their houses into arsenals, without danger to Government.' " Joseph G.S. Greenlee, *The Right to Train: A Pillar of the Second Amendment*, WM. & MARY BILL OF RTS. J. at 132 (2022-2023), https://scholarship.law.wm.edu/cgi/viewcontent.cgi?article=2024&context=wmborj (quoting Ira Allen, *Particulars of the Capture of the Olive Branch, Laden with a Cargo of Arms* 403 (London 1798)). "[I]n the late seventeenth and early eighteenth centuries, guns were next in importance after beds, cooking utensils, and pewter-and ahead of chairs and books." SER-155 (James Lindgren and Justin L. Heather*, Counting*

---

[11]    A "brace of pistols" is a pair. *See* https://www.merriam-webster.com/dictionary/brace ("brace" means "one of two" or a "pair").

*Guns in Early America*, 43 WM. & MARY L. REV. 1777, 1837 (2002)). They were "more common than chairs or hoes in a poor agricultural county" and "as common as plows" with "eighteenth century mid-Atlantic farmers." *Id.* "Thus, everywhere and in every time period from 1637 through 1810," there were "high percentages of gun ownership." *Id.*

In light of this reality, it is simply not true that "[t]he absence of restrictions on the number of firearms that could be purchased arises more from structural differences in the gun-making and distribution industries than from a nineteenth-century aversion to such a policy," 2-ER-121 (Rivas) at ¶ 31, as the State's expert claims in attempting to render an improper opinion on how this case should be resolved, *United States v. Diaz*, 876 F.3d 1194, 1197 (9th Cir. 2017) (an expert may not "undertake[] to tell the jury what result to reach" because such an opinion "attempts to substitute the expert's judgment for the jury's"). And it is also perverse to claim, as another of the State's experts does in rendering a similarly improper expert opinion, that during "the late colonial and founding / Early Republic eras" "individuals did not see the ownership of multiple firearms, or even professional repair services for their existing firearms, as necessary for their safety and protection." 2-ER-75

44

(McCutchen) at ¶ 7. In fact, this expert's cited sources rebut her own claim, recognizing that "firearms quickly became the main weapon of choice for both individual protection as well as defending the colony." Solomon K. Smith, "*Firearms Manufacturing, Gun Use, and the Emergence of Gun Culture in Early North America*," 4, Fortyninthparalleljournal.com,

https://fortyninthparalleljournal.files.wordpress.com/2014/10/solomons mithautumn2014.pdf (cited in McCutchen's report at ¶ 8 n. 9).

This backdrop starkly demonstrates that the traditions prevailing during the relevant historical period not only did not include anything remotely like the OGM law but operated to affirmatively *preclude* the possibility that the Founding generation would have even countenanced *any* frequency-over-time purchase restrictions for *any* type of firearm.

## 2. Restrictions on Trade with Native Americans

The State cites a 1646 Connecticut law and a 1652 New York law, which it opaquely characterizes as laws that "banned the sale of firearms by [] residents outside the colony," and "outlaw[ed] 'Illegal Trade in Power, Lead and Guns' by 'Private Persons.'" AOB at 24-25. The reality is, these were restrictions against trading with Native Americans, which

45

fall into the same general category as the 1676 law prohibiting colonists from carrying "more than one gun and ten charges of powder" at times when they were traveling "within any Indian town or three miles without the English plantations" on which the State's expert relied in support of her (improper) opinion evidence. 2-ER-79 (McCutchen) at ¶19.

While the State admits that "these Native American laws would be unconstitutional today and the Attorney General disapproves of their particularly odious application in the past," in the same breath it says, "they can still confirm traditions of firearm regulation." AOB at 25-26 n. 8. The State can't have it both ways—proffering these laws as purported analogues but divorcing itself from the motivations behind them— because those motivations necessarily form the basis for the "how and why" that must be considered in assessing the comparability of their burdens and justifications. *Bruen*, 597 U.S. at 29. Those very specific and very different motivations necessarily preclude any logical, much less relevantly similar, connection. According to the State's own expert, these laws were motivated by sentiments that Native Americans were "very poisonous and destructive" to the white population, and thus sought to either disarm them completely or to ensure all traded weapons were

"inferior to those owned by whites," such that the Natives were rendered dependent or subjugated to whites. 2-ER-69, 2-ER-77-83 (McCutchen) at ¶¶5, 16, 17, 18, 19, 20, 21, 22, 23. The 1652 New York that the State cites also starkly illustrates these very particularized motivations, as it banned the sale of ammunition to Native Americans "so that this cruel and barbarous Nation may not be able, at any time, to turn and employ their weapons against ourselves there." Addendum to AOB, A-26.

