No. 24-2036

In the United States Court of Appeals
for the Ninth Circuit

_____

MICHELLE NGUYEN, ET AL.,
*Plaintiffs-Appellees,*

v.

ROB BONTA, IN HIS OFFICIAL CAPACITY AS THE
CALIFORNIA ATTORNEY GENERAL, ET AL,
*Defendants-Appellants.*

_____

On Appeal from the United States District Court
for the Southern District of California
Case No. 3:20-cv-02470-WQH-MMP
Honorable William Q. Hayes

_____

**BRIEF OF AMICI CURIAE CALIFORNIA RIFLE & PISTOL
ASSOCIATION, SECOND AMENDMENT LAW CENTER, AND
OPERATION BLAZING SWORD-PINK PISTOLS, IN SUPPORT OF
APPELLEES AND AFFIRMANCE**

_____

C. D. Michel
Anna M. Barvir
Konstadinos T. Moros
MICHEL & ASSOCIATES, P.C.
180 East Ocean Blvd., Suite 200
Long Beach, CA 90802
(562) 216-4444
cmichel@michellawyers.com

*Counsel for Amici Curiae*

June 3, 2024

## CORPORATE DISCLOSURE STATEMENT

Under Rule 26.1(a) of the Federal Rules of Appellate Procedure, counsel for amici curiae certify that California Rifle & Pistol Association, Incorporated, Second Amendment Law Center, and Operation Blazing Sword-Pink Pistols are nonprofit organizations and thus have no parent corporations and no stock.


Date: June 3, 2024                    **MICHEL & ASSOCIATES, P.C.**


/s/ C.D. Michel
C.D. Michel
*Counsel for Amici Curiae*

# TABLE OF CONTENTS

**Page**

Corporate Disclosure Statement ............................................................... i

Table of Contents ..................................................................................... ii

Table of Authorities ............................................................................... iii

Interest of Amici Curiae ........................................................................... 1

Introduction .............................................................................................. 2

Argument .................................................................................................. 3

I.  The Second Amendment Analysis Is a One-Step Test ..................... 3

II.  This Case Does Not Call for *Bruen*'s "More Nuanced Approach" ...................... 8

III.  California Always Argues That *Bruen*'s "More Nuanced Approach" Should Apply, No Matter the Facts of the Case ............................... 12

Conclusion .............................................................................................. 15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*B&L Prods. v. Newsom,*
  No. 23-3793 (9th Cir. Jan. 16, 2024) ........................................................... 14

*B&L Prods. v. Newsom,*
  No. 23-55431 (9th Cir. Oct. 11, 2023) .......................................................... 14

*Baird v. Bonta,*
  No. 2:19-cv-00617 (E.D. Cal. Aug. 18, 2023) ............................................. 15

*Boland v. Bonta,*
  662 F. Supp. 3d 1077 (C.D. Cal. 2023) .......................................................... 6

*Boland v. Bonta,*
  No. 23-55276 (9th Cir. April 28, 2023) ........................................................ 13

*Chavez v. Bonta,*
  No. 3:19-cv-01226-L-AHG (S.D. Cal. Mar. 15, 2024) ......................... 11, 14

*District of Columbia v. Heller,*
  554 U.S. 570 (2008) ..................................................................................... 7, 8

*Ezell v. City of Chicago,*
  651 F.3d 684 (7th Cir. 2011) .......................................................................... 6

*Jackson v. City & Cnty. of San Francisco,*
  746 F.3d 953 (9th Cir. 2014) .......................................................................... 6

*Luis v. United States,*
  578 U.S. 5 (2016) ............................................................................................ 7

*May v. Bonta,*
  No. 23-4356 (9th Cir. Jan. 20, 2024) ........................................................... 13

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen,*
  597 U.S. 1 (2022) ..................................................................................passim

*Rhode v. Bonta*,
 No. 24-542 (9th Cir. Jan. 31, 2024) .................................................................. 14

*Rigby v. Jennings*,
 630 F. Supp. 3d 602 (D. Del. Sept. 23, 2022) .................................................. 7

