No. 24-2036

# In the United States Court of Appeals for the Ninth Circuit

◆

MICHELLE NGUYEN, ET AL.,

*Plaintiffs–Appellees*,

v.

ROB BONTA, IN HIS OFFICIAL CAPACITY
AS THE CALIFORNIA ATTORNEY GENERAL, ET AL.,

*Defendants–Appellants*.

◆

Appeal from the United States District Court
for the Southern District of California
No. 3:20-cv-02470-WQH-MMP
The Honorable William Q. Hayes

◆

**BRIEF OF THE NATIONAL RIFLE ASSOCIATION
OF AMERICA AS *AMICUS CURIAE* IN SUPPORT
OF PLAINTIFFS-APPELLEES AND AFFIRMANCE**

◆

JOSEPH G.S. GREENLEE
 *Counsel of Record*
ERIN M. ERHARDT
NATIONAL RIFLE ASSOCIATION
OF AMERICA – INSTITUTE FOR
LEGISLATIVE ACTION
11250 Waples Mill Road
Fairfax, VA 22030
(703) 267-1161
jgreenlee@nrahq.org

Counsel for *Amicus Curiae*

## CORPORATE DISCLOSURE STATEMENT

The National Rifle Association of America has no parent corporation, nor is there any publicly held corporation that owns more than 10% of its stock.

/s/ *Joseph G.S. Greenlee*
Counsel for *Amicus Curiae*

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT .............................................i

TABLE OF AUTHORITIES ................................................................. iii

STATEMENT OF *AMICUS CURIAE* .................................................1

CONSENT TO FILE ...........................................................................1

SUMMARY OF ARGUMENT ..............................................................2

ARGUMENT .....................................................................................5

   I.   The Second Amendment's plain text covers the right to acquire arms. ....................................................................5

      A.   The initial inquiry in this case is whether the plain text covers the right to acquire arms. ...................................5

      B.   This Court has held that the Second Amendment protects the right to acquire arms. ...............................................7

      C.   The right to keep arms includes the right to acquire arms. ........7

      D.   The right to acquire arms is a necessary concomitant of the right to keep and bear arms. .........................................9

   II.   Historically, multiple gun purchases per month were common. . 12

      A.   The societal problem California claims to address pre-dates the Founding. ...........................................................12

      B.   Militiamen were regularly required to acquire multiple firearms in a single month. .........................................19

      C.   Pistols were commonly sold in pairs. .....................................23

   III.   The State offers no founding era analogs; the colonial laws it provides allowed unlimited sales to Englishmen and restricted firearm sales only to hostile foreign nations. ..............28

CONCLUSION ................................................................................34

CERTIFICATE OF COMPLIANCE .....................................................35

CERTIFICATE OF SERVICE .............................................................36

# TABLE OF AUTHORITIES

## Cases

*Andrews v. State,*
  50 Tenn. 165 (1871) ............................................................... 10

*Atkinson v. Garland,*
  70 F.4th 1018 (7th Cir. 2023) ............................................. 14

*Brown v. Bureau of Alcohol, Tobacco, Firearms & Explosives,*
  No. 1:22-CV-80, 2023 WL 8361745 (N.D.W. Va. Dec. 1, 2023) ........... 11

*District of Columbia v. Heller,*
  554 U.S. 570 (2008) ................................................... *passim*

*Doe v. Bonta,*
  No. 23-55133, 2024 WL 2037144 (9th Cir. May 8, 2024) ..................... 5

*Drummond v. Robinson Twp.,*
  9 F.4th 217 (3d Cir. 2021) ..................................................... 10

*Ezell v. City of Chicago,*
  651 F.3d 684 (7th Cir. 2011) ................................................ 7

*Illinois Ass'n of Firearms Retailers v. City of Chicago,*
  961 F. Supp. 2d 928 (N.D. Ill. 2014) ..................................... 11

*Jackson v. City & Cnty. of San Francisco,*
  746 F.3d 953 (9th Cir. 2014) .......................................... 7, 10

*Kole v. Vill. of Norridge,*
  No. 11-cv-3871, 2017 WL 5128989 (N.D. Ill. Nov. 6, 2017) ............... 12

*Luis v. United States,*
  578 U.S. 5 (2016) .............................................................. 10

*McConnell v. Federal Election Com'n,*
  540 U.S. 93 (2003) ........................................................... 12

*McCulloch v. Maryland,*
  17 U.S. 316 (1819) ............................................................. 9

*Miller v. Bonta*,
  No. 19-CV-01537, 2023 WL 6929336 (S.D. Cal. Oct. 19, 2023) .......... 11

*Minneapolis Star and Tribune Co. v. Minn. Comm'r of Revenue*,
  460 U.S. 575 (1983) .................................................................................... 11

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*,
  597 U.S. 1 (2022) ........................................................................... *passim*

*New York State Rifle & Pistol Ass'n, Inc. v. City of New York*,
  140 S. Ct. 1525 (2020) ................................................................................. 9

*Oakland Tactical Supply, LLC v. Howell Twp., Michigan*,
  No. 23-1179, 2024 WL 2795571 (6th Cir. May 31, 2024) ........ 10, 11, 12

*Range v. Att'y Gen. United States of Am.*,
  69 F.4th 96 (3d Cir. 2023) (en banc) ..................................................... 13

*Renna v. Bonta*,
  667 F. Supp. 3d 1048 (S.D. Cal. 2023) ................................................... 11

*Richmond Newspapers v. Virginia*,
  448 U.S. 555 (1980) ...................................................................................... 9

*Teixeira v. Cnty. of Alameda*,
  873 F.3d 670 (9th Cir. 2017) (en banc) ................................................... 7

*United States v. Alston*,
  No. 5:23-CR-021-FL-1, 2023 WL 7003235 (E.D.N.C. Oct. 24, 2023) .. 11

*United States v. Daniels*,
  77 F.4th 337 (5th Cir. 2023) ................................................................. 13

*United States v. Duarte*,
  101 F.4th 657 (9th Cir. 2024) ................................................................. 14

*United States v. McNulty*,
  684 F. Supp. 3d 14 (D. Mass. 2023) ....................................................... 11

*United States v. Perez-Garcia*,
  96 F.4th 1166 (9th Cir. 2024) ................................................................. 14

iv

*United States v. Quiroz,*
    629 F. Supp. 3d 511 (W.D. Tex. 2022) ................................................9

## Constitutional Provisions

U.S. Const. amend. I ................................................................11

U.S. Const. amend. II.......................................................*passim*

## Statutes and Regulations

1 Stat. 271 (1792) ..................................................................22

18 U.S.C. § 922(g)(3).............................................................11

22 U.S.C. § 2778 ...................................................................33

## Other Authorities

Allen, Ira, Particulars of the Capture of the Ship Olive Branch,
    vol. 1 (1798) ....................................................................18

Aurora General Advertiser, Jan. 23, 1796.......................................27

