No. 24-2036

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

————————

MICHELLE NGUYEN; DOMINIC BOGUSKI; JAY MEDINA; FRANK COLLETTI; JOHN PHILLIPS; PWGG, LP; DARIN PRINCE; NORTH COUNTY SHOOTING CENTER, INC.; FIREARMS POLICY COALITION, INC.; SAN DIEGO COUNTY GUN OWNERS PAC; SECOND AMENDMENT FOUNDATION,

*Plaintiffs-Appellees*,

v.

ROB BONTA, in his official capacity as Attorney General of the State of California; ALLISON MENDOZA, in her capacity as the Director of the Department of Justice Bureau of Firearms,

*Defendants-Appellants*.

————————

On Appeal from the United States District Court
for the Southern District of California,
No. 20-cv-02470

————————

## BRIEF FOR NATIONAL SHOOTING SPORTS FOUNDATION, INC., AS *AMICUS CURIAE* IN SUPPORT OF APPELLEES

————————

LAWRENCE G. KEANE
SHELBY BAIRD SMITH
NATIONAL SHOOTING
 SPORTS FOUNDATION, INC.
400 N. Capitol St., NW
Washington, DC 20001
(202) 220-1340

PAUL D. CLEMENT
ERIN E. MURPHY
 *Counsel of Record*
MATTHEW D. ROWEN
NICHOLAS M. GALLAGHER[*]
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
erin.murphy@clementmurphy.com

[*] Supervised by principals of the firm who are members of the Virginia Bar

*Counsel for* Amicus Curiae *National Shooting Sports Foundation, Inc.*

June 4, 2024

**RULE 26.1 DISCLOSURE STATEMENT**

*Amicus curiae* National Shooting Sports Foundation, Inc., has no parent corporation and no publicly held company owns ten percent or more of its stock.

CLEMENT & MURPHY, PLLC

s/Erin E. Murphy
Erin E. Murphy

*Counsel for* Amicus Curiae

June 4, 2024

# TABLE OF CONTENTS

RULE 26.1 DISCLOSURE STATEMENT ............................................................... i

TABLE OF AUTHORITIES........................................................................ iii

STATEMENT OF INTEREST...................................................................... 1

INTRODUCTION ................................................................................. 1

BACKGROUND .................................................................................. 4

ARGUMENT ..................................................................................... 5

I.     California's One-Gun-A-Month Law Is Unconstitutional ............................ 5

    A.     California's One-Gun-A-Month Law Regulates Conduct That the Plain Text of the Second Amendment Protects ............................ 6

    B.     Earlier Generations Addressed the Same Problem the State Seeks to Combat, but They Did So Through Materially Different Means........................................................................ 9

    C.     Even Under a "More Nuanced" Approach, California's Law Fails ........................................................................... 15

    D.     The State Cannot Avoid *Bruen* By Invoking *Heller*'s "Presumptively Lawful" Language.................................................... 21

CONCLUSION ................................................................................. 24

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases**

*Andrews v. State,*
  50 Tenn. 165 (1871) ................................................8

*Baird v. Bonta,*
  81 F.4th 1036 (9th Cir. 2023) ............................... 15, 18

*District of Columbia v. Heller,*
  554 U.S. 570 (2008) ........................................ *passim*

*Joseph Burstyn, Inc. v. Wilson,*
  343 U.S. 495 (1952) ...........................................17

*McDonald v. City of Chicago,*
  561 U.S. 742 (2010) .........................................8, 18

*Minneapolis Star Trib. Co. v. Minn. Comm'r,*
  460 U.S. 575 (1983) ...........................................8

*Miss. Cent. R.R. Co. v. Kennedy,*
  41 Miss. 671 (Miss. Errors & Appeals 1868) ...................11

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen,*
  597 U.S. 1 (2022) .......................................... *passim*

*Parker v. District of Columbia,*
  478 F.3d 370 (D.C. Cir. 2007) ................................11

*Sekhar v. United States,*
  570 U.S. 729 (2013) ...........................................8

*Sprint Comm'cns Co., L.P. v. APCC Servs., Inc.,*
  554 U.S. 269 (2008) ..........................................23

*Teixeira v. Cnty. of Alameda,*
  873 F.3d 670 (9th Cir. 2017) ............................ 2, 8, 12

*United States v. Daniels,*
  77 F.4th 337 (5th Cir. 2023) .................................10

*United States v. Duarte*,
101 F.4th 657 (9th Cir. 2024)................................................................ 3, 6, 21, 22

*United States v. Jones*,
565 U.S. 400 (2012)........................................................................17

*United States v. Murillo*,
2024 WL 1517209 (C.D. Cal. Apr. 8, 2024)....................................8

*United States v. Perez-Garcia*,
96 F.4th 1166 (9th Cir. 2024)........................................................ 5, 7, 21, 22

**Constitutional Provision**

U.S. Const. amend. II................................................................ 7