Unless the State intends to argue that the OGM law is designed to establish firearm restrictions based on similarly bigoted or racist motives, these restrictions against Native Americans speak for themselves in defeating any claim that they represent historical analogues justifying the OGM law as part of "this Nation's historical tradition of firearm regulation." In fact, as the district court aptly observed, 1-ER-23, Natives were not even considered part of the "People" during the Founding Era; hence the need for acts of Congress to authorize any lawful dealings in the trade or sell of property involving Native Americans. *See* Indian Trade and Intercourse Act (1790) § 5 ("And be it further enacted, That no sale of lands made by any Indians, or any nation or tribe of Indians with the United States, shall be valid to any person or

persons, or to any State, whether having the right of pre-emption to such lands or not, unless the same shall be made and duly executed at some public treaty held under the authority of the United States."),  available at  https://www.loc.gov/resource/rbpe.21401300/?sp=2&st=image.  Laws restricting *their* ability to purchase arms at the Founding can tell us nothing about the rights of Plaintiffs (who *are* part of "the people") today.

As the district court also aptly observed here, "even if the Court were to consider such firearm restrictions on 'dangerous' people, they do not impose a comparable burden to the OGM law," because they "targeted only a narrow subset of the population perceived as dangerous, while the OGM law, with limited exceptions, affects all people acquiring handguns and semiautomatic centerfire rifles in California." 1-ER-23-24.

### 3.  Loyalty Oath and Allegiance Conditions

The State cites a 1676 Virginia "authoriz[ing] the sale of firearms and ammunition only to 'his majesties loyal[] subjects inhabiting this colony.' " AOB at 25, Addendum at A-28. While the colonies were still under British control, citizens who refused "to swear loyalty" to the King were forbidden to possess or use of firearms or ammunition, and even disarmed of the firearms they had, as means of subjugation. Stephen P.

48

Halbrook, *The Arms of All The People Should Be Taken Away*, Independent Institute (1989), available at https://www.independent.org/publications/article.asp?id=1422. All such prohibitions and disarmaments are untenable under *Heller*. Unquestionably then, they were not "incorporated into the Second Amendment's scope," *Bruen*, 597 U.S. at 43 n.10, and no such regulations could bear any of the hallmarks of an analogue to the OGM law's purchase prohibitions on law-abiding citizens today, *id.* (noting "the Crown's interest in firearm suppression even during the 16th century").

### 4. Permits to Carry

The State proffers a small handful of municipal ordinances, all from the late 1800s, which conditioned the lawful carry of firearms on the very sort of subjective, character-based judgments of local law enforcement struck down as unconstitutional in *Bruen*. AOB at 26-27 (citing ordinances conditioning issuance of carry permits on the judgment of local officials that the permittee is of "temperate, of adult age, and capable of exercising self-control," "is a proper and law-abiding person," a "peaceable person," and "of good moral character"). The *Bruen* opinion exhaustively describes the history of regulations on the public carrying

49

of firearms, illustrating why no historical analogue exists that would justify the sort of "special need" condition of New York's "may-issue" licensing scheme and that law-abiding citizens cannot be subject to such a restriction. The *valid* historical regulations were only aimed at restricting "bearing arms to terrorize the people," *Bruen*, 597 U.S. at 47, and blanket prohibitions on carrying or bearing firearms without any requirement of criminal or wrongful intent are simply unconstitutional, *id.* at 43 n.10; *id.* at 43-44, 50-51, 52-53, 55-57 (rejecting New York's attempt to analogize restrictions that only applied to those who carried with an evil, violent, or nefarious purpose, and did not prohibit public carry *per se*).

## 5. Public Intoxication

The two state laws (again from the late 1800s) "forbidding the sale of firearms to intoxicated individuals because of the concern for impulsive firearm violence," AOB at 28, add nothing "relevantly similar" either. Neither the "why"—curbing violence spurred by drug intoxication—nor the "how"—targeting a specific subset of individuals who created a particularized risk of firearm violence, as opposed to the entire

population of law-abiding responsible Californians like Plaintiffs—is anywhere within the realm of the required analogical similarity.

### 6. "Deadly Weapons" Restrictions

The State also cites as supposed analogues a small batch of mid to late nineteenth century laws that it says, "outlawed the sale of entire classes of weapons that were particularly associated with interpersonal violence, to prevent them from ending up in criminal hands," AOB at 29, i.e., that these states classified as "deadly weapons" at the time, 2-ER-107. Once again, the "how and why" of such laws are not comparable. There's never been any claim that the weapons targeted by the OGM law are either "dangerous" or "unusual"—much less that they are *both* "dangerous and unusual" so as to be subject to any kind of *constitutionally valid* weapons ban. *Heller*, 554 U.S. at 627. Rather, the State has not disputed the essential fact that the targeted arms are not subject to *general* prohibitions rendering them "unlawful to sell," Dkt. No. 59 at 19, because they are in common use for lawful purposes. Nor can there be any reasonable dispute on this point. *Bruen*, 597 U.S. at 47 (quoting *Heller*, 554 U.S. at 627) ("The Second Amendment protects the possession and use of weapons that are 'in common use at the time.' ");

51

*id.* at 628-29 (the handgun is "the quintessential self-defense weapon" "overwhelmingly chosen by American society" for lawful self-defense).