*United States v. Alaniz*,
 69 F.4th 1124 (9th Cir. 2023) ............................................................................ 4

*United States v. Duarte*,
 No. 22-50048, 2024 WL 2068016 (9th Cir. May 9, 2024) ..................... 4, 5, 6

**Statutes**

Cal. Pen. Code § 27535 ............................................................................................. 8

**Other Authorities**

Alberts, Kristin, *A Primer on the Gun that Won the West: Winchester 1873*, Guns.com (July 8, 2020), https://www.guns.com/news/2020/07/08/a-primer-on-the-gun-that-won-the-west-winchester-1873 (last visited May 20, 2024) ......................................... 9

*Bogardus Double-Barreled Shot-Gun Ad*, Harper's Wkly., Oct. 13, 1883, *available at* https://archive.org/details/sim_harpers-weekly_harpers-weekly_1883-10-13_27_1399/page/654/mode/2up (last visited May 31, 2024) ............................... 11

*E. Remington & Sons Ad*, The Flushing Daily Times, Nov. 12, 1866, *available at* https://books.google.com/books?id=XvRZAAAAIBAJ&pg=PA4&dq=revolvers&article_id=3783,751801&hl=en&sa=X&ved=2ahUKEwjqvZivj6CGAxVIIzQIHWvWCo04PBDoAXoECAUQAg#v=onepage&q=revolvers&f=false ................. 10

*Elliot's Pocket Revolver Advertisement*, Harper's Wkly., Dec. 14, 1861, *available at* https://archive.org/details/harpersweeklyv5bonn/page/798/mode/2up (last visited May 31, 2024) ............................................................................................ 10

*Fish & Simpson 7-Shot Revolver Ad*, Harper's Wkly., May 22, 1875 *available at* https://archive.org/details/sim_harpers-weekly_1875-05-22_19_960/page/n13/mode/2up (last visited May 31, 2024) .................................... 11

*G.W. Simmons & Co. Revolver Ad*, Boston Evening Tr., Dec. 12, 1887, *available at* https://books.google.com/books?id=6Zc-AAAAIBAJ&pg=PA8&dq=revolvers&article_id=4796,5116559&hl=en&sa=X&ved=2ahUKEwiKu5KCjaCGAxUh3ckDHTp5A_wQ6AF6BAgGEAI#v=onepage&q=revolvers&f=false (last visited May, 31, 2024).....................................................10

History.com Editors, *1847: Samuel Colt Sells His First Revolvers to the U.S. Government*, History.com (Nov.16, 2009), https://www.history.com/this-day-in-history/colt-sells-his-first-revolvers-to-the-u-s-government (last visited May 20, 2024)................9

Revolver Advertisements, Sears, Roebuck, and Co. Catalogue, Issue No. 112, Fall 1902, *available at* https://archive.org/details/catalogueno11200sear/page/306/mode/2up (last visited May 31, 2024) ........................................................................................................11

### INTEREST OF AMICI CURIAE[1]

Founded in 1875, the California Rifle and Pistol Association, Incorporated, ("CRPA") is a nonprofit organization that seeks to defend the Second Amendment and advance laws that protect the rights of individual citizens. In service of its mission to preserve the constitutional and statutory rights of gun ownership, CRPA regularly participates as a party or amicus in firearm-related litigation.

The Second Amendment Law Center, Inc. ("2ALC") is a nonprofit corporation headquartered in Henderson, Nevada. 2ALC is dedicated to promoting and defending the individual rights to keep and bear arms as envisioned by the Founding Fathers. Its purpose is to defend these rights in state and federal courts across the United States. It also seeks to educate the public about the social utility of firearm ownership and to provide accurate historical, criminological, and technical information about firearms to policymakers, judges, and the public.