Aurora General Advertiser, Dec. 17, 1799.......................................28

Backgrounds of Selective Service: Military
    Obligation: The American Tradition, vol. 2
    (Arthur Vollmer ed., 1947)................................ 14, 20, 21, 22

Connecticut Courant, Sep. 24, 1792 ...........................................27

Connecticut Courant, Nov. 14, 1796............................................27

Connecticut Courant, Mar. 6, 1797 ........................................17, 27

Cramer, Clayton E. & Olson, Joseph Edward, *Pistols, Crime,
    and Public: Safety in Early America*, 44 Willamette L. Rev.
    699 (2008).................................................................19, 23

v

DUNLAP'S PENNSYLVANIA PACKET OR THE GENERAL ADVERTISER,
Dec. 11, 1775 ........................................................................25

DUNLAP'S PENNSYLVANIA PACKET OR THE GENERAL ADVERTISER,
Apr. 15, 1776 ........................................................................25

DUNLAP'S PENNSYLVANIA PACKET OR THE GENERAL ADVERTISER,
July 22, 1776 ........................................................................25

FEDERAL AND STATE CONSTITUTIONS COLONIAL CHARTERS,
AND OTHER ORGANIC LAWS OF THE STATES, TERRITORIES,
AND COLONIES NOW OR HERETOFORE FORMING THE UNITED
STATES OF AMERICA, vols. 3, 7 (Francis Thorpe ed., 1909) ........... 15, 16

GAZETTE OF THE UNITED STATES, AND PHILADELPHIA DAILY
ADVERTISER, Feb. 12, 1798 .....................................................27

GAZETTE OF THE UNITED STATES, AND PHILADELPHIA DAILY
ADVERTISER, Mar. 9, 1798 .......................................................28

Gill, Jr., Harold B., THE GUNSMITH IN COLONIAL VIRGINIA (1974) .........15

Hening, William Waller, THE STATUTES AT LARGE: BEING A
COLLECTION OF ALL THE LAWS OF VIRGINIA, FROM THE FIRST
SESSION OF THE LEGISLATURE, IN THE YEAR 1619, vol. 2 (1823) ..... 31, 32

INDEPENDENT GAZETTEER, Oct. 8, 1783 .....................................26

Johnson, Samuel, DICTIONARY OF THE ENGLISH LANGUAGE, vol. 1
(4th ed. 1773) ........................................................................8

Kopel, David B. & Greenlee, Joseph G.S., *The History of Bans
on Types of Arms Before 1900*, 50 J. LEGIS. 223 (2024) ................ 17, 18

Kopel, David B. & Greenlee, Joseph G.S., *The Second Amendment
Rights of Young Adults*, 43 S. ILL. U. L.J. 495 (2019) ........................14

Kopel, David B., *How the British Gun Control Program Precipitated
the American Revolution*, 6 CHARLESTON L. REV. 283 (2012) ..............15

LAWS AND ORDINANCES OF NEW NETHERLAND, 1638–1674 (E. B.
O'Callaghan ed., 1868) ...........................................................32

MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (10th ed. 1996)................8

Neumann, George C., BATTLE WEAPONS OF THE AMERICAN
    REVOLUTION (2011) ................................................................21

*New England Confederation*, BRITANNICA.COM .....................................30

PENNSYLVANIA GAZETTE, Mar. 29, 1748 ...................................................16

PENNSYLVANIA GAZETTE, Sep. 15, 1748 ....................................................16

PENNSYLVANIA GAZETTE, Sep. 19, 1751 ....................................................24

PENNSYLVANIA GAZETTE, Nov. 3, 1757 .....................................................17

PENNSYLVANIA GAZETTE, Oct. 21, 1762 .....................................................24

PENNSYLVANIA GAZETTE, May 24, 1775.....................................................25

PENNSYLVANIA JOURNAL; AND WEEKLY ADVERTISER, July 22, 1762........24

PENNSYLVANIA JOURNAL; AND WEEKLY ADVERTISER, July 29, 1762........24

*Samuel Colt sells his first revolvers to the U.S. government*,
    HISTORY.COM ......................................................................17

Sawyer, Charles Winthrop, FIREARMS IN AMERICAN HISTORY, vol. 1
    (1910)..............................................................................14

SOUTH-CAROLINA AND AMERICAN GENERAL GAZETTE, Aug. 25, 1775......25

SOUTH-CAROLINA GAZETTE, Oct. 2, 1736 ..................................................23

SOUTH-CAROLINA GAZETTE, June 1, 1745...................................................16

SOUTH-CAROLINA GAZETTE; AND COUNTRY JOURNAL, Apr. 4, 1775 .........24

THE AMERICAN HERITAGE COLLEGE DICTIONARY (3d ed. 1993) .................8

THE HISTORY OF CONNECTICUT, FROM ITS EARLIEST SETTLEMENT TO
    THE PRESENT TIME (W. H. Carpenter & T. S. Arthur eds., 1872) .......30

THE PENNSYLVANIA PACKET OR THE GENERAL ADVERTISER,
Apr. 8, 1779 ................................................................................ 26

THE PENNSYLVANIA PACKET OR THE GENERAL ADVERTISER,
Dec. 25, 1779 .............................................................................. 26

THE PENNSYLVANIA PACKET OR THE GENERAL ADVERTISER,
Sep. 23, 1780 .............................................................................. 26

THE PUBLIC RECORDS OF THE COLONY OF CONNECTICUT,
PRIOR TO THE UNION WITH NEW HAVEN COLONY, MAY,
1665 (J. Hammond Trumbull ed., 1850) .................................... 29, 30

VERGENNES GAZETTE AND VERMONT AND NEW-YORK ADVERTISER,
Sep. 12, 1799 .............................................................................. 23

Webster, Noah, AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE,
vol. 1 (1828) ................................................................................. 8

Winthrop, John, THE HISTORY OF NEW ENGLAND FROM 1630 TO 1649,
vol. 2 (James Savage ed., 1826) .............................................. 29

## STATEMENT OF *AMICUS CURIAE*[1]

The National Rifle Association of America (NRA) is America's oldest civil rights organization and America's foremost defender of Second Amendment rights. It was founded in 1871 by Union generals who, based on their Civil War experiences, sought to promote firearms marksmanship and expertise amongst the citizenry. The NRA has approximately 4.2 million members, and its programs reach millions more.

The NRA has an interest in this case because California's one-gun-per-month restriction imposes unconstitutional limitations on the right to keep and bear arms.

## CONSENT TO FILE

All parties consented to the filing of this brief.

---

[1] No counsel for a party authored this brief in any part. No party or counsel contributed money intended to fund its preparation or submission. No person other than *amicus* and its members contributed money intended to fund its preparation or submission.

## SUMMARY OF ARGUMENT

The initial inquiry in a Second Amendment challenge is whether the Second Amendment's plain text covers the plaintiffs' desired conduct. The desired conduct is the conduct the regulation prevents plaintiffs from engaging in. The challenged regulation here prevents Plaintiffs from acquiring even two firearms in one month. The plain text question, therefore, is whether the Second Amendment protects the right to acquire arms.