**Statutes**

Act of Feb. 14, 1873, ch. 138, 17 Stat. 437 ....................................14

Cal. Penal Code §27535 (2021)....................................................4

Cal. Penal Code §27540(g) ..........................................................4

**Other Authorities**

William Bradford, *A Descriptive and Historical Account of New
England in Verse*, reprinted in 3 *Collections of the Massachusetts
Historical Society for the Year 1794* (1810)....................................11

Clayton E. Cramer & Joseph Edward Olson, *Pistols, Crime, and
Public: Safety in Early America*, 44 Willamette L. Rev. 699 (2008) ................11

George Armstrong Custer, *My Life on the Plains* (1876) ...................... 13

Lansford Warren Hastings, *The Emigrant's Guide to Oregon and
California* (1845) ........................................................................ 12

William Waller Hening, *The Statutes at Large: Being a Collection of
All the Laws of Virginia, from the First Session of the Legislature,
in the Year 1619* (1823)................................................................ 13

D.W. Howe, *What Hath God Wrought* (2007)................................ 17, 18

iv

Capt. Randolph Barnes Marcy, *The Prarie Traveler* (1859).................................. 12

David J. Silverman, *Thundersticks: Firearms and the Violent
Transformation of Native America* (2016)...........................................................12

*Records of the Governor and Company of the Massachusetts Bay in
New England* (1853) ..........................................................................................10

Univ. of Ill., *American Newspapers, 1800-1860: An Introduction*,
https://tinyurl.com/mu5v9aby (last visited June 4, 2024) ..................................18

## STATEMENT OF INTEREST[1]

The National Shooting Sports Foundation, Inc. ("NSSF"), is the firearms industry trade association; its membership includes thousands of federally licensed manufacturers, distributors, and retailers of firearms, ammunition, and related products, including many in California. NSSF's interest in this case is manifest. California Penal Code sections 27535 and 27540(f) restrict law-abiding citizens' ability to purchase lawful arms for self-defense and other lawful purposes.

## INTRODUCTION

If a state passed a law limiting readers to one book a month, or Catholics to Sunday Mass but not daily Mass, or a criminal defendant to one attorney per trial, no court in this country would let it stand. California apparently believes things are different when it comes to the Second Amendment, despite the Supreme Court's repeated admonition that the Second Amendment is not a second-class right. The state has made it a crime for ordinary, law-abiding citizens to purchase more than one firearm in a month. The state says this restriction is necessary to address straw purchasing, but that societal problem has existed for centuries, and yet no American government (state, local, or federal) addressed it by remotely similar means until 1975, and that law was an outlier. So, under a straightforward application of *New*

---

[1] No party's counsel authored any part of this brief, and no one other than amicus contributed to its preparation or submission. All parties have consented to this filing.

*York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. 1 (2022), California's one-of-a-kind one-gun-a-month regime is unconstitutional.

California does not meaningfully challenge that a straightforward application of *Bruen* dooms its law. To be sure, it asks this Court to apply a less stringent form of analogical reasoning than the one *Bruen* held applies in cases like this one, where "earlier generations addressed the societal problem" the challenged law targets "but did so through materially different means." *Id.* at 26-27. But its main contention is that *Bruen* does not apply at all. California insists that because the Second Amendment does not say "purchase" alongside "keep" and "bear," purchasing firearms is not *even presumptively* protected (never mind that firearms have never been free, and one cannot "keep" or "bear" an arm one does not have). That argument is so obviously meritless that this Court rejected it even before *Bruen*. *See Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 677-78 (9th Cir. 2017) (en banc). And the notion that *Bruen* somehow revived that right-nullifying contention or gave states *greater* leeway to prohibit the acquisition of common arms is risible.

Perhaps recognizing that *Bruen* cannot credibly be claimed to have improved arguments rejected in *Teixeira*, California tries another tack. It argues that *Bruen*'s historical framework is inapplicable here because the one-gun-a-month law is just a "condition[] and qualification[] on the commercial sale of arms," which, according to the state, makes it "presumptively lawful" under *District of Columbia v. Heller*,

2

554 U.S. 570 (2008). CA.Br.1 (quoting *Heller*, 554 U.S. at 626-27 & n.26). That argument is triply wrong. First, this Court has squarely rejected the notion—just this past month, no less—that *Heller*'s presumptive-validity dictum is a get-out-of-*Bruen*-free card: "'Simply repeat[ing] *Heller*'s language' about the 'presumptive[] lawful[ness]' of [certain firearm restrictions] will no longer do after *Bruen*." *United States v. Duarte*, 101 F.4th 657, 668 (9th Cir. 2024). Second, the one-gun-a-month law is not a condition or qualification of sale; it is an outright prohibition on purchasing at the relevant point in time. Third, and in all events, *Heller* did not say that all "conditions and qualification[] on the commercial sale of arms" are "presumptively lawful"; it said it was not disturbing the status of certain "longstanding" laws. 554 U.S. at 626-27 & n.26. The state omits that critical limitation, which confirms that *Heller*'s dictum is consistent with *Bruen*'s holding that while modern laws that respect our Nation's historical tradition of firearm regulation do not violate the Second Amendment, novel ones like this do.