For the same reason, just as colonial laws that "prohibited the carrying of handguns because they were considered 'dangerous and unusual weapons' in the 1690s" could "provide no justification for laws restricting the public carry of weapons that are unquestionably in common use today," laws from the mid to late 19th century that may have prohibited the sale of certain weapons deemed "dangerous" can provide no justification for a 30-day ban on the purchase of the arms targeted by the OGM law that are also "unquestionably in common use today." *Bruen*, 597 U.S. at 47. As the district court observed, on the "how" and "why," "[t]hese laws targeted weapons used for criminal activity rather than self-defense," and they "impose[d] a different burden" in targeting arms "associated with interpersonal violence and crime," while "[t]he OGM law, by contrast, burdens a broader class of arms that includes handguns, semiautomatic centerfire rifles, and, starting in 2024, all other firearms," 1-ER-24-25, and it does so as to all ordinary law-abiding Californians.

Moreover, whatever these laws established in their individual territories at the time, like with the other isolated or small handful of

52

supposed analogues the State proffers, being from just a handful of jurisdictions they cannot establish any "historical tradition of firearm regulation." *See id.* at 46 ("We doubt that *three* colonial regulations could suffice to show a tradition of public-carry regulation."); *id.* at 67-68 (quoting *Heller*, 554 U.S. at 632) (rejecting "a handful of temporary territorial laws that were enacted nearly a century after the Second Amendment's adoption, governed less than 1% of the American population, and also 'contradic[t] the overwhelming weight' of other, more contemporaneous historical evidence").[12]

### 7. Gunpowder Storage Regulations

The State's reliance on any historical regulations "controll[ing] commerce in gunpowder," AOB at 29-30 (citing as examples a 1651 Massachusetts law and a 1775 Connecticut law), is also off-base. As the

---

[12]    In fact, the way that Rivas portrays these laws, they stemmed from a "general disdain" for "the habitual carrying of weapons in public spaces" or from a disdain for concealable weapons based merely on their inherent capability to cause harm. 2-ER-103, 2-ER-106 & n. 21 (Rivas) at ¶¶ 14, 17. To whatever extent this may have been true in those jurisdictions, *Bruen* has rejected any such sentiments towards public carrying as "outlier" laws, *Bruen*, 597 U.S. at 70, and *Heller* already took account for the general concerns about the misuse of firearms in society, 554 U.S. at 636 ("We are aware of the problem of handgun violence in this country, and we take seriously the concerns raised by the many *amici* who believe that prohibition of handgun ownership is a solution.").

district court said, in aptly pointing out the obvious, "the purpose of historical gunpowder regulations was to prevent accidental fires and explosions," 1-ER-22 (citing *Heller*, 554 U.S. at 632, which "explained that 'gunpowder-storage laws' are 'fire-safety laws' "), by "limit[ing] the quantity of gunpowder that may be stored or transported," *id.* The OGM law, by contrast, "addresses risks associated with illegal gun trafficking and gun violence," *id.*, and it assertedly does by " 'limiting the number of firearms that can be purchased' within a certain period of time," *id.*

## 8. Taxing and Licensing Conditions

The "licensing requirements" from the late 1800s that the State cites were principally designed to do the same thing as the rest of the late-day laws that it cites in this group of purported analogues: to impose a tax on the sale of firearms. *See* AOB at 30 (describing "licensing requirements for firearms dealers" as "prohibiting anyone from selling certain weapons unless they paid a tax and received a 'written certificate' "). The State characterizes these laws as though their ultimate function was to limit the availability or ownership of firearms. AOB at 30. That can only prove their lack of relevant similarity.

And to the extent these laws served the normal function of taxes—to generate revenue for the common welfare—obviously, they bear no similarity to the OGM law, which has nothing to do with *generating* sales revenue but is instead designed to prohibit otherwise lawful sales. Either way, the State's proffer is an apples-versus-oranges comparison with no "relevantly similar" connection at all to the OGM law.

### 9. Registration and Tracking

Finally, the laws requiring firearms dealers to "register and track their sales"—again, only from the late 1800s—are misfits as well. AOB at 28. Initially, they stemmed from the same sort of "disdain" toward the so-called "deadly weapons" of yesteryear that clearly has no bearing on constitutionally protected arms. *See* AOB at 28 (citing 2-ER-111-112); 2-ER-112 (Rivas) at ¶22 n. 42 (citing the District of Columbia's 1892 law titled, "To Punish the Carrying or Selling of Deadly or Dangerous Weapons within the District of Columbia, and for other Purposes").