Operation Blazing Sword–Pink Pistols ("OBSPP") comprises two organizations, Operation Blazing Sword and Pink Pistols, which together advocate on behalf of lesbian, gay, bisexual, transgender, and queer ("LGBTQ") firearm owners, with specific emphasis on self-defense issues. Operation Blazing Sword maintains a network of over 1,600 volunteer firearm instructors in nearly a thousand locations across all fifty states. Pink Pistols, which was incorporated into Operation Blazing Sword in 2018, is a shooting society that honors gender and sexual

---

[1] The parties have given their consent to the filing of this brief. No counsel for a party authored the brief in whole or in part. No party, counsel for a party, or any person other than amici and their counsel made a monetary contribution intended to fund the preparation or submission of this brief.

1

diversity and advocates for the responsible use of firearms for self-defense. Membership is open to anyone, regardless of sexual orientation or gender identity, who supports the rights of LGBTQ firearm owners.

## INTRODUCTION

Some cases may present challenging constitutional questions, but this is not one of them. The district court and Appellees are undeniably correct that there is no historical tradition of limiting the number of firearms a law-abiding citizen may buy at one time. The State has no relevantly similar historical laws in its support, and its interest-balancing arguments pertaining to fears about gun trafficking are not only wholly irrelevant under *Bruen* but are also nonsensical. It is hard to imagine that many illegal gun traffickers are going to source their supply from licensed dealers in California—a state where guns are more expensive than any surrounding state, where every sale requires a background check that adds nearly $40 more, and where expenses will soar even higher when the newly adopted 11% excise tax on firearm sales takes effect in July. Buying guns from California gun stores to resell them illegally makes about as much business sense as a liquor seller sourcing their beer supply from the overpriced concession stands at SoFi stadium.

But Amici are not here to point out all the flaws in the State's arguments; Appellees have done that well enough in their responsive brief. Instead, Amici write separately to draw this Court's attention to two analytical issues in the district court's otherwise excellent ruling that have also proliferated in post-*Bruen* litigation in this circuit. First, the district court mischaracterized *Bruen* as a two-step test. Then, it applied *Bruen*'s "more nuanced approach" when it should not have.

While, fortunately, neither error meaningfully affected the result here, it is vital that courts uniformly and correctly apply *Bruen* to stop government defendants from dodging the proper historical burden they must meet. The State's brief demonstrates exactly how it abuses *Bruen* under an improper analysis, such as its borderline-frivolous argument that acquiring arms does not even implicate the plain text of the Second Amendment. Appellants' Opening Br. (A.O.B.) at 13. And as always, the State argues that *Bruen*'s "more nuanced approach" is required, even though there is nothing new about purchasing more than one firearm at a time. *Id.* at 21.

This is not surprising. The State has advocated for this approach in every post-*Bruen* civil case challenging a firearm law. To Amici's knowledge, the State has never conceded that it is limited to the "straightforward historical inquiry" that forecloses reliance on historical laws that are only analogous at a high degree of generality. *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 26-28 (2022). If this Court allows the State to get away with such reasoning here—in a straightforward case challenging a restriction on purchasing more than one firearm at a time—it is hard to imagine that the State will ever be held to its clear burden under *Bruen*'s historical inquiry.

## ARGUMENT

## I. THE SECOND AMENDMENT ANALYSIS IS A ONE-STEP TEST

The State incorrectly describes *Bruen* as requiring a two-step analysis—an error the district court adopted. A.O.B. 13; 1-ER-019. By its plain language, *Bruen* eschews a two-step test and calls for a one-step test. As the Court held, "[d]espite the popularity of th[e] two-step approach, *it is one step too many*." *Bruen*, 597 U.S. at 19 (emphasis

added). It would make little sense for the Court to expressly abrogate a step as an unnecessary second step only to then reinsert a substitute. Unfortunately, however, both trial courts and courts of appeal—including this circuit—have often mischaracterized the breadth and application of *Bruen* allowing the mythological two-step analysis to take root and thrive. *See United States v. Alaniz*, 69 F.4th 1124, 1128 (9th Cir. 2023) (stating that *Bruen* abrogated one two-step test but then adopted another); *see also United States v. Duarte*, No. 22-50048, 2024 WL 2068016, at *4 (9th Cir. May 9, 2024) (also applying the new two-step test). This panel should take this opportunity to correct this oft-repeated error.