This Court has twice held that the Second Amendment protects the right to acquire arms. This Court's prior holdings are supported by Supreme Court precedent. First, the Supreme Court has determined that "keep Arms" in the Amendment's text means to "have weapons," and the plain meaning of "have" encompasses the act of acquisition. Second, the Supreme Court has acknowledged that certain rights are implicit in enumerated guarantees. In the Second Amendment context, four Justices have recognized—and none have disagreed—that firearms training is "a necessary concomitant" of the right to keep and bear arms. As this Court, the Third Circuit, and many district courts have recognized, acquiring a firearm must be a necessary concomitant as well.

2

Because the plain text covers Plaintiffs' desired conduct, it becomes the State's burden to justify its regulation with historical tradition. The State must provide distinctly similar historical regulations when addressing a general societal problem that has persisted since the 18th century.

The State argues that a more nuanced analogical approach is required because historically firearms were too laborious to manufacture and too expensive to purchase for firearms to be available for bulk purchase. In fact, firearms were ubiquitous in early America, and affordable enough for every militiaman and many women to be required to purchase one or several firearms. Indeed, newspaper advertisements regularly offered large quantities of firearms for sale.

In any event, California does not merely prohibit "bulk" purchases; it prohibits the purchase of even *two* firearms in one month. Americans commonly purchased multiple firearms in a single transaction in the colonial and founding eras—and no law ever forbade it. This practice is most clearly demonstrated by focusing on pistols.

Pistols were often sold in matching pairs, called a "case of pistols," which were necessarily purchased simultaneously. At least 42 militia

acts from the colonial and founding eras required militiamen to acquire, keep, and bear a case of pistols—many required them to acquire a carbine as well. Moreover, a plethora of newspaper advertisements offering cases of pistols for sale demonstrates how commonly purchased and possessed they were in early America.

The State failed to provide a single historical law limiting how many firearms someone could purchase in a month. Nor did the State provide any founding era regulation. Instead, the State relied primarily on colonial restrictions preventing the arming of hostile foreign nations and late-19th-century concealed carry licensing laws, restrictions for intoxicated persons, tax laws, and gunpowder export laws. None of them limited the number of firearms that law-abiding, responsible citizens could acquire.

## ARGUMENT

### I. The Second Amendment's plain text covers the right to acquire arms.

#### A. The initial inquiry in this case is whether the plain text covers the right to acquire arms.

In a Second Amendment challenge, the initial inquiry is whether "the Second Amendment's plain text covers" the desired conduct. *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 24 (2022). The desired conduct is "the conduct the regulation prevents plaintiffs from engaging in." *Doe v. Bonta*, No. 23-55133, 2024 WL 2037144, at *5 (9th Cir. May 8, 2024). "In *Bruen*, the 'proposed course of conduct' was 'carrying handguns publicly for self-defense.' That was what the plaintiffs wanted to do and what the challenged law prevented them from doing." *Id.* (quoting *Bruen*, 597 U.S. at 32).

Plaintiffs desire to acquire firearms for lawful purposes. Answering Br. 8. That is "what the plaintiffs want[] to do and what the challenged law prevent[s] them from doing." *Doe*, 2024 WL 2037144, at *5 (quoting *Bruen*, 597 U.S. at 32).

5

The State characterizes Plaintiffs' desired conduct as "the right to purchase an unlimited number of firearms within a 30-day period." Opening Br. 13. In truth, Plaintiffs desire merely to purchase "*more than one*" firearm "within a 30-day period." Answering Br. 4 (emphasis added). But in any event, the State places more pressure on the plain text analysis than it can bear. The adjective "plain" is essential. If the Second Amendment protects the act of acquiring arms, nothing in the plain text provides a basis to set a limitation on when, where, or how many firearms can be acquired. Rather, it is only through historical analysis that limitations on the conduct can be established.

The *Bruen* Court, for example, considered only whether the plain text covers "carrying handguns publicly for self-defense." 597 U.S. at 32. The Court considered potential limitations—*e.g.*, whether the manner of carry or the intent for which one can carry may be restricted—in its historical analysis. 597 U.S. at 38.

The plain text question here, therefore, is whether the Second Amendment protects the right to acquire arms. Any limitations— including whether the number of firearms acquired can be capped at one per month—may be considered only in the historical analysis.

**B.    This Court has held that the Second Amendment protects the right to acquire arms.**

This Court has already held that the Second Amendment protects the right to acquire arms: "prohibitions on the sale of ammunition do not fall outside the historical understanding of the scope of the Second Amendment right" because "the right to possess firearms for protection implies a corresponding right to obtain the bullets necessary to use them." *Jackson v. City & Cnty. of San Francisco*, 746 F.3d 953, 967–68 (9th Cir. 2014), *abrogated on other grounds by Bruen*, 597 U.S. at 19 (quotation marks and brackets omitted). Indeed, the "Second Amendment right to keep and bear arms for self-defense 'wouldn't mean much' without the ability to acquire arms." *Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017) (en banc) (quoting *Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011)).

**C.    The right to keep arms includes the right to acquire arms.**

The Supreme Court conducted the plain text analysis of the Second Amendment in *District of Columbia v. Heller*, 554 U.S. 570, 576–600 (2008). The *Heller* Court consulted Samuel Johnson's and Noah

Webster's dictionaries to conclude that "the most natural reading of 'keep Arms' in the Second Amendment is to 'have weapons.'" 554 U.S. at 582.

To "have" something—both historically and today—has always included its acquisition. Johnson's dictionary defined "have" as "5. To obtain" and "6. To take; to receive." 1 Samuel Johnson, DICTIONARY OF THE ENGLISH LANGUAGE (4th ed. 1773) (unpaginated).[2] Webster's defined "have" as "9. To gain; to procure; to receive; to obtain; to purchase." 1 Noah Webster, AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (1828) (unpaginated).[3] Today, Merriam Webster's defines "have" as "4 a: to acquire or get possession of: OBTAIN" and to "b: RECEIVE." MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 533 (10th ed. 1996). American Heritage defines "have" as "6.a. To come into possession of; acquire. b. To receive; get. c. To accept; take." THE AMERICAN HERITAGE COLLEGE DICTIONARY 622 (3d ed. 1993).

Because "the plain meaning of the verbs 'have' or 'possess' include the act of receipt," "'to have weapons'" must encompass the "receipt" and

---

[2] *Heller* relied on Johnson to define "arms," 554 U.S. at 581, "keep," *id.* at 582, "bear," *id.* at 584, and "well-regulated," *id.* at 597.

[3] *Heller* relied on Webster to define "arms," *id.* at 581, "keep," *id.* at 582, "bear," *id.* at 584, and "militia," *id.* at 595.

"possession of those weapons." *United States v. Quiroz*, 629 F. Supp. 3d 511, 516 (W.D. Tex. 2022).