In the end, then, California cannot escape *Bruen* or the fact that its one-gun-a-month law addresses a general societal problem "that preoccupied the Founders" and "the Reconstruction generation," but does so "through materially different means" than any American government adopted until the tail end of the 20th century and no other state has seen fit to enact even now. *Bruen*, 597 U.S. at 26-27, 29. The district court correctly rejected California's gambit. This Court should affirm.

## BACKGROUND

In 1999, California enacted a law prohibiting residents from purchasing "more than one handgun or semiautomatic centerfire rifle within any 30-day period." Cal. Penal Code §27535 (2021); *see also id.* §27540(g) (imposing a reciprocal restriction on firearm dealers). According to the legislative record, the law's aim is "to stop one gun purchaser from buying several firearms and transferring a firearm to another person who does not have the legal ability to buy a gun him/herself. Such a transfer is referred to as a 'straw transaction.'" ER165. California recently amended the law Plaintiffs challenge—but rather than trim back its restriction to comply with the Supreme Court's recent guidance in *Bruen*, the state went in the opposite direction, expanding the law to cover *all* firearms that are legal in California. ER5-6.

Plaintiffs, who include "individuals who desire and intend to purchase multiple handguns and/or semiautomatic centerfire rifles within a 30-day period but are prevented from doing so by Defendants' enforcement of the [one-gun-a-month] law," filed this lawsuit arguing that §§27535 and 27540(g) violate their Second Amendment rights. ER5-6. The district court agreed, recognizing that the Second Amendment plainly protects the right of the people to acquire firearms, and that the societal problem of straw purchasing is as old as (if not older than) the Republic, yet no government until after Watergate had ever tried to tackle it by limiting how many firearms law-abiding individuals may purchase in any given period of time.

## ARGUMENT

### I. California's One-Gun-A-Month Law Is Unconstitutional.

*Bruen* left no doubt about how to resolve Second Amendment claims. "The threshold question in a Second Amendment claim is whether the Amendment presumptively protects the individual's conduct." *United States v. Perez-Garcia*, 96 F.4th 1166, 1178 (9th Cir. 2024); *see Bruen*, 597 U.S. at 32 (asking "whether the plain text of the Second Amendment protects [the plaintiffs'] proposed course of conduct"). If the answer is yes, then the state can justify a restriction on that conduct only by identifying a "well-established and representative" historical tradition of imposing similar burdens on the right to keep and bear arms (the "how") for similar reasons (the "why"). *Bruen*, 597 U.S. at 17, 29-30. The district court correctly resolved both inquiries here. A law that prohibits ordinary, law-abiding citizens from purchasing a firearm just because they recently purchased a different firearm unquestionably restricts conduct that the plain text of the Second Amendment covers. And the undisputed reality that California's law targets a societal problem that predates the Founding, but that no government entity sought to address this way until the end of the 20th century, means that California's law is far out of step with our Nation's historical tradition of firearm regulation. Under a straightforward application of *Bruen*, California's novel one-gun-a-month law is unconstitutional.

A. **California's One-Gun-A-Month Law Regulates Conduct That the Plain Text of the Second Amendment Protects.**

The threshold textual inquiry here is simple, as it will be in most cases. At the outset, the state does "not dispute" that "Plaintiffs are 'people' protected by the Second Amendment" or that "the weapons at issue are subject to Second Amendment protection as 'arms.'" ER18; *see* CA.Br.13-17. Those concessions are wise. California's one-gun-a-month restriction applies to the general public, not some smaller subset like non-citizens, violent felons, etc. And as this Court just explained, "the original public meaning of 'the people' in the Second Amendment included, at a minimum, all American citizens." *Duarte*, 101 F.4th at 671. This Court also "easily conclude[d]" in *Duarte* that "a handgun[] is an 'arm' within the meaning of the Second Amendment's text," *id.* at 662, and the inquiry is no more difficult as to semiautomatic center-file rifles—or any of the other firearms to which the as-amended restriction applies, all of which are perfectly legal in California. After all, rifles, no less than handguns, are bearable instruments "that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another," and thus constitute "Arms" for purposes of the Second Amendment. *Heller*, 554 U.S. at 581; *see also Bruen*, 597 U.S. at 28 (confirming that "that general definition covers modern instruments that facilitate armed self-defense"). Indeed, even "one founding-era thesaurus" that took a relatively "limited" view of the scope of the term

"Arms" "stated that all firearms constituted 'arms.'" *Heller*, 554 U.S. at 581. That "18th-century meaning" is "the meaning" that governs "today." *Id.*

"[T]he plain text of the Second Amendment" likewise easily "protects" the "conduct" in which Plaintiffs seek to engage. *Bruen*, 597 U.S. at 32. The plain text of the Second Amendment declares that "the people" have "the right" "to keep and bear Arms." U.S. Const. amend. II. Plaintiffs here would like to purchase arms so that they may keep and bear them. The one-gun-a-month law restricts their ability to do so. The threshold textual inquiry here is thus quite simple: Because "the challenged condition restricts [Plaintiffs'] ability to bear or keep [a] firearm—even those [they] would lawfully store at home for self-defense—[it] unquestionably implicates [their] Second Amendment rights." *Perez-Garcia*, 96 F.4th at 1181.