And it's not like there's an exception to the OGM law's 30-day purchase ban for submitting to registration and "tracking." Again, the OGM law broadly applies a 30-day purchase ban against all ordinary, law-abiding citizens like Plaintiffs who simply wish to purchase more

than one of the targeted arms *regardless* of any registration or "tracking" of the related sales. This is true even though it is undisputed that: (1) the State implements and enforces a multitude of independent statutes, regulations, policies, and systems that collect, maintain, and monitor identifying information of those who are currently prohibited persons, who lawfully acquire, sale, and transfer firearms, and who later become prohibited persons, Dkt. No. 67-1 No. 24 (undisputed); (2) these various schemes compel ordinary law-abiding citizens to obtain special certification, pass a background check, wait ten days, and complete a safe handling demonstration as preconditions to any lawful purchase, *id.* at No. 25; (3) myriad state and federal laws specifically criminalize straw purchasing and illegal firearms trafficking, *id.* at No. 26; and (4) all federal licensees must report to ATF and all related state law enforcement agencies all sales, transfers, or disposals of two or more handguns at one time or during any five consecutive business days, *id.* at No. 28.

In other words, an injunction against the OGM law would have no impact on any of the State's other laws, policies, and procedures related

to registering or tracking firearms in the state, thereby further demonstrating the lack of similarity in these types of regulations.

### E. Individually or Collectively, No Viable Historical Analogue Exist to Rescue the OGM Law.

The State criticizes the district court for "isolat[ing]" the various proffered analogues and improperly applying a "divide-and-conquer approach" in determining that the State failed to carry its burden under *Bruen*. AOB at 33, 34 (citing *Perez-Garcia*, 96 F.4th at 1191). Obviously, any proper analysis here requires specific consideration of the "how" and "why" of any and all regulations the government proffers as analogues to the challenged law, and to that extent it must be an individualized inquiry. *See Bruen*, 597 U.S. at 28-29 ("Like all analogical reasoning, determining whether *a* historical regulation is *a* proper analogue for a distinctly modern firearm regulation requires a determination of whether *the two* regulations are 'relevantly similar.' ") (emphasis added); *see e.g.*, *Duarte*, 2024 WL 2068016 at *14-22 (separately analyzing several categories of proffered analogues based on the individualized "how" and "why" of each category). The court did not "miss[] the forest for the trees," AOB at 35, but instead considered both "the forest" and "the trees" while granting the State the leeway of assuming that a "more

nuanced approach" applies for purposes of the historical analysis. 1-ER-21; *see also* 1-ER-19 (recognizing that the proffered historical precedent, whether consisting of a single law or multiple laws must coalesce around and thus sufficiently "evince[] a comparable tradition of regulation").

Indeed, the leeway that the district court extended the State here was particularly generous given that it carefully analyzed the substance every category of the State's proffered analogues even though the vast majority are irrelevant as being "too late" and many only affected small, isolated pockets of the population, as demonstrated above. *See Bruen*, 597 U.S. at 67 (it is improper to "stake our interpretation of the Second Amendment" upon laws impacting only a small percentage of the population, particularly when they conflicted with the traditions throughout the majority of the population at the time). The fact is, examined individually *and* "as a whole," the historical record is bereft of evidence that the OGM law is "consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 17.

## CONCLUSION

The district court's order granting Plaintiffs' motion for summary judgment against the State, and enjoining further enforcement of the OGM law, was correct and should be affirmed in full.

Respectfully submitted,

/s/ *Raymond M. DiGuiseppe*
RAYMOND M. DIGUISEPPE
THE DIGUISEPPE LAW FIRM, P.C.
116 N. Howe Street, Suite A
Southport, NC 28461
Telephone: (910) 713-8804
Email: law.rmd@gmail.com

59

## CERTIFICATE OF COMPLIANCE

I am the attorney or self-represented party.

This brief contains 12,242 words, excluding the items exempted by

Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed.

R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[X] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R.
28.1-1.

[ ] is an **amicus** brief and complies with the word limit of Fed. R. App.
P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir.
R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b)
because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties;
    [ ] a party or parties are filing a single brief in response to multiple
    briefs; or
    [ ] a party or parties are filing a single brief in response to a longer
    joint brief.

[ ] complies with the length limit designated by court order dated
_____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R.
32-2(a).

**Signature:** *Raymond M. DiGuiseppe*          **Date:** May 28, 2024

60

## CERTIFICATE OF SERVICE

I hereby certify that on May 28, 2024, I served the foregoing brief via the CM/ECF system for the United States Court of Appeals for the Ninth Circuit, which will distribute the brief to all attorneys of record in this case. No privacy redactions were necessary.

Dated this 28th day of May 2024.

/s/ *Raymond M. DiGuiseppe*
*Counsel for Appellees*