Indeed, this case offers this Court the chance to clarify that the requirement that a challenged law implicates the right to keep or bear arms is not a separate analytical "step" and thus, as many courts have transmuted it, an imposing hurdle. Rather, it is a mere qualifier. This is critical because courts have cynically transformed this manufactured first step into a barrier that, more often than not, relieves the government of its burden under the historical analysis altogether. This unfairly shifts the burden from the government to civil plaintiffs and reinserts the interest balancing expressly rejected by *Bruen* under the guise of a "plain text" analysis.

The State's brief exemplifies this. It essentially argues that the 1-in-30 rule is "no big deal" because individuals can still buy one firearm each month to use for self-defense. A.O.B. 17 ("California's law does not inhibit any person from possessing multiple firearms; individuals may acquire as many firearms as they would like as long as they wait 30 days before buying the next one."). But this is just another way of arguing that the *burden* on individuals is not significant, while the government's

4

claimed *need* for regulation (the State's imagined fears of gun trafficking) is very important. In other words, the State tries to resurrect the very same interest-balancing analysis that *Bruen* shot down by packaging it as a "plain text analysis." *See* 597 U.S. at 26 (explaining that while "judicial deference to legislative interest balancing is understandable—and, elsewhere, appropriate—it is not deference that the Constitution demands here").

Moreover, a great deal of abuse can occur in how the "proposed course of conduct" is described and analyzed. In *Bruen*, there was no extensive analysis of that. The Court summarily concluded that "the plain text of the Second Amendment protects Koch's and Nash's proposed course of conduct—carrying handguns publicly for self-defense." *Id.* at 4. In this case, the conduct is just as straightforward. All that is at issue is purchasing firearms. The State wants a far more tortured description of the conduct, describing it as purchasing "an unlimited number of firearms within a 30-day period." A.O.B. 13. But this is not what the *Bruen* Court did, as it did not define the conduct at issue in *Bruen* as "carrying handguns publicly for self-defense without first demonstrating to a government official good cause to do so." Nor is it what this Court did in *Duarte*, a case about whether nonviolent felons may be barred from possessing firearms. That panel did not define Duarte's proposed course of conduct as "possessing a firearm even though he had been convicted of prior nonviolent felonies." The Court simply defined it as "simple possession [of a firearm]" and proceeded to the historical analysis. *Duarte*, 2024 WL 2068016, at *9. The State's attempt to overly constrain the proposed course of conduct to avoid historical scrutiny must fail.

5

To be sure, for there to be a viable Second Amendment challenge, the right to keep and bear arms must be implicated. *Id.* at 17. Just as a First Amendment free speech case must involve speech,[2] a Second Amendment case must involve the peaceable use or ownership of arms. But this should be no more than a qualifier, not an independent "step" requiring in-depth analysis that allows the government to dodge the burden of historical scrutiny. This is especially so because supposed "plain text" analyses often drift into historical analysis anyway, as this Court's recent ruling in *Duarte* reveals. There, the panel first determined whether Duarte, a nonviolent felon, was one of "the People" the Second Amendment protects. To do so, the panel had to conduct an extensive historical analysis. *Duarte*, 2024 WL 2068016, at *10-13 (tracing the meaning of "the People" back to English common law). Unless the right to keep and bear arms is obviously not implicated at all, to determine the Second Amendment's applicability to the conduct at issue, historical review is often required even to discern the meaning of the text in the first place, supporting Amici's position that *Bruen* is really a one-step historical test.

Further, "implicating" the Second Amendment may be direct or indirect because "[t]he Second Amendment also protects attendant rights that make the underlying right to keep and bear arms meaningful." *Boland v. Bonta*, 662 F. Supp. 3d 1077, 1085 (C.D. Cal. 2023) (citing *Jackson v. City & Cnty. of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014)); *Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011);

---

[2] Even in the context of commercial speech, there is no extended handwringing over whether the First Amendment is at least implicated, because commercial speech is still plainly speech. Instead, courts quickly move past that question and apply the test laid out in *Central Hudson Gas & Electric Corp. v. Public Serv. Comm'n of New York*, 447 U.S. 557 (1980).