**D.     The right to acquire arms is a necessary concomitant of the right to keep and bear arms.**

"A constitution. . . . requires, that only its great outlines should be marked, its important objects designated, and the minor ingredients which compose those objects, be deduced from the nature of the objects themselves." *McCulloch v. Maryland*, 17 U.S. 316, 407 (1819) . Thus, "the [Supreme] Court has acknowledged that certain unarticulated rights are implicit in enumerated guarantees." *Richmond Newspapers v. Virginia*, 448 U.S. 555, 579 (1980); *see also id.* at 580 ("fundamental rights, even though not expressly guaranteed, have been recognized by the Court as indispensable to the enjoyment of rights explicitly defined").

In the Second Amendment context, four Supreme Court Justices determined—and none disagreed—that "a necessary concomitant" of "the right to keep a handgun in the home for self-defense" is the right "to take a gun to a range in order to gain and maintain the skill necessary to use it responsibly." *New York State Rifle & Pistol Ass'n, Inc. v. City of New York*, 140 S. Ct. 1525, 1541 (2020) (Alito, J., joined by Gorsuch and Thomas, J.J., dissenting); *id.* at 1527 (Kavanaugh, J., concurring)

9

(expressing "agree[ment] with Justice Alito's general analysis of *Heller*");
*see also Oakland Tactical Supply, LLC v. Howell Twp., Michigan*, No. 23-
1179, 2024 WL 2795571, at *3 (6th Cir. May 31, 2024) ("[A]t least some
[firearms] training is protected . . . because it is a necessary corollary to
the right defined in *Heller*. Four Justices seemingly endorsed this
view[.]"). Another "necessary concomitant" of the right to keep and bear
arms is the right to acquire arms:

> Constitutional rights thus implicitly protect those closely
> related acts necessary to their exercise. . . . The right to keep
> and bear arms, for example, "implies a corresponding right to
> obtain the bullets necessary to use them," *Jackson* v. *City and
> County of San Francisco*, 746 F. 3d 953, 967 (CA9 2014)
> (internal quotation marks omitted). . . . Without protection for
> th[is] closely related right[], the Second Amendment would be
> toothless.

*Luis v. United States*, 578 U.S. 5, 26–27 (2016) (Thomas, J., concurring).

In a case *Heller* cited thrice approvingly, 554 U.S. at 608, 614, 629,
the Tennessee Supreme Court held that "[t]he right to keep arms,
necessarily involves the right to purchase them," *Andrews v. State*, 50
Tenn. 165, 178 (1871). More recently, the Third Circuit held that the
Second Amendment protects the right to purchase firearms. *Drummond*

*v. Robinson Twp.*, 9 F.4th 217, 226–29 (3d Cir. 2021). Numerous district courts have also recognized the right to acquire arms.[4]

Similarly, "[t]he First Amendment guarantee of a free press . . . implies a right to buy the inks and paper necessary for printing newspapers." *Oakland Tactical Supply, LLC*, 2024 WL 2795571, at *10 (Kethledge, J., dissenting) (citing *Minneapolis Star and Tribune Co. v. Minn. Comm'r of Revenue*, 460 U.S. 575, 582–83 (1983)). And "the First

---

[4] *See, e.g.*, *Brown v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, No. 1:22-CV-80, 2023 WL 8361745, at *10 (N.D.W. Va. Dec. 1, 2023) ("the act of purchasing a handgun is within the bounds of the Second Amendment"); *Miller v. Bonta*, No. 19-CV-01537, 2023 WL 6929336, at *6 (S.D. Cal. Oct. 19, 2023) (recognizing "a citizen's constitutional right to acquire these firearms for self-defense"); *United States v. McNulty*, 684 F. Supp. 3d 14, 20 (D. Mass. 2023) ("The text of the Second Amendment itself also suggests that the right to 'keep' firearms necessarily includes an ability to purchase" firearms); *United States v. Alston*, No. 5:23-CR-021-FL-1, 2023 WL 7003235, at *4 (E.D.N.C. Oct. 24, 2023) ("The court has little difficulty concluding that [18 U.S.C.] § 922(g)(3), which prohibits the receipt of firearms, burdens conduct within the ambit of the Second Amendment.") (quotation marks omitted); *Renna v. Bonta*, 667 F. Supp. 3d 1048, 1065 (S.D. Cal. 2023) ("Plaintiffs' desire to purchase the arms in question on the retail market falls within the plain text of the Second Amendment"); *Illinois Ass'n of Firearms Retailers v. City of Chicago*, 961 F. Supp. 2d 928, 930 (N.D. Ill. 2014) ("the right to keep and bear arms for self-defense. . . . must also include the right to *acquire* a firearm"). Several of these decisions have been appealed, but they nevertheless represent the widespread consensus that the Second Amendment protects the right to acquire arms.

Amendment 'right to speak would be largely ineffective if it did not include the right to engage in financial transactions that are the incidents of its exercise.'" *Id.* (quoting *McConnell v. Federal Election Com'n*, 540 U.S. 93, 252 (2003) (Scalia, J., concurring in part)).

Because "the Second Amendment right . . . to acquire a firearm . . . is implicated by . . . laws directly or functionally banning firearm sales," *Kole v. Vill. of Norridge*, No. 11-cv-3871, 2017 WL 5128989, at *21 (N.D. Ill. Nov. 6, 2017), "the Constitution presumptively protects" Plaintiffs' desired conduct and the State must justify its one-gun-per-month restriction with historical tradition, *Bruen*, 597 U.S. at 24.

## II. Historically, multiple gun purchases per month were common.

### A. The societal problem California claims to address pre-dates the Founding.

"When the Second Amendment's plain text covers an individual's conduct," it becomes the government's burden to "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 24; *see also id.* at 17, 33–34, 38–39, 60, 70. If "a challenged regulation addresses a general societal

problem that has persisted since the 18th century," the government must provide "a *distinctly similar* historical regulation addressing that problem." *Id.* at 26 (emphasis added); *see also Range v. Att'y Gen. United States of Am.*, 69 F.4th 96, 103 (3d Cir. 2023) (en banc); *United States v. Daniels*, 77 F.4th 337, 342 (5th Cir. 2023) (recognizing the heightened standard for regulations targeting longstanding problems). But "cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach." *Bruen*, 597 U.S. at 27.