California contends that because the Second Amendment's plain text does not list a verb such as "purchase" or "acquire" alongside "keep" and "bear," challenges to state laws that restrict the people's ability to purchase or acquire arms do not even implicate the Second Amendment. Nonsense. Plaintiffs seek to keep and bear firearms—conduct which not even California could seriously deny falls within the scope of the Amendment's plain text as interpreted by the Supreme Court. And the state has unquestionably restricted that conduct by preventing Plaintiffs from purchasing the firearms they wish to keep and bear. Just as a law restricting people to distributing one pamphlet a month, or restricting their access to ink and paper,

plainly restricts the ability to speak, *see, e.g.*, *Minneapolis Star Trib. Co. v. Minn. Comm'r*, 460 U.S. 575, 592-93 (1983), a restriction on acquiring a firearm plainly restricts the ability to keep and bear them. Any other conclusion would turn the Second Amendment into "'a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees.'" *Bruen*, 597 U.S. at 70 (quoting *McDonald v. City of Chicago*, 561 U.S. 742, 780 (2010) (plurality)).

Indeed, even before *Bruen*, this Court recognized that the "right to keep and bear arms for self-defense" necessarily includes "the ability to acquire arms." *Teixeira*, 873 F.3d at 677-78; *see also United States v. Murillo*, 2024 WL 1517209, at *4 (C.D. Cal. Apr. 8, 2024) (noting that *Teixeira* so "held" by "applying a textual analysis"). That much has been settled for well over a century. *See, e.g.*, *Andrews v. State*, 50 Tenn. 165, 178 (1871) ("The right to keep arms, necessarily involves the right to purchase them…."). California's position that *Bruen* somehow gives states *more* leeway to prohibit ordinary citizens from keeping and bearing arms "sounds absurd, because it is." *Sekhar v. United States*, 570 U.S. 729, 738 (2013).

Equally unavailing is California's suggestion that because its one-gun-a-month law merely prevents people from purchasing a second firearm in a "short" time-window, it does not impose enough of a burden on Second Amendment rights to constitute an "infringement." *See* CA.Br.14-17. The threshold textual inquiry in *Bruen* focuses on the conduct in which the plaintiff seeks to engage, not the degree

8

to which the state has restricted it. *See, e.g.*, *Bruen*, 597 U.S. at 32. Here, Plaintiffs simply want to keep and bear arms, and the state has temporarily prohibited them from obtaining the arms they want to keep and bear. That is the end of the textual inquiry. Just as "[n]othing in the Second Amendment's text draws a home/public distinction with respect to the right to keep and bear arms," *id.*, nothing in the Amendment's text says that the right is safeguarded only against total prohibitions. Whether California's law imposes a *permissible* burden on the right to keep and bear arms thus must be answered by looking to historical tradition, not by deferring to the state's value judgment that law-abiding citizens who already have one firearm (regardless of the type) do not have a pressing need for another.

## B. Earlier Generations Addressed the Same Problem the State Seeks to Combat, but They Did So Through Materially Different Means.

Because Plaintiffs' proposed course of conduct is "presumptively protect[ed]" by the Constitution, the state must "affirmatively prove" that its restriction is "consistent with this Nation's historical tradition of firearm regulation." *Id.* at 17, 19, 28, 33-34. That is a heavy burden, as a state may not restrict Second Amendment rights unless it can demonstrate that the restriction is consistent with "a well-established" historical tradition. *Id.* at 30. The state cannot meet that burden here, as its one-gun-a-month law concededly addresses a societal problem that has vexed the states since the beginning of the Republic, but does so through fundamentally different means than any law enacted before Star Wars opened in theaters.

The first question at the historical-tradition stage is a methodological one: "What kind of similarity are we looking for? 'Distinct' similarity or a less precise 'relevant' similarity?" *United States v. Daniels*, 77 F.4th 337, 343 (5th Cir. 2023); *see Bruen*, 597 U.S. at 26-27. The answer—and corresponding degree of closeness required between historical regulations and the challenged law—depends on what problem a law is designed to solve and how long that problem has persisted. "[W]hen a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a *distinctly similar* historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Bruen*, 597 U.S. at 26 (emphasis added).