*Rigby v. Jennings*, 630 F. Supp. 3d 602, 615 (D. Del. Sept. 23, 2022)); *see also Luis v. United States*, 578 U.S. 5, 26 (2016) (Thomas, J., concurring in the judgment) ("Constitutional rights … implicitly protect those closely related acts necessary to their exercise."). Otherwise, the government could impose, for example, ahistorical sales restrictions that effectively ban the sales of firearms and cynically claim they do not implicate the Second Amendment because the literal "keeping" and "bearing" of arms are unaffected. In fact, this sheer absurdity is close to what California argues for here.

Of course, the State argues its imposition on the right is minimal as residents merely need to wait 30 days for their next purchase. A.O.B. 16. But if the State's argument were correct, there is no reason it would be constitutionally limited to just 30 days. Once an individual has purchased one firearm, and therefore can "keep" and "bear" that one firearm, then according to the State's logic, limiting him to one gun a year (or five years or ten years) would not even implicate the plain text of the Second Amendment. The State could just as easily claim that "individuals may acquire as many firearms as they would like as long as they wait [a decade] before buying the next one." A.O.B. 16.

In short, any law that affects the right of an American to peaceably acquire, possess, use, or carry bearable arms must be backed by historical tradition. That is *Bruen*'s fundamental holding. It is not for any inferior court to ask whether particular aspects of the Second Amendment right are "really worth insisting upon." *District of Columbia v. Heller*, 554 U.S. 570, 634 (2008). This Court's precedent on this point should be clarified.

## II. THIS CASE DOES NOT CALL FOR *BRUEN*'S "MORE NUANCED APPROACH"

In deciding *Bruen*, the Supreme Court explained that the question at issue (whether carrying a firearm in public for self-defense was covered by the Second Amendment) required no stretched reasoning because the relevant analogies were "relatively simple to draw." *Bruen*, 597 U.S. at 27. The same was true in *Heller*, where the Court confronted a ban on possessing handguns for any purpose. *Id.* When, however, a case involves an "unprecedented societal concern" or "dramatic technological change," a "more nuanced approach" may be justified. *Id.* Otherwise, the government is limited to "distinctly similar" historical laws. *Id.* at 26.

Here, the district court assumed that *Bruen*'s "more nuanced approach" applied. 1-ER-021. While the court was correct that the State must lose even under that weaker standard, it should not have applied it here because there is nothing new about purchasing more than one firearm at a time. To be sure, the State makes some weak arguments for why the more nuanced approach should apply. For instance, it argues that, in the past, firearms could not be purchased in bulk because they were made by hand and distribution limitations made selling firearms in volume difficult. A.O.B. 21. But this logic quickly falls apart for three reasons.

First, California Penal Code section 27535 does not merely apply to "bulk" purchases. It applies to *any* purchase of more than one firearm at a time. For example, if an individual who is newly interested in responsible firearm ownership wants to buy both a handgun for self-defense and a shotgun for skeet shooting or hunting, he may not do so. Perhaps California would have a marginally better argument for the

8

application of the "more nuanced approach" if its law applied to purchases of five, ten, or more firearms in a short period of time. But when it comes to merely purchasing *two* firearms at once, there simply is no justification for such a restriction, nor is there any historical precedent for it. If an individual wanted to buy more than one firearm at a time during the Founding Era, no law stopped him from doing so.

Second, even if the State's arguments about production limitations making purchasing multiple firearms at one time difficult in the Founding Era were true,[3] those limitations were gone by the mid-19th century. For example, between 1850 and 1860, separate from its government contracts, Samuel Colt's young company sold about 170,000 pocket revolvers and another 98,000 full-size revolvers to civilians. History.com Editors, *1847: Samuel Colt Sells His First Revolvers to the U.S. Government*, History.com (Nov.16, 2009), https://www.history.com/this-day-in-history/colt-sells-his-first-revolvers-to-the-u-s-government (last visited May 20, 2024). As another example, between its introduction in 1873 and its discontinuation in 1919, Winchester sold 720,000 units of its Model 1873, the lever action rifle known as the "gun that won the west." *See* Kristin Alberts, *A Primer on the Gun that Won the West: Winchester 1873*, Guns.com (July 8, 2020), https://www.guns.com/news/2020/07/08/a-primer-on-the-gun-that-won-the-west-winchester-1873 (last visited May 20, 2024).