The State argues that "a more nuanced analogical approach is required" here, because "[d]uring the founding and Reconstruction eras, firearms were made by hand, in a time consuming and laborious process" so "they could not be mass produced or distributed quickly" and thus "were not widely available for bulk purchase." Opening Br. 21. Moreover, the State alleges, "because firearms were essentially artisanal goods that required significant labor and materials, they were prohibitively expensive for many early Americans." Opening Br. 23.[5]

---

[5] The State also claims that "California's limitation on the number of firearms that may be purchased in a 30-day period is [a] presumptively lawful 'condition and qualification on the commercial sale of arms.'" Opening Br. 18 (quoting *Heller*, 554 U.S. at 627) (brackets omitted). But

None of these claims are accurate. First, firearms were constantly produced in early America, and they were not prohibitively expensive. Virtually every able-bodied male from the earliest colonial days through the Second Amendment's ratification was *required* by law to keep and bear one or several firearms. *See generally* 2 BACKGROUNDS OF SELECTIVE SERVICE: MILITARY OBLIGATION: THE AMERICAN TRADITION, Parts 2–14 (Arthur Vollmer ed., 1947). So were many women. *See* David B. Kopel & Joseph G.S. Greenlee, *The Second Amendment Rights of Young Adults*, 43 S. ILL. U. L.J. 495, 528–29 (2019). Thus, "[e]verywhere the gun was more abundant than the tool." 1 Charles Winthrop Sawyer, FIREARMS IN AMERICAN HISTORY 1 (1910). And "[g]unsmiths were found nearly

---

this Court has made clear that "'[s]imply repeating *Heller*'s language' about the 'presumptive lawfulness'" of the regulations identified in *Heller* "will no longer do after *Bruen*." *United States v. Duarte*, 101 F.4th 657 (9th Cir. 2024) (brackets omitted). Rather, "*Bruen* expressly 'requires courts to assess whether' . . . '*any* regulation infringing on Second Amendment rights, is consistent with this nation's historical tradition of firearm regulation.'" *Id.* (quoting *United States v. Perez-Garcia*, 96 F.4th 1166, 1175 (9th Cir. 2024)) (brackets omitted); *see also Bruen*, 597 U.S. at 24 (setting forth "*the* standard for applying the Second Amendment") (emphasis added). "It would pay lip service to this mandate if we continued to defer . . . to *Heller*'s ['presumptively lawful'] footnote." *Id.* "Nothing allows us to sidestep *Bruen* in th[is] way." *Id.* (quoting *Atkinson v. Garland*, 70 F.4th 1018, 1022 (7th Cir. 2023)).

everywhere." Harold B. Gill, Jr., THE GUNSMITH IN COLONIAL VIRGINIA 1 (1974).

Second, Americans were always free to import whatever arms they desired—the only exception being when King George III imposed an arms embargo in 1774, which precipitated the Revolutionary War. *See* David B. Kopel, *How the British Gun Control Program Precipitated the American Revolution*, 6 CHARLESTON L. REV. 283, 297–301 (2012). In 1606, King James I, binding his "Heirs, and Successors," granted the "Southern Colony" (today's Virginia and the entire South) the perpetual right to import from Great Britain, "the Goods, Chattels, Armour, Munition, and Furniture, needful to be used by them, for their said Apparel, Food, Defence or otherwise." 7 FEDERAL AND STATE CONSTITUTIONS COLONIAL CHARTERS, AND OTHER ORGANIC LAWS OF THE STATES, TERRITORIES, AND COLONIES 3787–88 (Francis Thorpe ed., 1909).[6] The 1620 Charter of New England (originally the entire North) similarly guaranteed the right "att all and every time and times hereafter, out of our Realmes or Dominions whatsoever, to take, load, carry, and

---

[6] "Armour" included all equipment for fighting, including firearms. *Heller*, 554 U.S. at 581.

15

transports in . . . Shipping, Armour, Weapons, Ordinances, Munition, Powder, Shott, Victuals . . . and all other Things necessary for the said Plantation, and for their Use and Defense, and for Trade with the People there." 3 *id.* at 1834–35.

Third, newspaper advertisements make clear that firearms could easily be acquired in large quantities prior to the Founding. In 1745, "300 Muskets and Bayonets" were "sold by Mr. Commissary Dart, at his House." SOUTH-CAROLINA GAZETTE, June 1, 1745, at 2.[7] In 1748, "12 fine carriage guns, 12 swivels [small cannons], a parcel [of] fine blunderbusses, muskets, [and] pistols" were sold at one Pennsylvania auction. PENNSYLVANIA GAZETTE, Sep. 15, 1748, at 3.[8] The same page of one 1748 newspaper contained a notice that Charles Willing was selling "at his House" "a parcel of small arms, pistols, cutlasses, 16 fine cannon . . . swivel guns, grenadoes, and other warlike stores" and an auction notice where "10 carriage guns, and 6 swivel guns" would be sold. PENNSYLVANIA GAZETTE, Mar. 29, 1748, at 3.[9] "Twenty-Six pair

---

[7] https://www.newspapers.com/image/605132111/.

[8] https://www.newspapers.com/image/39398672/.

[9] https://www.newspapers.com/image/39395868/.

16

Horsemen's Pistols"—or 52 handguns—were offered for sale by a Connecticut store in 1797. CONNECTICUT COURANT, Mar. 6, 1797, at 3;[10] *see also* PENNSYLVANIA GAZETTE, Nov. 3, 1757, at 3 (selling "[t]he remaining store-goods belonging to the late" owner, including "a large parcel of muskets and bayonets").[11]

Fourth, firearms were mass produced well before the Reconstruction era. Thomas Jefferson, James Madison, and James Monroe laid the foundation for the mass production of firearms. *See* David B. Kopel & Joseph G.S. Greenlee, *The History of Bans on Types of Arms Before 1900*, 50 J. LEGIS. 223, 263–65 (2024). Samuel Colt "began mass-producing his popular revolvers in 1847" by developing interchangeable parts, *Samuel Colt sells his first revolvers to the U.S. government*, HISTORY.COM,[12] and other manufacturers soon followed to the extent that "[b]y mid-century, what had begun as the mass production of firearms from interchangeable parts had become globally

---

[10] https://www.newspapers.com/image/233556024/.

[11] https://www.newspapers.com/image/39397821/.

[12] https://www.history.com/this-day-in-history/colt-sells-his-first-revolvers-to-the-u-s-government (last visited June 3, 2024).

known as 'the American system of manufacture,'" Kopel & Greenlee, *The History of Bans*, at 265.

Finally, Ira Allen's experience transporting mass quantities of arms into America demonstrates that a Founder himself possessed large quantities of arms. Allen was seized by British forces in 1796 while transporting 20,000 muskets and twenty-four "field pieces" (cannons and other artillery) from France to America. Allen said the arms were for Vermont's militia, whereas the British suspected that he planned to arm a Canadian revolt against the British. He was prosecuted in Britain's Court of Admiralty. At trial, the idea of one individual possessing 20,000 arms was received with skepticism. Allen retorted that in America, "[a]rms and military stores are free merchandise, so that any who have property and ch[oo]se to sport with it, may turn their gardens into parks of artillery, and their houses into arsenals, without danger to Government." 1 Ira Allen, PARTICULARS OF THE CAPTURE OF THE SHIP OLIVE BRANCH 403 (1798). The arms were restored to Allen. *Id.*

In any event, California does not merely prohibit "bulk" purchases; it prohibits the purchase of even *two* firearms in one month. Americans commonly purchased multiple firearms in a single transaction in the

colonial and founding eras—and no law ever forbade it. This practice is most clearly demonstrated by focusing on pistols. Pistols were often sold in matching pairs, "sometimes as a 'case of pistols' or a 'brace of pistols.'" Clayton E. Cramer & Joseph Edward Olson, *Pistols, Crime, and Public: Safety in Early America*, 44 WILLAMETTE L. REV. 699, 719 (2008). The commonality of cases of pistols being required by militiamen and advertised for sale in newspapers illustrates how regularly multiple firearms were purchased in a single month—and indeed, a single transaction.