That is precisely the situation here. The problem California claims its law is intended to solve—straw purchasing—is as old as the United States, if not older. The prospect of "one gun purchaser … buying several firearms and transferring a firearm to another person who does not have the legal ability to buy a gun him/herself," ER6, vexed our Nation's forefathers. *See, e.g.*, 2 *Records of the Governor and Company of the Massachusetts Bay in New England* 16 (1853) (citing a colonial court decision lamenting that, despite a prohibition "against selling guns and powder to the Indians, they are yet supplied by indirect meanes"). Indeed, it came to the fore so early in American history that a signatory of the Mayflower Compact and Governor of Plymouth Colony even wrote a poem about it. *See*

William Bradford, *A Descriptive and Historical Account of New England in Verse*, reprinted in 3 *Collections of the Massachusetts Historical Society for the Year 1794*, at 83 (1810) ("Good laws have been made, this evil to restrain,/But, by men's close deceit, they are made in vain.").

Nevertheless, there was no tradition—not at the Founding, not in the Reconstruction era, and not even for the better part of the 20th century—of restricting people to purchasing only one firearm at a time. To the contrary, it was "sufficiently common" in the 18th century for Americans to "carry two, four, or even six single shot pistols on their belt" that "pistols were often sold … in pairs." Clayton E. Cramer & Joseph Edward Olson, *Pistols, Crime, and Public: Safety in Early America*, 44 Willamette L. Rev. 699, 719-20 (2008). Indeed, colonial and early state governments often *commanded* soldiers, militiamen, and even civilians to bear more than one gun at once. The Militia Act of 1792, for instance, required cavalry and dragoon officers to be furnished with, *inter alia*, "a pair of pistols." *Parker v. District of Columbia*, 478 F.3d 370, 397-98 (D.C. Cir. 2007) (emphasis omitted). Carrying multiple firearms at the time of Reconstruction was so common that one state court held that insurers were required as a matter of law to cover the replacement cost of multiple firearms when baggage was lost in transit. *Miss. Cent. R.R. Co. v. Kennedy*, 41 Miss. 671, 678-79 (Miss. Errors & Appeals 1868). Pioneers provisioning for a journey west were likewise advised to "be armed with a rifle and

revolver, and … never, either in camp or out of it, lose sight of them."  Capt. Randolph Barnes Marcy, *The Prarie Traveler* 41 (1859); *see, e.g.*, Lansford Warren Hastings, *The Emigrant's Guide to Oregon and California* 143 (1845) (advising westward travelers to "equip themselves with a good gun" and "a holster of good pistols").  The notion that they could be made to delay their journey by a month so that they could avoid buying their rifle and revolver in the same month occurred to exactly no one.

That is not to say that early American governments made no effort to curb the actual problem—straw purchasing—more directly.  In fact, they deployed a host of strategies to keep firearms out of the hands of those they deemed unfit to exercise the right to keep and bear arms.  For instance, while some colonies allowed members of "friendly" Indian tribes to purchase firearms, they required that "munitions" sold to such tribesmen "c[o]me with instructions to keep them out of the hands of other indigenous people."  David J. Silverman, *Thundersticks: Firearms and the Violent Transformation of Native America* 101 (2016); *see also, e.g.*, *id.* at 74, 76.  Colonial Virginia took the most aggressive approach, making it a crime for "any person … within an Indian town or more than three miles from an English plantation" to have "arms or ammunition above and beyond what he would need for personal use"; such a person "would be guilty of the crime of selling arms to Indians, even if he was not actually bartering, selling, or otherwise engaging with the Indians."  *Teixeira*, 873

F.3d at 685 (citing statute).  Virginia enacted this law because, "though good lawes have been made for prohibiting the tradeing with Indians for armes and ammunition, yet greate quantities have been yearely vended amongst them."  2 William Waller Hening, *The Statutes at Large: Being a Collection of All the Laws of Virginia, from the First Session of the Legislature, in the Year 1619*, at 336 (1823).  But even Virginia did not go to the extreme of limiting people to obtaining only one firearm over a given period of time.

Straw purchasing remained a major concern when the Fourteenth Amendment was ratified.  In 1867, for instance, General Ulysses S. Grant protested to Secretary of War Edwin Stanton that "[i]f the rule is to be followed that all [Indian] tribes with which we have treaties, … can procure [firearms] without stint or limit, it will not be long before … they avail themselves of it to equip themselves for war.  They will get the arms either by making treaties themselves or *through tribes who have such treaties*."  George Armstrong Custer, *My Life on the Plains* 118-19 (1876) (emphasis added).  Yet, despite what would have to qualify as a compelling government interest, neither Congress nor any state sought to address this concern with laws anything like California's.  American governments instead mostly confined themselves to traditional means that did not limit the procurement of firearms by citizens who could possess them, such as penalties on the act of supplying a firearm to someone prohibited from possessing it.  *See, e.g.*, Act of Feb. 14, 1873, ch. 138,

§1, 17 Stat. 437, 457 (authorizing the Secretary of the Interior to prohibit the sale of arms to hostile Indian tribes and to revoke the license of and exclude any trader who violates those rules), repealed 67 Stat. 590 (1953); *see also* CA.Br.28-29 (citing Reconstruction era laws requiring dealers to track sales).