Firearms had become easy enough to produce that advertisements even appeared in mainstream publications to drum up sales. For instance, a December 1861 issue of Harper's Weekly advertised "Elliot's Pocket Revolver," a small pistol that "could be carried constantly about the person" and came with 100 cartridges for

---

[3] Appellees aptly demonstrate why they are not. *See* Appellees' Br. 41-44.

a total of $10 (about $356 today[4]).[5] This is just one of many firearm sales advertisements to appear in that popular weekly magazine; an advertisement for another revolver appears on the same page. During the Reconstruction Era and after, newspapers ran similar ads. For instance, Remington advertised its wide array of "revolvers, rifles, muskets, pocket and belt revolvers, repeating pistols, rifle canes, [and] revolving rifles" in the Flushing Daily Times on November 12, 1866.[6] And the Boston Evening Transcript published an advertisement for revolvers in its December 12, 1887 issue, with the vendor stating it expected to sell 200 per day.[7] Clearly, mass production had arrived, and no sales restrictions were implemented in response.

Third, mail-order gun sales began to proliferate during the Reconstruction Era and the years that followed,[8] which rebuts the State's spurious claim that "existing distribution networks" made buying more than one gun at a time problematic. A.O.B. 23. With mail order, buyers were not limited to "local general stores" like the

---

[4] All conversions were made using the CPI Inflation Calculator available here https://www.in2013dollars.com/us/inflation/1883?amount=12.50.

[5] *Elliot's Pocket Revolver Advertisement*, Harper's Wkly., Dec. 14, 1861, at 799, *available at* https://archive.org/details/harpersweeklyv5bonn/page/798/mode/2up (last visited May 31, 2024).

[6] *E. Remington & Sons Ad*, The Flushing Daily Times, Nov. 12, 1866, *available at* https://books.google.com/books?id=XvRZAAAAIBAJ&pg=PA4&dq=revolvers&article_id=3783,751801&hl=en&sa=X&ved=2ahUKEwjqvZivj6CGAxVIIzQIHWvWCo04PBDoAXoECAUQAg#v=onepage&q=revolvers&f=false.

[7] *G.W. Simmons & Co. Revolver Ad*, Boston Evening Tr., Dec. 12, 1887, at 8, *available at* https://books.google.com/books?id=6Zc-AAAAIBAJ&pg=PA8&dq=revolvers&article_id=4796,5116559&hl=en&sa=X&ved=2ahUKEwiKu5KCjaCGAxUh3ckDHTp5A_wQ6AF6BAgGEAI#v=onepage&q=revolvers&f=false (last visited May, 31, 2024).

[8] Amici agree with Appellees that the lack of a Founding Era analogue is dispositive in this case, as that is the most relevant time period. However, because the State insists on presenting late-19th-century historical laws as (completely dissimilar) analogues, it should also have to contend with 19th-century gun sales and distribution realities. It cannot have it both ways.

State claims. *Id.* For example, a May 1875 issue of Harper's Weekly advertised a seven-shot pocket revolver that could be ordered and shipped by mail for $5 (about $142 today).[9] And an issue from October 1883 advertised a double-barreled shotgun and urged readers to "ORDER AT ONCE."[10] By the turn of the century, Americans could browse a large selection of firearms in the Sears Catalog, purchase as many as they wanted at affordable prices, and have them shipped to their homes with no background check or any other government intrusion. For example, the 1902 catalog prominently advertised an automatic revolver for $2.75 ($101 today) and also listed other revolvers for as low as $1.60 ($59 today).[11]

The era of "artisan" gunmakers the State describes, A.O.B. 23, had quite emphatically ended by the mid-19th century,[12] but not one state passed any law limiting the number of firearms Americans could buy. Nothing stopped anyone from purchasing or ordering as many firearms as they desired at once, for comparatively lower prices than today, and with no background check.