## B. Militiamen were regularly required to acquire multiple firearms in a single month.

When a new militia law took effect, militiamen were ordinarily required to acquire the mandated arms before the first muster. Therefore, when a militia act required militiamen to keep and bear multiple firearms, they had to acquire those firearms promptly. And when militia laws mandated militiamen to keep and bear a case of pistols, because such firearms were sold together, those firearms were necessarily purchased simultaneously.

Connecticut required all horsemen to keep and bear a "case of good pistols" starting in 1687. 2 BACKGROUNDS OF SELECTIVE SERVICE, Part 2,

at 46. Horsemen were required to be "furnished with a Carbine" in addition to "a Case of good Pistols" in 1715. *Id.* at 92. The carbine and case of pistols requirement was restated in Connecticut's 1741 and 1754 acts. *Id.* at 131, 151. In 1784, horsemen were no longer required to keep and bear a carbine, but still needed to "always be provided with . . . a Case of good Pistolls." *Id.* at 256.

Massachusetts required "each Trooper to be provided with a . . . Carbine, a pair of Pistols, [and] Holsters" in 1685. *Id.*, Part 6, at 132. Likewise, in 1693, "every trooper" was required to "be always provided with . . . a carbine" and "a case of good pistols." *Id.* at 139.

New Hampshire, starting in 1687, required all horsemen to keep and bear "a case of good pistolls" and also to "have at his usuall place of abode a well fixed Carbine . . . which they shall bring into the feild when commanded." *Id.*, Part 7, at 13.

New Jersey's 1746 militia act mandated that each horseman keep and bear a "Case of Good Pistols well fitted," and always "keep at his Place of Abode, besides the Arms and Ammunition abovesaid, a well fixed Carbine . . . and bring the same into the Field when specially required[.]" *Id.*, Part 8, at 30. In 1777, a horseman had to "furnish himself with" a

20

"Case of Pistols well fitted" and "a well fixed Carbine." *Id.* at 45. Under a 1781 act, the carbine requirement was dropped, but a horseman still needed to "at all Times keep himself provided with . . . a Pair of Pistols and Holsters." *Id.* at 80–81.

In New York, "every Soldier belonging To the Horse" had to keep and bear "a Case of good pistolls" and also "have at his usuall place of Abode, a well fixed Carbine," under a 1691 militia act. *Id.*, Part 9, at 16. The same arms were required in New York's 1694, 1702, and 1721 militia acts. *Id.* at 4–5, 46, 53, 80. In subsequent acts from 1724, 1739, 1743, 1744, 1755, 1764, 1772, 1775, 1778, and 1782, the horsemen had to appear with the carbine in addition to the pistols when called into service. *Id.* at 89, 116, 134, 148, 188, 227, 243, 252, 273, 311.

Horsemen in North Carolina had to keep and bear "a good Case of Pistols" and "a Fuzee" starting in 1746.[13] *Id.*, Part 10, at 13. In 1756, the fuzee was replaced with a carbine. *Id.* at 21. These three firearms were then required of horsemen in North Carolina's acts of 1760, 1764, 1766, 1774, and 1778. *Id.* at 29, 35, 42, 52, 75.

---

[13] A fuzee was "a light, smoothbore shoulder arm of smaller size and caliber than the regular infantry weapon." George C. Neumann, BATTLE WEAPONS OF THE AMERICAN REVOLUTION 19 (2011).

Rhode Island horsemen had to keep "one Carbine" and "one pair of good Pistolls" starting in 1718. *Id.*, Part 12, at 45. This requirement was renewed in 1767. *Id.* at 95. To comport with the federal Uniform Militia Act of 1792, horsemen under Rhode Island's 1793 and 1798 acts were required to keep and bear a pair of pistols. *Id.* at 206, 219.

Virginia horsemen were required to keep and bear "a case of pistolls" and "a carbine" starting in 1684. *Id.*, Part 14, at 50. In 1705, they were required to keep a carbine at their "usuall place of abode," but had to bring only their "case of good pistolls well fixed" to musters. *Id.* at 65. The 1705 mandate was restated in 1723. *Id.* at 78. In 1738, horsemen could choose between a carbine or fuzee, but also had to keep "a case of pistols," and appear with all three firearms at musters and exercises. *Id.* at 105. The fuzee option was dropped in 1752, and horsemen had to appear with a "case of pistols" and "carbine." *Id.* at 145.

Under the federal Uniform Militia Act of 1792, enacted soon after the Second Amendment's ratification, horsemen—including the "commissioned officers" and "each dragoon"—were required to "furnish themselves" with a "pair of pistols." 1 Stat. 271, 272 (1792).

22

### C.    Pistols were commonly sold in pairs.

Many early Americans would carry multiple handguns to increase their firing capacity. "[T]hose who were expecting trouble might carry two, four, or even six single shot pistols on their belt."[14] Cramer & Olson, at 719. Thus, pistols were commonly sold in pairs.

South Carolinian William Douglas advertised in 1736 that he was selling "two pair of very neat pistols." SOUTH-CAROLINA GAZETTE, Oct. 2, 1736, at 4.[15]

A notice in the *Pennsylvania Gazette* in 1751 informed the public that "a pair of pistols" would be sold at a public auction held "under the

---

[14] An account from Richmond, Virginia, in 1799 demonstrates why:

> a gentleman, returning home about 11 o'clock, was called upon to stop . . . by two fellows. . . . The gentleman instantly pulled out and cocked a pair of pistols. As the night was clear the fellow [who approached the gentleman] saw them and started back. The following dialogue then took place: "And so you have got pistols?"—"Yes!"—"And what if I should try to take them from you?"—"Then I'll blow you to damnation."— "And so you think I had best let you alone?"—"I think you had best;"—the fellow then went off.

VERGENNES GAZETTE AND VERMONT AND NEW-YORK ADVERTISER, Sep. 12, 1799, at 3, available at https://www.newspapers.com/image/488954725/.

[15] https://www.newspapers.com/image/605373149/.