To be sure, not all early efforts to prevent straw purchases would withstand constitutional scrutiny today. Some early American laws targeted at preventing straw purchases and keeping firearms out of the hands of disfavored individuals were tinged with racial animus and are thus now constitutionally suspect. But, for present purposes, the important point is that earlier generations consistently confronted the very issue that California says its one-gun-a-month law is designed to address— keeping firearms out of the hands of those who are prohibited from possessing them—and yet *none* of our forefathers addressed the problem by limiting the number of firearms an individual could purchase in any given amount of time. This is not disputed; California conceded below "that the first OGM law nationally was not passed until 1975." ER16 n.2. And as the foregoing makes clear, the lack of any distinctly similar analog is decidedly *not* because straw purchasing is a distinctly modern problem. Indeed, the state admits that American governments for centuries "have regulated firearms transactions to ensure that firearms did not end up in the hands of those who could not lawfully possess them." CA.Br.2. They just never tried to do so the way California now does.

14

That is the end of the road for the state and its ahistoric one-gun-a-month restriction. *Bruen* was emphatic on this point: "[I]f earlier generations addressed the societal problem" a state claims its challenged modern law is designed to address, "but did so through materially different means"—in other words, if the same "why" preoccupied earlier generations, but those earlier generations chose an entirely different (and far less restrictive) "how"—then the "modern regulation is unconstitutional," full stop. 597 U.S. at 26-27, 29. Any other conclusion "would entail 'endorsing outliers that our ancestors would never have accepted' and thus be inconsistent with the historical inquiry required by *Bruen*." *Baird v. Bonta*, 81 F.4th 1036, 1043 (9th Cir. 2023) (quoting *Bruen*, 597 U.S. at 30).

## C.   Even Under a "More Nuanced" Approach, California's Law Fails.

Given that unambiguous historical record, it is little surprise that the state pleads for "nuance[]," insisting that its law implicates "unprecedented societal concerns" and "dramatic technological changes." *See* CA.Br.10-11, 20 (quoting *Bruen*, 597 U.S. at 27). But the only purported "changes" the state identifies are matters of minor degree: It claims that the straw-purchaser problem has become more "widespread" because firearms are now "more widely available for purchase than in the founding and Reconstruction eras." CA.Br.2. That is decidedly not an "unprecedented" concern or "dramatic" change. One could attribute virtually every problem attendant to the misuse of firearms to their increased availability for

purchase. Yet neither *Bruen* nor *Heller* deemed an increase in the *prevalence* of a longstanding problem a sufficient reason to entitle states to a greater degree of regulatory authority.

In fact, *Heller* squarely rejected that argument, observing that "the fact that modern developments [may] have limited the degree of fit between the prefatory clause and the protected right cannot change our interpretation of the right." 554 U.S. at 627-28. The right to keep and bear arms was "enshrined with the scope [it was] understood to have when the people adopted [it], whether or not future legislatures or (yes) even future judges think that scope too broad" to tackle modern-day instantiations of longstanding societal problems. *Id.* at 634-35.

*Bruen* even more directly repudiated the notion that advancements in technology that make certain types of firearms more attractive to law-abiding individuals are cause for restricting their rights out of fear of what criminals might do with them. *Bruen* acknowledged that while handguns may have been "considered 'dangerous and unusual' during the colonial period," technological advancements have led them to become "'the quintessential self-defense weapon.'" 597 U.S. at 47 (quoting *Heller*, 554 U.S. at 629). According to California, the quantum leap in handgun technology since the colonial period should mean that states today have more authority to regulate when modern handguns are involved. According to the Supreme Court, however, the opposite is true. Even though the colonies may have

16

"prohibited the carrying of handguns because they were considered 'dangerous and unusual weapons' in the 1690s," those historical restrictions "provide no justification for laws restricting the public carry of [handguns] today." *Id.*

  That is not the only problem with the state's plea for regulatory carte blanche. Consider what it would mean if applied to other constitutional rights. The production of print media, no less than the manufacture of firearms, underwent spectacular changes during the Industrial Revolution, going from the hand-operated block-type printing presses used "since the time of Gutenberg" to industrialized printers that could produce thousands of copies in an hour. D.W. Howe, *What Hath God Wrought* 227 (2007). Improvements in transit and distribution compounded these developments, and the effects on mass communication—for good and ill—were revolutionary. *See id.* But far from viewing the "greater capacity for evil" that these technological improvements enabled as an excuse for expanded regulation, the Supreme Court honored the balance struck by the framers in the Bill of Rights. *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 502 (1952). The story is the same in the Fourth Amendment context. *See, e.g.*, *United States v. Jones*, 565 U.S. 400, 406-07 (2012). And what is true for the First and Fourth Amendments must be true here, lest the Second Amendment once again be treated as "a second-class right, subject

to an entirely different body of rules than the other Bill of Rights guarantees." *Bruen*, 597 U.S. at 70 (quoting *McDonald*, 561 U.S. at 780 (plurality)).[2]