---

[9] *Fish & Simpson 7-Shot Revolver Ad*, Harper's Wkly., May 22, 1875, at 426, *available at* https://archive.org/details/sim_harpers-weekly_1875-05-22_19_960/page/n13/mode/2up (last visited May 31, 2024).

[10] *Bogardus Double-Barreled Shot-Gun Ad*, Harper's Wkly., Oct. 13, 1883, *available at* https://archive.org/details/sim_harpers-weekly_harpers-weekly_1883-10-13_27_1399/page/654/mode/2up (last visited May 31, 2024).

[11] Revolver Advertisements, Sears, Roebuck, and Co. Catalogue, Issue No. 112, Fall 1902, at 306-07, *available at* https://archive.org/details/catalogueno11200sear/page/306/mode/2up (last visited May 31, 2024).

[12] The State admitted as much in another case: "The market revolution of the Jacksonian period (1828-1854) led to radical advancements in firearms technology and wide availability of cheaper, deadlier, concealable firearms…" *See* Defendants' Memorandum of Points and Authorities in Support of Motion for Summary Judgment at 15, *Chavez v. Bonta*, No. 3:19-cv-01226-L-AHG (Southern District of California Mar. 15, 2024), ECF No. 132-1.

It is thus unserious to argue, as the States does, that "large-scale firearms trafficking and straw purchasing simply did not present the same concern that it does today." A.O.B. 22. A buyer who buys firearms in California must pass a background check and pay hefty fees and taxes incomparable to anything from before 1900. And any firearm ordered online or by mail must first ship to a licensed dealer so a background check can be conducted. So even if trafficking firearms sourced from licensed dealers is a concern today, it would have been much more of a concern in the 19th century. Yet the State has presented no laws of historical purchase limits, and so "the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Bruen*, 597 U.S. at 26.

California's 1-in-30 law did not arrive until 1999, and even today it lacks many contemporary analogues. Indeed, only Virginia, Maryland, and New Jersey have similar laws. The overwhelming majority of states do not. California would thus even fail to establish a representative *modern* tradition of this sort of firearm regulation, let alone a historical one.

## III. CALIFORNIA ALWAYS ARGUES THAT *BRUEN*'S "MORE NUANCED APPROACH" SHOULD APPLY, NO MATTER THE FACTS OF THE CASE

It is no surprise that the State argues for the application of the "more nuanced approach" because that is what it has always done since *Bruen*. The Supreme Court did not intend to give the government greater analogical leeway in every case, only those implicating significant technological or social changes. This Court must not countenance California's continued defiance of that instruction.

Some examples of cases pending in this Court or in a district court within this circuit are in order:

In *May v. Bonta*, a case challenging California's unprecedented move to designate every public place except streets and sidewalks "sensitive" and thus off limits for the right to carry, the State argued that the "more nuanced approach" should apply even though most of the places it restricts (like bars, libraries, parks, privately owned businesses, and more) existed in the past without carry being restricted within them. The conduct at issue in *May* is identical to *Bruen*—i.e., carrying handguns in public for self-defense—yet the State still insisted it was entitled to use stretched analogies. *See* Appellant's Opening Brief 27, *May v. Bonta*, No. 23-4356 (9th Cir. Jan. 20, 2024), ECF No. 25.1.

In *Boland v. Bonta*, a case that challenges aspects of California's Unsafe Handgun Act that had effectively blocked the sale of all modern semiautomatic handguns released after 2013, the State argued that the "more nuanced approach" should apply because handgun ownership in the Founding Era was less common and semiautomatic handguns did not yet exist. *See* Appellant's Opening Brief 32, *Boland v. Bonta*, No. 23-55276 (9th Cir. April 28, 2023), ECF No. 11. Of course, *Heller* already decided that modern handguns are protected, using a straightforward historical inquiry. *Bruen*, 597 U.S. at 27.