23

Court-house" in Philadelphia on September 25. PENNSYLVANIA GAZETTE, Sep. 19, 1751, at 2.[16]

Cornelius Bradford offered for sale "Ten Pair of Pistols" in two 1762 advertisements in a Pennsylvania paper. *See, e.g.*, PENNSYLVANIA JOURNAL; AND WEEKLY ADVERTISER, July 22, 1762, at 3;[17] PENNSYLVANIA JOURNAL; AND WEEKLY ADVERTISER, July 29, 1762, at 1.[18]

A notice in the *Pennsylvania Gazette* announced the auction of a deceased farmer's estate occurring on October 29, 1762, which included "two Pair of Pistols." PENNSYLVANIA GAZETTE, Oct. 21, 1762, at 3.[19] An auction held for the same reason in South Carolina on April 12, 1775, included "a Pair of neat Pistols" in addition to "one or two neat Guns." SOUTH-CAROLINA GAZETTE; AND COUNTRY JOURNAL, Apr. 4, 1775, at 1.[20]

In May 1775, the *Pennsylvania Gazette* listed several items that had been recovered from a thief that would be sold to the public in Philadelphia—including "I pair horse pistols." PENNSYLVANIA GAZETTE,

---

[16] https://www.newspapers.com/image/39401652/.

[17] https://www.newspapers.com/image/1033771580/.

[18] https://www.newspapers.com/image/1033771597/.

[19] https://www.newspapers.com/image/39401532/.

[20] https://www.newspapers.com/image/605383343/.

May 24, 1775, at 4.[21] In August 1775, Edward Oats advertised for sale "Several GUNS" including "four Pair of PISTOLS." SOUTH-CAROLINA AND AMERICAN GENERAL GAZETTE, Aug. 25, 1775, at 1.[22] Later that same year, a "Handsome pair of HORSE PISTOLS, brass barrels, silver mounted" were offered for sale in a Philadelphia newspaper. DUNLAP'S PENNSYLVANIA PACKET OR THE GENERAL ADVERTISER, Dec. 11, 1775, at 3.[23]

The following year, a tackle shop in Philadelphia advertised that in addition to all sorts of "fishing tackle," it also sold some firearm-related products, including a "pair of pistols." DUNLAP'S PENNSYLVANIA PACKET OR THE GENERAL ADVERTISER, Apr. 15, 1776, at 3.[24]

After Pennsylvanian John George passed away, many of his goods were sold at auction on July 27, 1776, including "a good gun, two pair of pistols and a cutlass." DUNLAP'S PENNSYLVANIA PACKET OR THE GENERAL ADVERTISER, July 22, 1776, at 3.[25]

---

[21] https://www.newspapers.com/image/39389827/.

[22] https://www.newspapers.com/image/605068969/.

[23] https://www.newspapers.com/image/1034013148/.

[24] https://www.newspapers.com/image/1034013576/.

[25] https://www.newspapers.com/image/1034013974/.

"[T]wo Blunderbusses, a pair of Pistols, &c." were sold at a public auction in Philadelphia on April 16, 1779. THE PENNSYLVANIA PACKET OR THE GENERAL ADVERTISER, Apr. 8, 1779, at 3.[26] Later that year, on December 27, a "pair [of] neat pistols and holsters" were sold at a public auction in Downingtown, Pennsylvania. THE PENNSYLVANIA PACKET OR THE GENERAL ADVERTISER, Dec. 25, 1779, at 1.[27]

A Philadelphian offered for sale "a pair of silver mounted double barrel Pistols" and "a pair of Pocket Pistols" on September 23, 1780. THE PENNSYLVANIA PACKET OR THE GENERAL ADVERTISER, Sep. 23, 1780, at 3.[28]

A Philadelphia gunsmith reported that he had been burglarized on two separate occasions in September 1783, and that two pairs of holster pistols and one pair of pocket pistols were among the stolen goods. INDEPENDENT GAZETTEER, Oct. 8, 1783, at 2.[29] A general store burglarized in Hartford, Connecticut, in September 1792, reported "a pair of pocket

---

[26] https://www.newspapers.com/image/1034015473/.

[27] https://www.newspapers.com/image/1034016885/.

[28] https://www.newspapers.com/image/1034018018/.

[29] https://www.newspapers.com/image/39983593/.

Pistols" among the stolen items. CONNECTICUT COURANT, Sep. 24, 1792, at 3.[30]

On January 23, 1796, a shop in Philadelphia advertised a "Pair of Pistols, by Knubley, Charing-Cross . . . fitted in [their] case." AURORA GENERAL ADVERTISER, Jan. 23, 1796, at 1.[31] Later that year, a store named Solomon Porter announced its grand opening in Hartford, Connecticut, and listed "a few pair of Troopers Pistols" among its inventory along with a variety of non-firearm related goods. CONNECTICUT COURANT, Nov. 14, 1796, at 4.[32] The following year, Isaac Bull of Hartford advertised a great variety of goods "Just received, and for Sale," including "Twenty-Six pair Horsemen's Pistols." CONNECTICUT COURANT, Mar. 6, 1797, at 3.[33]

William Priestman regularly advertised pairs of pistols in the late 18th century. *See, e.g.*, GAZETTE OF THE UNITED STATES, AND PHILADELPHIA DAILY ADVERTISER, Feb. 12, 1798, at 4;[34] GAZETTE OF THE

---

[30] https://www.newspapers.com/image/233654374/.

[31] https://www.newspapers.com/image/585597731/.

[32] https://www.newspapers.com/image/233667099/.

[33] https://www.newspapers.com/image/233556024/.

[34] https://www.newspapers.com/image/593170159/.

UNITED STATES, AND PHILADELPHIA DAILY ADVERTISER, Mar. 9, 1798, at 1.[35]

The *Aurora General Advertiser* included an advertisement on December 17, 1799, for "10 Cases Horsemen's Pistols, of different qualities" to be sold "[o]n reasonable terms, by the package." AURORA GENERAL ADVERTISER, Dec. 17, 1799, at 1.[36]

## III. The State offers no founding era analogs; the colonial laws it provides allowed unlimited sales to Englishmen and restricted firearm sales only to hostile foreign nations.

Although multiple gun purchases per month were common, no historical law ever forbade them.

Nevertheless, the State claims to have identified four colonial "historical precursors" to its one-gun-per-month restriction. Opening Br. 24. *Bruen* provided two metrics for determining whether historical and challenged regulations are sufficiently similar: "how and why the regulations burden a law-abiding citizen's right to armed self-defense." 597 U.S. at 29. None of the State's alleged "precursors" satisfy either the "how" or "why" requirement.

---

[35] https://www.newspapers.com/image/593170395/.

[36] https://www.newspapers.com/image/586546655/.