In all events, even if the Court affords California some "nuance," as the district court did, the result remains the same. To be sure, states have somewhat more leeway when it comes to "unprecedented societal concerns or dramatic technological changes." *Id.* at 27. But even accounting for a degree of "nuance," only historical laws that are "relevantly similar" to a modern law lacking a direct analog will do. *Id.* at 29. Historical restrictions thus still "must be close" to the challenged modern law in terms of both "how and why" they "burden[] a law-abiding citizen's right to armed self-defense." *Baird*, 81 F.4th at 1043 (quoting *Bruen*, 597 U.S. at 29). "This does not mean that courts may engage in independent means-end scrutiny under the guise of an analogical inquiry." *Bruen*, 597 U.S. at 29 n.7. Although California tries

---

[2] Below, California offered a variant of this argument that is just as (if not more) dangerous. "Defendants rel[ied] on expert testimony stating that firearms were not widely owned or purchased during the Founding and Reconstruction eras" and therefore could be regulated differently today. ER21. Putting aside that the factual premise is untrue, *see* pp.10-13, *supra*, this argument is a license to restrict constitutional rights at will. Just about everything has become "significantly easier to manufacture and thus less expensive and more widely available for purchase" since the Reconstruction era, and doubly so vis-à-vis the Founding. CA.Br.2. To take just one example, newspapers in the 18th and early-19th centuries were usually no more than four pages long, and they were often days or weeks behind on events. *See* Univ. of Ill., *American Newspapers, 1800-1860: An Introduction*, https://tinyurl.com/mu5v9aby (last visited June 4, 2024); Howe, *supra*, at 228-29. It is now infinitely easier for a libelous article to spread and cause injury. Yet the state presumably would never dream of restricting the rights of newspapers on that basis.

to muddy the waters on this point, *Bruen* was clear that the means and ends of a law must be judged against historical restrictions, not against how much of a burden a state (or a court) thinks is too much in the abstract. *Id.* at 26. A flat ban regulates differently from, say, a restriction on concealed carry or a requirement to pass a background check—so even if all three were enacted to try to address the same problem (the "why"), they are not "relevantly similar" to one another because they do so "through materially different means" (the "how"). *See id.* at 26-27.

None of California's purported analogs comes close to clearing that threshold. California offers a hodgepodge of historical laws as purportedly representative precursors to its novel one-gun-a-month law: restrictions on the sale of firearms to Indians; restrictions on the sale of firearms to foreigners; restrictions on the sale of firearms to intoxicated persons; restrictions on certain dangerous and unusual weapons; recordkeeping requirements; licensing schemes for concealed carry; and taxes on firearms. *See* CA.Br.24-31. Those laws do not even have a common "why," let alone a common "how"; some were about particular people, some particular arms, some particular places, and so on. The state all but admits as much by trying to ratchet up the level of "why" generality from "ensur[ing] that firearms did not end up in the hands of those who could not lawfully possess them," CA.Br.2, to "'preserv[ing] the peace and public safety'" generally, CA.Br.27. If that were enough to show a common historical "why" under *Bruen*, then the "why" analysis

19

would be pointless, as it is hard to imagine what law is not meant to "preserve the peace and public safety" in at least some sense.

More to the point, conspicuously absent from the state's laundry list is any historical restriction remotely similar to California's one-gun-a-month law in terms of the "how."[3]   Indeed, California's historical regulations have next to nothing in common *with each other* on that score, beyond the truism that they all "imposed regulatory requirements on firearms" in some sense.  CA.Br.11.  To state the obvious, the mere fact that there is a historical tradition of regulating firearms *in some ways* does not suffice to establish a historical tradition of regulating firearms *in all ways*. If it did, then the historical tradition framework that *Bruen* so painstakingly laid out would be an exercise in futility, as *Bruen* took as a given that "this Nation[]" has *some* "historical tradition of firearm regulation."  *See* 597 U.S. at 34-70.

Ultimately, what matters under *Bruen* is whether there is a historical tradition of prohibiting law-abiding citizens under no suspicion of misconduct from acquiring common arms just because they recently acquired another, out of fear that prohibited persons would obtain them.  Because the state concededly has identified no historical restrictions remotely resembling that approach, its novel law is unconstitutional.

---

[3] In fact, some of those laws did not apply to firearms, *see* CA.Br.29-30 (knife and sword laws), and others did not apply to sales, *see* CA.Br.26-27 (carry restrictions).

### D.  The State Cannot Avoid *Bruen* By Invoking *Heller*'s "Presumptively Lawful" Language.

Perhaps reading the *Bruen* writing on the wall, California tries to create one more escape hatch.  By the state's telling, its one-gun-a-month law is a "'condition[] and qualification[] on the commercial sale of arms'" and thus is "[p]resumptively lawful."  CA.Br.17 (quoting *Heller*, 554 U.S. at 626-27).  That argument is squarely foreclosed by this Court's precedent and is wrong even on its own terms.