In *Chavez v. Bonta*, a case that challenges California's ban on firearm purchases by adults between the ages of 18 and 21, the State advocated for the "more nuanced approach" because although young adults have been around since the Founding, firearms technology has advanced. *See* Defendants' Memorandum of Points and

13

Authorities in Support of Motion for Summary Judgment 14-17, *Chavez v. Bonta*, No. 3:19-cv-01226 (S.D. Cal. Mar. 15, 2024), ECF No. 132-1. Of course, if that reason alone were sufficient to trigger the "more nuanced approach," it would necessarily apply in *every* case. Such a result cannot be what the *Bruen* Court had in mind.

In *Rhode v. Becerra*, a case challenging California's ammunition background check system which wrongfully denies 10% of law-abiding Californians who try to buy ammunition, the State argued that the "more nuanced approach" is "*required* under *Bruen*," even though ammunition has been sold without a background check for all of American history, and California's law is the very first of its kind. *See* Appellant's Emergency Motion for Stay 17, *Rhode v. Bonta*, No. 24-542 (9th Cir. Jan. 31, 2024), ECF No. 4.1 (emphasis added).

In *B&L Productions, Inc. v. Newsom*, a challenging California's bans on gun shows at the Orange County Fair & Events Center and all state-owned properties, the State insisted it need not find similar historical laws and instead relied on vague concepts like the government's authority when acting as a proprietor, the general regulation of firearms commerce, and the regulation of firearms at "sensitive places." *See* Appellants' Opening Brief 39, *B&L Productions v. Newsom*, No. 23-3793 (9th Cir. Jan. 16, 2024), ECF No. 13.1.[13]

In *Baird v. Bonta*, a case challenging California's total prohibition on open carry in most counties, the State advocated for the "more nuanced approach" even as it conceded that almost all historical laws that existed only regulated concealed carry,

---

[13] The State made the same arguments in a related case of the same name which challenges California's ban on gun shows at the Del Mar Fairgrounds. *See* Appellees' Brief, *B&L Productions v. Newsom*, No. 23-55431 (9th Cir. Oct. 11, 2023), ECF No. 19.

not open carry. *See* Defendants' Memorandum of Points and Authorities in Support of Motion for Summary Judgment 8-9, *Baird v. Bonta*, No. 2:19-cv-00617 (E.D. Cal. Aug. 18, 2023), ECF No. 90-1.

As these examples show, the State will likely never concede that any case will ever require it to find closely similar historical laws. At any rate, if any case does not implicate the "more nuanced approach," it is this one, as it just concerns the acquisition of arms. Should this Court rule otherwise, it is hard to imagine which cases would *not* implicate that approach. The State would have succeeded in distorting the *Bruen* standard, which did not call for extended analogical leeway for every single Second Amendment challenge.

Like the conduct at issue in *Bruen* and *Heller*, the conduct of acquiring firearms only implicates a "straightforward historical inquiry," not a nuanced one. *Bruen*, 597 U.S. at 27. Because the State lacks any distinctly similar analogues from the founding or reconstruction eras, the district court's ruling should be affirmed.

## CONCLUSION

For these reasons, Amici urge this Court to affirm the district court's ruling.

Dated: June 3, 2024                    Respectfully submitted,

/s/ C.D. Michel
C.D. Michel
Anna M. Barvir
Konstadinos T. Moros
Michel & Associates, P.C.
180 East Ocean Blvd., Suite 200
Long Beach, CA 90802
(562) 216-4444
cmichel@michellawyers.com
*Counsel for Amici Curiae*

15

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 24-2036

I am the attorney or self-represented party.

**This brief contains** | 4,237 | **words,** including | 0 | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

○ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

● is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
  ☐ it is a joint brief submitted by separately represented parties.
  ☐ a party or parties are filing a single brief in response to multiple briefs.
  ☐ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated [          ].

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/ C.D. Michel | **Date** | June 3, 2024

*(use "s/[typed name]" to sign electronically-filed documents)*