The State first claims that "Connecticut banned the sale of firearms by its residents outside the colony in 1646." Opening Br. 24 (citing THE PUBLIC RECORDS OF THE COLONY OF CONNECTICUT, PRIOR TO THE UNION WITH NEW HAVEN COLONY, MAY, 1665, at 137–39, 145–46 (J. Hammond Trumbull ed., 1850)). The State's description is misleading. First, the law was not a ban, but rather required a license to sell arms "to any out of the Jurisdiction." THE PUBLIC RECORDS OF THE COLONY OF CONNECTICUT, at 145. Second, the "Jurisdiction" did not refer to "the colony," as the State contends, but rather to "the confederate jurisdictions." *Id.* "The confederate jurisdictions" was another name for the United Colonies of New England—including "the plantations under the government of the Massachusetts, the plantations under the government of New Plimouth, the plantations under the government of Connecticut and the government of New Haven, with the Plantations in combination therewith"—which agreed upon "articles of confederation" in 1643. 2 John Winthrop, THE HISTORY OF NEW ENGLAND FROM 1630 TO 1649, at 101 (James Savage ed., 1826). Third, the law was enacted to restrict trade to hostile foreign nations. Connecticut's General Court ordered in 1644 that "no prson . . . shall at any tyme hereafter sell nēther gun nor pistoll

nor any Instrument of warre, nether to Dutch nor French men," because "the Dutch and French doe sell and trade to the Indeans, guns, pistolls and warlike instruments." THE PUBLIC RECORDS OF THE COLONY OF CONNECTICUT, at 113–14. Next, in 1646, the General Court expressed its desire "that the Com̃issiors should be moved that noe Am̃unition should be traded wth any that live out of the Jurisdictions in combinatiō, whereby [they] might supply the Indeans[.]" *Id.* at 138. Later that year, the Court confirmed the order of the Commissioners requiring a license to sell arms "to any out of the Jurisdiction." *Id.* at 145.

At the time, the Dutch colony of New Netherland, west of New England, was "a powerful and already quarrelsome neighbor" to Connecticut. THE HISTORY OF CONNECTICUT, FROM ITS EARLIEST SETTLEMENT TO THE PRESENT TIME 77–78 (W. H. Carpenter & T. S. Arthur eds., 1872). North of New England was the French colony of Quebec. "[T]he principal impetus" for forming the United Colonies of New England "was a concern over defense against attacks by the French, the Dutch, or the Indians." *New England Confederation*, BRITANNICA.COM.[37]

---

[37] https://www.britannica.com/topic/New-England-Confederation (last visited June 3, 2024).

In sum, Connecticut's law had a different "why"—to prevent arming hostile foreign nations (including Indian nations)—and a different "how"—by requiring a license.

The State next alleges that "[i]n 1676, Virginia authorized the sale of firearms and ammunition only to 'his majesties loyal[] subjects inhabiting this colony.'" Opening Br. 25 (quoting 2 William Waller Hening, THE STATUTES AT LARGE: BEING A COLLECTION OF ALL THE LAWS OF VIRGINIA, FROM THE FIRST SESSION OF THE LEGISLATURE, IN THE YEAR 1619, at 403 (1823)). The law's full text ensured a broader right than the State reveals and contains no express limitations: "It *is ordered* that all persons have hereby liberty to sell armes and ammunition to any of his majesties loyall subjects inhabiting this colony, and that the Indians of the Easterne shore have like and equall liberty of trade or otherwayes with any other our friends and neighbouring Indians." 2 Hening, at 403. Far from a restriction analogous to California's, the law permitted unlimited sales to Virginians and even non-countrymen.

The State also claims that "[a] 1652 New York law outlawed 'Illegal Trade in Powder, Lead and Guns' by 'Private persons.'" Opening Br. 25 (quoting E.B. O'Callaghan, LAW & ORDINANCES OF NEW NETHERLAND,

1638–1674, at 128 (1867)).[38] In fact, the text of this law no longer exists. *See* LAWS AND ORDINANCES OF NEW NETHERLAND, 1638–1674, at 128 (E. B. O'Callaghan ed., 1868). But it seems to have echoed a 1639 law, which forbade the sale of "Guns, Powder or Lead *to the Indians*." *Id.* at 19 (emphasis added). And it "seems, indeed, not to have been very strictly enforced." *Id.* at 128. Most importantly, it was not a "New York law," as the State claims, but rather a New Netherland law. New Netherland was a Dutch colony. The Dutch law did not survive when the English seized control of the colony in 1664. This law therefore does not reflect English— not to mention American—tradition.

The fourth "precursor" the State cites is a Virginia act entitled, "*An act prohibiting trade with Indians*." Opening Br. 25; 2 Hening, at 336. The act was a response to "traders" arming "Indians with powder, shott and gunns," which the Indians then used "to fall upon the fronteer plantations [and murder] many of our people" and "throw us into a . . . most dangerous warr." 2 Hening, at 336. The law did not restrict sales to

---

[38] The year (1867) may be a typo. It appears that the first edition of this book appeared in 1868.

Englishmen and was expressly intended to prevent arming Indians who might use the arms to attack the Virginians.

None of the colonial laws limited purchases by Englishmen in any way—so they do not satisfy *Bruen*'s "how" requirement. They all were enacted to prevent the arming of hostile foreign nations—so they do not satisfy *Bruen*'s "why" requirement, either.[39]

The State provided no founding era restrictions, which is especially consequential because the Second Amendment's "meaning is fixed according to the understandings of those who ratified it." *Bruen*, 597 U.S. at 28. Instead, the State relies primarily on a variety of late-19th-century regulations, Opening Br. 26–31, despite *Bruen*'s assurances that "post-Civil War discussions of the right to keep and bear arms . . . do not provide as much insight into its original meaning as earlier sources" and can only be "treated as mere confirmation of what" has "already been established," 597 U.S. at 36–37. These regulations include concealed carry licensing laws, restrictions for intoxicated persons, tax laws, and gunpowder export laws. Opening Br. 26–30. The only similarity most of these

---

[39] Today, the "why" of these laws is accomplished by the federal Arms Export Control Act. 22 U.S.C. § 2778.

33

regulations share with the State's one-gun-per-month restriction is that they sometimes involved firearms. None of them limited the number of firearms that law-abiding, responsible citizens could acquire. They are therefore not "distinctly similar" and cannot justify the State's regulation.

## CONCLUSION

The district court's order should be affirmed.

Respectfully submitted,

/s/ *Joseph G.S. Greenlee*
JOSEPH G.S. GREENLEE
  *Counsel of Record*
ERIN M. ERHARDT
NATIONAL RIFLE ASSOCIATION
OF AMERICA – INSTITUTE FOR
LEGISLATIVE ACTION
11250 Waples Mill Road
Fairfax, VA 22030
(703) 267-1161
jgreenlee@nrahq.org

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 24-2036

I am the attorney or self-represented party.

**This brief contains** 6,520 **words,** including 0 words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◯ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◉ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.

☐ a party or parties are filing a single brief in response to multiple briefs.

☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated [          ].

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/ Joseph G.S. Greenlee | **Date** 6/4/2024

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8** | *Rev. 12/01/22*

## CERTIFICATE OF SERVICE

I certify that on June 4, 2024, I served the foregoing with the Clerk of the Court using the ACMS System, which will send notice of such filing to all registered ACMS users.

/s/ *Joseph G.S. Greenlee*
Counsel for *Amicus Curiae*