As this Court recently held, "*Bruen* makes clear that text, history, and tradition are the '[o]nly' ways the Government can justify a regulation that implicates Second Amendment rights."  *Perez-Garcia*, 96 F.4th at 1177 (quoting *Bruen*, 597 U.S. at 17).  Thus, "'[s]imply repeat[ing] *Heller*'s language' about the "presumptive[] lawful[ness]' of felon firearm bans will no longer do after *Bruen*."  *Duarte*, 101 F.4th at 668 (first alteration added).  That is no less true when it comes to *Heller*'s language about "laws imposing conditions and qualifications on the commercial sale of arms"; after all, the two clauses are part of the very same sentence.  *See* 554 U.S. at 626-27.  Robotically "defer[ring] … to *Heller*'s [dictum]" would violate *Bruen*'s "mandate," "not least because the historical pedigree of [conditions and qualifications on the commercial sale of arms] was never an issue the *Heller* Court purported to resolve."  *Duarte*, 101 F.4th at 668.  "*Bruen* expressly 'require[s] courts to assess whether" [California's one-gun-a-month law], like '*any* regulation infringing on Second Amendment rights[,] is consistent with this nation's historical tradition of firearm

regulation.'" *Id.* (second alteration added) (quoting *Perez-Garcia*, 96 F.4th at 1175). For all the reasons already discussed, it is not.

At any rate, the one-gun-a-month law is not a condition or qualification of sale. It is a flat prohibition—albeit a time-limited one—on the sale of arms in common use for self-defense. Consider a law-abiding citizen who owned zero firearms a week ago, lawfully purchased a hunting rifle yesterday, and now wants to buy a handgun, the "quintessential self-defense weapon," for personal protection. *See Heller*, 554 U.S. at 629. California's one-gun-a-month law prohibits that person from keeping or bearing a handgun *right now* and *for several weeks hence*, no matter how many background checks she passes or hoops she jumps through. A law banning gun sales to individuals under 25 would not escape Second Amendment scrutiny on the ground that it simply imposes a condition on sale. The same is true of California's law here. A law that outright forbids a law-abiding citizen from purchasing a handgun is a prohibition of, not a condition on, sale, regardless of whether the prohibition lasts 29 days or until a 25th birthday.

Even if that prohibition could somehow be considered a condition or qualification of sale, moreover, California's argument would still fail. *Heller* did not say that *all* "conditions and qualification[] on the commercial sale of arms" are "presumptively lawful"; it included the critical caveat that it was talking only about "longstanding" laws. 554 U.S. at 626-27 & n.26. In that respect, *Heller* is entirely

22

consistent with *Bruen*, as the Court was simply acknowledging that a "longstanding" law likely satisfies the historical tradition test. Yet, as explained in detail above, California admits that the first law that even remotely resembled the one-gun-a-month restriction was not enacted until 1975, and no others followed until the 1990s. That is the opposite of "longstanding." *Id.* at 626. If regulatory "innovations of the mid- to late-19th-century courts come too late to provide insight into the meaning of [the Constitution in 1787]," *Bruen*, 597 U.S. at 36-37 (alteration in original) (quoting *Sprint Comm'cns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 312 (2008) (Roberts, C.J., dissenting)), then regulatory innovations that did not come around until the end of the *20th* century plainly come too late as well, no matter whether 1787 or 1868 is the right starting point. In short, there is no "historical tradition limiting … law-abiding citizens" to just one firearm at a time, or anything remotely analogous, so California's one-gun-a-month law is unconstitutional. *See id.* at 38, 70.

## CONCLUSION

For the reasons set forth above, this Court should affirm.

Respectfully submitted,

LAWRENCE G. KEANE
SHELBY BAIRD SMITH
NATIONAL SHOOTING
  SPORTS FOUNDATION, INC.
400 N. Capitol St., NW
Washington, DC 20001
(202) 220-1340

s/ERIN E. MURPHY
PAUL D. CLEMENT
ERIN E. MURPHY
 *Counsel of Record*
MATTHEW D. ROWEN
NICHOLAS M. GALLAGHER[*]
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
erin.murphy@clementmurphy.com

[*] Supervised by principals of the firm who are members of the Virginia Bar

*Counsel for* Amicus Curiae *National Shooting Sports Foundation, Inc.*

June 4, 2024

**CERTIFICATE OF COMPLIANCE**

1.  This brief complies with the type-volume limitation of Circuit Rule 32-1 because this brief contains 5,752 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

2.  This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6), because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Times New Roman type.

June 4, 2024

s/Erin E. Murphy
Erin E. Murphy

## CERTIFICATE OF SERVICE

I hereby certify that on June 4, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the CM/ECF system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

s/Erin E. Murphy
Erin E. Murphy