No. 24-2036

In the
**United States Court of Appeals for the Ninth Circuit**

MICHELLE NGUYEN, *ET AL.*,
*Plaintiffs-Appellees*,

v.

ROB BONTA, in his official capacity as
Attorney General of the State of California, *ET AL.*,
*Defendants-Appellants*.

On Appeal from the
**United States District Court for
the Southern District of California**

**Brief *Amicus Curiae* of Gun Owners of California, Inc.,
Gun Owners of America, Inc., Gun Owners Foundation,
Heller Foundation, Tennessee Firearms Association, Tennessee Firearms
Foundation, Virginia Citizens Defense League, Virginia Citizens Defense
Foundation, America's Future, Inc., U.S. Constitutional Rights Legal
Defense Fund, and Conservative Legal Defense and Education Fund in
Support of Plaintiffs-Appellees and Affirmance**

JOHN I. HARRIS III
  SCHULMAN, LEROY & BENNETT, P.C.
  3310 West End Avenue
  Suite 460
  Nashville, TN 37203

JEREMIAH L. MORGAN*
WILLIAM J. OLSON
  WILLIAM J. OLSON, P.C.
  370 Maple Avenue W., Suite 4
  Vienna, VA 22180-5615
  (703) 356-5070
  *Attorneys for Amici Curiae*

June 4, 2024
*Attorney of Record

## DISCLOSURE STATEMENT

The *amici curiae* herein, Gun Owners of California, Inc., Gun Owners of America, Inc., Gun Owners Foundation, Heller Foundation, Tennessee Firearms Association, Tennessee Firearms Foundation, Virginia Citizens Defense League, Virginia Citizens Defense Foundation, America's Future, Inc., U.S. Constitutional Rights Legal Defense Fund, and Conservative Legal Defense and Education Fund, through their undersigned counsel, submit this Disclosure Statement pursuant to Federal Rules of Appellate Procedure 26.1 and 29(a)(4)(A). These *amici curiae* are non-stock, nonprofit corporations, none of which has any parent company, and no person or entity owns them or any part of them.

*s/Jeremiah L. Morgan*
Jeremiah L. Morgan

# TABLE OF CONTENTS

Page

DISCLOSURE STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

INTEREST OF *AMICI CURIAE* . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT

I.   CALIFORNIA'S ONE GUN A MONTH LAW VIOLATES RIGHTS
     PROTECTED BY THE SECOND AMENDMENT . . . . . . . . . . . . . . . . . 3

     A.   The People Did Not Consent to Be Governed under Laws that
          Restrict Their Right to Keep and Bear Arms . . . . . . . . . . . . . 4

     B.   The *Bruen* Methodology Is a One-Step Test — Applicable to
          All Restrictions on the Second Amendment's "Plain Text" . . . . . 7

     C.   The Right to Acquire Firearms Is Part of the Right to "Keep
          and Bear Arms" . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

     D.   California Misconstrues Heller's "Presumptively Lawful"
          Limiting Language as "Proof" that All "Conditions and
          Qualifications" Are Lawful. . . . . . . . . . . . . . . . . . . . . . 14

     E.   *Bruen* Anticipated that Presumptively Lawful Categories
          Would Be Tested by Historical Analogues . . . . . . . . . . . . . . 18

II.  CALIFORNIA OFFERS NO "RELEVANTLY SIMILAR" HISTORICAL
     ANALOGUES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

A.  California's OGM Law Does Not Require a Nuanced Approach . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

B.  Restrictions on Sale to Native Americans . . . . . . . . . . . . . . . . 24

III.  THIS COURT IS DUTY BOUND TO FOLLOW *BRUEN* AND REJECT CALIFORNIA'S CONTINUED HOSTILITY TO THE SECOND AMENDMENT . . 25

A.  California Has Long Embraced an Extreme, Narrow Reading of the Second Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

B.  Restricting the Ability of Californians to Resist State Tyranny . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

# TABLE OF AUTHORITIES

<u>Page</u>

**HOLY BIBLE**

*Genesis* 22:18 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
*Genesis* 26:4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
*Genesis* 28:14 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
*Galatians* 3:16 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

**UNITED STATES CONSTITUTION**

Amendment II . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, *passim*

**STATUTES**

California Penal Code § 27535 . . . . . . . . . . . . . . . . . . . . . . 1, *passim*
California Senate Joint Resolution 7 (passed Sept. 21, 2023) . . . . . . . . . . . 28

**CASES**

*Bezet v. United States*, 714 F.App'x 336 (5th Cir. 2017) . . . . . . . . . . . . . 12
*District of Columbia v. Heller*, 554 U.S. 570 (2008) . . . . . . . . . . . 3, *passim*
*Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011) . . . . . . . . . . . 13, 14
*INS v. Chadha*, 462 U.S. 919 (1983) . . . . . . . . . . . . . . . . . . . . . . . . 15
*Jackson v. City & County of San Francisco*, 746 F.3d 953 (9th Cir. 2014) . . . 14
*Luis v. United States*, 578 U.S. 5 (2016) . . . . . . . . . . . . . . . . . . . . . 13
*Md. Shall Issue, Inc. v. Moore*, 86 F.4th 1038 (4th Cir. 2023) . . . . . . . . . 19
*Mai v. United States*, 974 F.3d 1082 (9th Cir. 2020) . . . . . . . . . . . . . . . 6
*McRorey v. Garland*, 2024 U.S. App. LEXIS 10247 (5th Cir. 2024) . 10, 11, 12
*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022) 2, *passim*
*NRA v. Vullo*, 2024 U.S. Lexis 2366 (2024) . . . . . . . . . . . . . . . . . . . 5, 6
*Pena v. Lindley*, 898 F.3d 969 (9th Cir. 2018) . . . . . . . . . . . . . . . . . . 17
*Rigby v. Jennings*, 630 F. Supp. 3d 602 (D. Del. 2022) . . . . . . . . . . . . . 16
*Silveira v. Lockyer*, 312 F.3d 1052 (9th Cir. 2002) . . . . . . . . . . . . . . . 26
*Teixeira v. County of Alameda*, 873 F.3d 670 (9th Cir. 2017) . . . . . . . . . 17
*United States v. Chovan*, 735 F.3d 1127 (9th Cir. 2013) . . . . . . . . . . 17, 28
*United States v. Duarte*, 2024 U.S. App. LEXIS 11323
        (9th Cir. 2024) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 19, 25
*United States v. Marzzarella*, 614 F.3d 85 (3d Cir. 2010) . . . . . . . . . 16, 17

*Young v. Hawaii*, 992 F.3d 765 (9th Cir. 2021) . . . . . . . . . . . . . . . . . . . . 7

**MISCELLANEOUS**

K. Agarwal, "A world of weapons: Historians shape scholarship on arms trading," *Perspectives on History* (Sept. 1, 2017) . . . . . . . . . . 21, 22, 23

T. Bunker, "California GOP Legislator Tells Parents to 'Flee' the State," *Newsmax* (June 16, 2023) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

J. Burnett, "Americans are fleeing to places where political views match their own," *NPR* (Feb. 18, 2022) . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

J. Campbell and L. Mascarenhas, "California governor signs gun control measures into law, including nation's first state tax on firearms and ammunition," *CNN* (Sept. 27, 2023) . . . . . . . . . . . . . . . . . . . . . 27

The Constitution, *Bill of Rights Institute* . . . . . . . . . . . . . . . . . . . . . . . . . 4

Federalist No. 51 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Federalist No. 78 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Freedom in the 50 States: California, *CATO Institute* . . . . . . . . . . . . . . . . 30

V. Holden, Society for Historians of the Early American Republic (SHEAR), "Firearms and the Violent Transformation of Native America," (Dec. 27, 2016) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

C.D. King, "The Power of Triadic Utterance," *Medium* (July 27, 2023) . . . . 8

A. Koseff, "Forget the first 220 failures to split California. This developer has a new plan to secede," *CalMatters.org* (June 3, 2024) . . . . . . . . 32

L. Sanders and J. Gedeon, "What Is New California? Rural Counties Want Independence From 'Tyrannical Government'," *Newsweek* (Jan. 17, 2018) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

A. Scalia and B. Garner, <u>Reading Law</u> (Thomson West: 2012) . . . . . . . . . 12

D. Silverman, <u>Thundersticks: Firearms and the Violent Transformation of Native America</u> (Belknap Press: 2016). . . . . . . . . . . . . . . . . . . . . . 22

D. Walters, "Gavin Newsom channels Jerry Brown with constitutional amendment proposal," *Cal Matters* (Aug. 21, 2023) . . . . . . . . . . . . 27

D. Worcester and T. Schilz, "The Spread of Firearms Among the Indians on the Anglo-French Frontiers," AMERICAN INDIAN QUARTERLY (Spring 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 23

## INTEREST OF *AMICI CURIAE*[1]

Gun Owners of California, Inc., Gun Owners of America, Inc., Gun Owners Foundation, Heller Foundation, Tennessee Firearms Association, Tennessee Firearms Foundation, Virginia Citizens Defense League, Virginia Citizens Defense Foundation, America's Future, Inc., U.S. Constitutional Rights Legal Defense Fund, and Conservative Legal Defense and Education Fund are nonprofit organizations, exempt from federal taxation under sections 501(c)(3) or 501(c)(4) of the Internal Revenue Code. Each is dedicated, *inter alia*, to the correct construction, interpretation, and application of law.

## STATEMENT OF THE CASE

In October 2019, California Governor Gavin Newsom signed SB 61, extending the 1999 one **handgun** per person limit to one **firearm** per month. Thus, SB 61 amended California Penal Code § 27535(a) to read: "A person shall not make an application to purchase more than one firearm within any 30-day period" — the "one gun a month" law.

---

[1] All parties have consented to the filing of this brief *amicus curiae*. No party's counsel authored the brief in whole or in part. No party or party's counsel contributed money that was intended to fund preparing or submitting the brief. No person other than these *amici curiae*, their members, or their counsel contributed money that was intended to fund preparing or submitting this brief.

In December 2020, several individuals, a shooting range, and three gun advocacy groups challenged § 27535(a) in the Southern District of California. In March 2024, the court granted Plaintiffs' Motion for Summary Judgment. *See Nguyen v. Bonta*, 2024 U.S. Dist. LEXIS 45512 (S.D. Cal. 2024).

The district court found that the plain text of the Second Amendment protects the conduct criminalized by the California law. Despite California's claim that the Supreme Court had described commercial regulations as "presumptively lawful" not requiring further analysis, the court concluded that historical analysis was needed to determine whether the conditions and qualifications on the commercial sale of arms is "longstanding" under *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022). Conducting that analysis, the court found that the statutes offered by California were not relevantly similar. *Id.* at *28-29.

On April 24, 2024, a motions panel of this Court issued a stay of the district court's permanent injunction pending appeal. Judge Nelson dissented noting that, under the Supreme Court's decision in *Bruen*, "no historical analogue permits California's regulation."

2

## ARGUMENT

## I. CALIFORNIA'S ONE GUN A MONTH LAW VIOLATES RIGHTS PROTECTED BY THE SECOND AMENDMENT.

In its Opening Brief ("Cal. Br."), California urges this Court to reverse the decision of the district court and uphold California's one gun a month ("OGM") statute. But when the *Bruen* methodology is applied faithfully, as the district court did, the "plain text" requirement is not a high hurdle and is cleared easily by laws such as the OGM law challenged here, then requiring the government to demonstrate historical analogues. And since California offered no relevantly similar historical analogues, its Opening Brief struggles mightily to demonstrate that the challenged law does not infringe on protected firearms rights.

With notable exceptions, this Circuit Court has a long record of suspicion to Second Amendment rights. Yet, a ruling for California here would require this Court to deliberately circumvent *Bruen*, even more directly than how its two-step test avoided *District of Columbia v. Heller*, 554 U.S. 570 (2008). This *amicus* brief will address the numerous ways in which California's Opening Brief departs from recent decisions of the U.S. Supreme Court and particularly the methodological approach set out in *Bruen*.

3

**A.     The People Did Not Consent to Be Governed under Laws that Restrict Their Right to Keep and Bear Arms.**

The Framers of the Second Amendment reflected the concerns of the People that the day would come when those in government would be tempted to abuse the People they were supposed to serve, through the exercise of powers with which they were never entrusted.  When a government exercises "arbitrary" power over the People, it begins to fear that it could provoke the People to withdraw their consent — to resist.  Rather than seeking to respect and serve the People, it looks to find ways to weaken their ability to resist arbitrary exercises of governmental power.  To protect the People against such a day when governments would be tempted to deny arms to the People, our Framers expressly wrote into our Constitution a recognition of a God-given right to self-defense only two years after the Constitution was ratified.  It was based on promises made during the 1789 national debates that a bill of rights would be forthcoming and, on that basis only, the People were willing to give their consent to be governed.[2]

---

[2] *See* The Constitution, *Bill of Rights Institute* ("Many of the state conventions ratified the Constitution, but called for amendments specifically protecting individual rights….  [K]ey states including Virginia and New York had not ratified.  James Madison … knew that grave doubts would be cast on the Constitution if those states (the home states of several of its chief architects,

As a result, the Second Amendment right could not have been more strongly stated, nor its purpose made more clear:

> A well regulated Militia, being **necessary** to the security of a **free State**, the right of the people to keep and bear Arms, **shall not be infringed**. [Emphasis added.]

Although rarely addressed in court opinions, the Second Amendment declares itself to be the means to prevent the exercise of "arbitrary" state power, declaring that the rights it protects are not just helpful or useful, but actually "**necessary**" for the preservation of a "**free State**." Politicians temporarily serving in elected or appointed offices have proven repeatedly that they are not "angels"[3] and can grossly exceed and be abusive of the powers with which they have been entrusted, requiring the Courts to step in and ensure the People are not dispossessed of the right to protect themselves.[4]

---

including Madison himself) did not adopt it. During the ratification debate in Virginia, Madison promised that a bill of rights would be added after ratification. His promise reassured the convention and the Constitution was approved in that state by the narrowest margin. New York soon followed…. Two states … refused to ratify without a bill of rights.").

[3] *See* Federalist No. 51.

[4] Unconstitutional acts of arbitrary government power abound. On March 30, 2024, the Supreme Court condemned a shameless exercise of arbitrary power exercised by the State of New York, where state regulators had threatened banks and insurance companies who were doing business with the National Rifle Association. *See NRA v. Vullo*, 2024 U.S. LEXIS 2366 (2024). For a

Sadly, the California legislature has demonstrated little, if any, respect for the Second Amendment rights of Californians, and this Circuit too often has upheld laws evidencing that disrespect.[5]  Often unconstrained by this Court, each year new proposals are advanced by state legislators seeking to outdo the restrictions on firearms imposed by the last session of the legislature.

Judges are entrusted with the responsibility to ensure that the political branches do not infringe on Second Amendment rights, regardless of their personal political and policy views.  Before *Heller* the lower courts failed in that duty, twisting the Second Amendment's protection of "the People" to protect only a "collective" right.  Then, after *Heller*, the lower courts twisted that decision through a two-step test that allowed them to engage in the type of interest balancing that *Heller* banned.  Now that *Bruen* re-established the *Heller* framework, California is asking this Court to twist *Bruen* as well.

---

unanimous Court, Justice Sotomayor explained:  "A government official cannot coerce a private party to punish or suppress disfavored speech on her behalf…. [T]he NRA plausibly alleged that Vullo violated the First Amendment by coercing DFS-regulated entities into disassociating with the NRA in order to punish or suppress the NRA's gun-promotion advocacy."  *Id*. at *22-24.

[5]  *See Mai v. United States*, 974 F.3d 1082, 1104-05 (9th Cir. 2020) (VanDyke, J., dissenting).

6

This case provides this Court an excellent opportunity to serve as "faithful guardians of the Constitution." Federalist No. 78.

**B.    The *Bruen* Methodology Is a One-Step Test — Applicable to All Restrictions on the Second Amendment's "Plain Text."**

In *Bruen*, after rejecting the two-step test used in most Circuits, including this Circuit,[6] the Supreme Court established the following methodology by which lower courts are required to consider challenges to firearms regulations:

> In keeping with *Heller*, we hold that when the Second Amendment's **plain text** covers an individual's conduct, the Constitution **presumptively protects** that conduct. To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's **"unqualified command**." [*Bruen* at 17 (emphasis added).]

*Bruen* made clear that the "plain text" threshold inquiry to be used is nothing new — it was the same approach the Court had used in 2008:

> In *Heller*, we began with a "**textual** analysis" focused on the **"'normal and ordinary'" meaning** of the Second Amendment's language. [*Bruen* at 20 (emphasis added).]

---

[6] *See, e.g., Young v. Hawaii*, 992 F.3d 765, 783-784 (9th Cir. 2021) (abrogated by *Bruen*).

7

The Court then repeated the "plain text" question for a third time[7] so that it could not be missed:

> **We reiterate** that the standard for applying the Second Amendment is as follows:  When the Second Amendment's **plain text** covers an individual's conduct, the Constitution **presumptively protects** that conduct.  The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation.  Only then may a court conclude that the individual's conduct falls outside the Second Amendment's "**unqualified command**."  [*Bruen* at 24 (emphasis added).]

Under *Bruen*, there are only a few permissible questions for courts to address to meet the "plain text" test.  Here, the district court explained, "the parties do not dispute that Plaintiffs are '**people**' protected by the Second Amendment or that the weapons at issue are subject to Second Amendment protection as '**arms**.'  Further, the right to 'keep' arms necessarily encompasses **ancillary rights**, including a right to acquire arms...."  *Nguyen* at *21-22 (emphasis added).   If so, this "plain text" requirement is met, and the burden shifts to the government.  It really is as simple as that.

---

[7]  A point often is made three times for emphasis — the "Rule of Three" or "Triadic Utterance...."  "The practice of repeating words or phrases three times holds deep roots in ancient civilizations."  C.D. King, "The Power of Triadic Utterance," *Medium* (July 27, 2023).

### C. The Right to Acquire Firearms Is Part of the Right to "Keep and Bear Arms."

The challenged statute states:

**[a] person shall not** make an application to **purchase more than one firearm** within any 30-day period.  This subdivision does not authorize a person to make an application to purchase a combination of firearms, completed frames or receivers, or firearm precursor parts within the same 30-day period.  [Cal. Penal Code § 27535 (emphasis added).]

California phrases the question for the Court in an absurd manner, as if the average Californian were visiting a federal firearms licensee to equip an army: does "'the right of the people to keep and bear Arms' — cover[] the right to purchase **an unlimited number** of firearms within a 30-day period."  Cal. Br. at 13 (emphasis added).  More realistically, the question is what the complaint alleges, that Plaintiffs "desire and intend to purchase multiple handguns and/or semiautomatic centerfire rifles within a 30-day period."  *Nguyen* at *4.  Or the question could be stated:  "does the right of the people to keep and bear arms cover the right to purchase a rifle and a handgun within a 30-day period?"[8]

---

[8]  Under the OGM law, it could be impossible for a collector to purchase a historically significant set of dueling pistols.  *See, e.g.,* "Dueling Pistols for sale," *GunsInternational.com.*

California's OGM law must be struck down because it violates the Second Amendment's text.  California seeks to justify its ban on multiple firearm sales by arguing that the Second Amendment's protection of the "right to keep and bear Arms" only protects the right to acquire one firearm.  Thus, California urges the Second Amendment be read as if it protects "the right to keep and bear **Arm (or "an Arm**."[9]  The use of singular and plural terms is often indicative of intent.[10]

Searching for a way to circumvent the plain text, California denies that the right to acquire a firearm is ancillary to keeping and carrying firearms.  California relies on a recent Fifth Circuit decision in *McRorey v. Garland*, 2024 U.S. App. LEXIS 10247 (5th Cir. 2024), for the dubious proposition that "on its face 'keep and bear' does not include purchase…" and therefore no historical showing by the government is required.  *McRorey* at *10.  *McRorey* was

---

[9]  The district court observed that "the usage of the term 'arms' in plural suggests" the Second Amendment right is not "limited to possession and acquisition of a single firearm…."  *Nguyen* at *22.

[10] Holy Writ shows how confusing singular and plural terms determines meaning.  Paul, writing to the Church at Galatia, explained:  "Now to Abraham and his **seed** were the promises made.  **He saith not**, And to **seeds**, as of many; but as of one, And to thy seed, which is Christ." *Galatians* 3:16, referencing *Genesis* 22:18 ("and in thy seed shall all the nations of the earth be blessed; because thou hast obeyed my voice."), *Genesis* 26:4 and *Genesis* 28:14.

10

addressing the issue of the constitutionality of purchase restrictions imposed by a federal law on those 18 to 21 years old, relying on language in *Bruen* regarding pre-purchases background checks. *See McRorey* at *7-10. However, the *McRorey* court then went beyond that issue to opine on purchases generally. In apparent *dicta*, it stated that purchase of firearms was not covered by the plain text.[11] *Id.* at *10. Logically, however, if the text "keep and bear" does not include the right to purchase, then no one can acquire a firearm to keep and bear — an absurd result. To avoid this problem, the court then tried to back into providing some protection of the right to purchase a firearm by asserting that, when a restriction on purchasing becomes a "functional prohibition[] on keeping," it has gone too far. *Id.* at *11. The court did not provide any authority for its "gone too far" test, which could be restated as:

> The text of the Second Amendment protects only a right to "keep and bear" arms and thus in no way implies any ancillary right to purchase. (Thus, restrictions on purchases are consistent with the text, and do not require the government to demonstrate historical analogues.) However, at some undefined point, a restriction on purchases can be considered so severe (*e.g.,* a total ban) that it does infringe on the right to "keep" arms — and the judges will let you know then that point is reached.

---

[11] This conclusion was properly rejected by the district court. *See Nguyen* at *21.

11

Making its position even more arbitrary and confusing is footnote 18, which states that, "under our reading of *Bruen*, the Second Amendment extends protection to acquisition" which the panel quickly qualifies to apply only when the restriction on purchase acts "as *de facto* prohibitions." *McRorey* at *12, n.18. Then and only then, the court believes the law "would be subject to constitutional challenge under *Bruen*'s rigorous historical requirement." *Id*. Compounding the confusion, the court also reaffirmed the continuing validity of a 2017 Fifth Circuit decision "that 'acquiring firearms to protect one's hearth and home' is a 'core Second Amendment guarantee.' *Bezet v. United States*, 714 F. App'x 336, 341 (5th Cir. 2017)." However, what *McRorey* does not explain is that *Bezet* employed the now-banned interest-balancing test — intermediate scrutiny — invoking core vs. non-core rights, reasonable fit, and consideration of "important" government objectives. That is "clearly irreconcilable with *Bruen*...." *United States v. Duarte*, 2024 U.S. App. LEXIS 11323, at *3 (9th Cir. 2024). This leaves the Fifth Circuit jurisprudence in a muddle.

As the modern father of textualism, Justice Scalia explained: "Textualism, in its purest form, begins and ends with what the text says **and fairly implies**."[12]

---

[12] A. Scalia and B. Garner, <u>Reading Law</u> at 16 (Thomson West: 2012) (emphasis added).

And as Justice Thomas noted in a 2016 concurrence, "[t]he law has long recognized that the '[a]uthorization of an act also authorizes a necessary predicate act.'" *Luis v. United States*, 578 U.S. 5, 26 (2016) (Thomas, J., concurring) (quoting A. Scalia, Reading Law). "Constitutional rights thus **implicitly protect those closely related acts necessary** to their exercise. There comes a point … at which the regulation of action intimately and unavoidably connected with [a right] is a regulation of [the right] itself." *Id*. (Thomas, J., concurring) (internal quotation omitted) (emphasis added).

California's faux "textual" argument would lead to the absurdity of a situation where "the People" had a right to "keep" and "bear" an arm which they cannot readily acquire. On the contrary, as the Seventh Circuit noted just three years after *Heller*, "[t]he right to possess firearms for protection implies a corresponding right to acquire…." *Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011). Under California's argument, a felon found with a firearm in his car could challenge the felon-in-possession statute, and the government would be obligated to present historical analogues, while a challenge brought by a law-abiding Californian seeking to purchase a firearm from a dealer could be barred without any historical showing.

13

California's position also defies this Court's recognition, long before *Bruen*, that the right to keep and bear arms necessarily implies the right to the ammunition to operate them. This Court held in 2014 that, "without bullets, the right to bear arms would be meaningless. A regulation eliminating a person's ability to obtain or use ammunition could thereby make it impossible to use firearms for their core purpose." *Jackson v. City & County of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014). As the *Ezell* court correctly noted, the right to keep and bear arms prevents government from "impos[ing] an impossible pre-condition on gun ownership for self-defense." *Ezell* at 712. California's argument that the right to "keep and bear" arms does not include the right to acquire them to begin with is meritless. This Court properly rejected a similar argument in *Jackson*, and should do so again here.

### D. California Misconstrues Heller's "Presumptively Lawful" Limiting Language as "Proof" that All "Conditions and Qualifications" Are Lawful.

California relies heavily on *Heller*'s "presumptively lawful" language:

> The law is also a "condition[] and qualification[] on the commercial sale of arms," which makes the law among those "presumptively lawful regulatory measures" that governments may adopt consistent with the Second Amendment. [Cal. Br. at 1.]

14

Although California treats this language as a holding, it is not. The issue of commercial sales was not before the *Heller* Court. Rather, this language is *Heller*'s explanation of limitations on the issues it decides and the scope of the opinion:

> [N]othing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms. [*Heller* at 626-627.]

Then, in a footnote, *Heller* again referred to these categories as "presumptively lawful regulatory measures." *Id.* at 627, n.26. This should not be surprising; the Court generally extends a presumption of constitutionality to all legislative enactments. *See INS v. Chadha*, 462 U.S. 919, 944 (1983) ("We begin, of course, with the presumption that the challenged statute is valid"). But California treats the word "presumptively" in limiting language as if it were the word "categorically" used in the holding of the case.

*Heller* made no such holding, and in fact, expressly declared that "we do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment." *Id.* at 626. The Court added, "since this case represents this Court's first in-depth examination of the Second Amendment, one should not

15

expect it to clarify the entire field … [a]nd there will be time enough to expound upon the historical justifications for the exceptions we have mentioned if and when those exceptions come before us." *Id.* at 635. The Court was basically "assuming without deciding" lawfulness, since issues of felon firearms bans, machine guns, and "conditions and qualifications on the commercial sale of arms" were **not before the Court**. *Bruen* changed all that, requiring that any restriction on the Second Amendment right must be justified by "relevantly similar" historical analogues. *Bruen* at 29.

Other courts have recognized this language was not a conclusive finding: "Of course, not every regulation on the commercial sale of arms is presumptively lawful." *Rigby v. Jennings*, 630 F. Supp. 3d 602, 613 (D. Del. 2022). The Third Circuit concluded similarly: "In order to uphold the constitutionality of a law imposing a condition on the commercial sale of firearms, a court necessarily must examine the nature and extent of the imposed condition. **If there were somehow a categorical exception for these restrictions**, it would follow that there would be **no constitutional defect in prohibiting the commercial sale of firearms**. Such a result would be

16

untenable under *Heller*." *United States v. Marzzarella*, 614 F.3d 85, 92 n.8 (3d Cir. 2010) (emphasis added).

The district court addressed and rejected California's argument that conditions on commercial sale were *per se* valid. *See Nguyen* at *13-20. The district court observed that, prior to *Bruen*, this Circuit had usually avoided deciding whether a challenged regulation was one of the "laws imposing conditions and qualifications on the commercial sale of arms" that was a "presumptively lawful regulatory measure" under *Heller*, citing *Pena v. Lindley*, 898 F.3d 969 (9th Cir. 2018) and *Teixeira v. County of Alameda*, 873 F.3d 670 (9th Cir. 2017). Furthermore, the district court showed that, where this Circuit actually did conduct such analysis, it was not consistently applied, and "the Ninth Circuit has not clarified the category's scope." *Nguyen* at *17.

In the end, the district court concluded that, even if there was a *Heller* test separate from the *Bruen* test, "[c]aselaw within this Circuit and elsewhere establish that the OGM law would not qualify as 'longstanding' even under the pre-*Bruen* approach." *Nguyen* at *20 n.2 (citing *United States v. Chovan*, 735 F.3d 1127 (9th Cir. 2013)). Therefore, it saw California's whole "presumptively lawful" argument as "at odds with *Bruen*" and that "*Bruen* made clear that …

17

the justification for any presumption of lawfulness must rest on the analysis of text and history." *Id*. at *19, *16.

### E. *Bruen* Anticipated that Presumptively Lawful Categories Would Be Tested by Historical Analogues.

Importantly, *Bruen* explains that it "made the constitutional standard endorsed in *Heller* more explicit." *Bruen* at 31. That "constitutional standard" in *Heller* was "to assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding." *Bruen* at 26. But *Bruen* carried *Heller*'s logic further. *Bruen* established that, if a challenged regulation implicates the plain text of the Second Amendment, "the burden falls on [the government] to show that [the regulation] is consistent with this Nation's historical tradition of firearm regulation. Only if respondents carry that burden can they show that the pre-existing right codified in the Second Amendment … does not protect petitioners' proposed course of conduct." *Id.* at 33-34. If the Second Amendment is implicated, the burden shifts to the government specifically to provide historical analogues "relevantly similar" to the challenged regulation, or the regulation fails. *Id.* at 29.

Unlike the district court, California simply misapprehends *Bruen*. Nothing in the text of the *Bruen* opinion suggests that historical analogues are unnecessary

18

when a regulation arguably fits a "presumably lawful" category. As the Fourth Circuit has noted, "*Bruen* effected a sea change in Second Amendment law." *Md. Shall Issue, Inc. v. Moore*, 86 F.4th 1038, 1041 (4th Cir. 2023). *Bruen* undertook *Heller*'s promise that the Court would "expound upon the historical justifications for the exceptions" *(Heller* at 635) and made clear that they too must be justified by "similarly relevant" historical analogues. California asks this Court to ignore that "sea change," a request this Court should decline.

As the district court properly realized, "Defendants have not met their burden of producing a 'well-established and representative historical analogue' to the OGM law." *Nguyen* at *36. This is because no such analogue exists.

As this Court recently recognized, "**Simply repeat[ing]** *Heller***'s language about … 'presumptive[] lawful[ness]' … will no longer do after** *Bruen*." *Duarte* at *18 (emphasis added). Instead, "*Bruen* expressly require[s] courts to assess whether … any regulation infringing on Second Amendment rights, is consistent with this nation's historical tradition of firearm regulation.… It would pay lip service to this mandate if we continued to defer … to *Heller*'s footnote." *Id.* at *19.

> Had the Court in *Bruen* endorsed simply deferring to *Heller*'s
> "presumptively lawful" footnote, the outcome of that case would

19

have been much different.… As with any other firearm regulation challenged under the Second Amendment, *Bruen* clarified, courts must now analyze "sensitive place" laws by analogizing them to a sufficiently comparable historical counterpart. [*Id*. at *20-21.]

*Bruen* requires "relevantly similar" historical analogues. California proffers not a single relevant historical numeric limitation on firearm purchases. Accordingly, the state has failed to meet its burden, and the law violates the Second Amendment.

## II.   CALIFORNIA OFFERS NO "RELEVANTLY SIMILAR" HISTORICAL ANALOGUES.

### A.   California's OGM Law Does Not Require a Nuanced Approach.

The district court understood from *Bruen* that "[t]he historical analysis differs depending on whether the law addresses a [i] novel societal issue, or [ii] one that was present during the Founding and Reconstruction eras." *Nguyen* at *24. Predictably, California argued that the regulatory challenges today are wholly different from those in the past, requiring what *Bruen* called a "more nuanced" approach. Rather than determining if the issue was novel, the district court merely "assume[d] that a 'more nuanced approach' applies," and then applied it. *Nguyen* at *27. However, there is good reason to believe that substantially the same problem existed during the founding era.

20

California's Opening Brief offered the following reasons for employing the "nuanced" approach:

> Throughout history, manufacturing, cost, and distribution limitations restricted the commercial availability of firearms. Today, mass production and modern-day distribution networks have rendered firearms less expensive and more widely available for purchase than in the founding and Reconstruction eras. Those advances have given rise to societal concerns regarding straw purchases and firearms trafficking that did not exist to the same extent during earlier periods. [Cal. Br. at 10-11.]

California repeats this same argument two other times (at 2 and 21) but, strikingly, in none of these three passages does California cite even once to the record or to even one secondary source proving there was a paucity of firearms during the nation's early days. There is good reason to believe that California's historical assertions are incorrect.

Kritika Agarwal, associate editor for publications at the American Historical Association, has written: "Emerging work seeks to lay to rest the idea that large-scale arms trading is a recent phenomenon. It's been part of commerce and politics since at least the early 17th Century…. **Long before**

**early 19th-century industrialization** transformed arms manufacturing in the United States, **the continent was flush with guns**."[13]

Professor David Silverman, Ph.D. at George Washington University, who specializes in Native American, Colonial American, and American racial history, is the author of Thundersticks: Firearms and the Violent Transformation of Native America (Belknap Press: 2016).  Silverman describes the "widespread success" of Native American tribes at "building and maintaining **large arsenals** of firearms," beginning **long before the Revolution.**[14]  Indeed, Holden explains, "[a]rms races erupted across Native America as indigenous people came to terms with the military potential of firearms" and "[t]he emergence of rifle technology in the **mid to late eighteenth century** … only accelerated this trend." *Id.* (emphasis added).  Native tribes traded with British, French, Dutch, Spanish, and American partners for firearms and ammunition.  *Id.*  The Pawnees were particularly eager for guns to use against their Apache enemies, and "by 1750 [a quarter century before the Revolution] almost every Pawnee warrior possessed a

---

[13]  K. Agarwal, "A world of weapons: Historians shape scholarship on arms trading," *Perspectives on History* (Sept. 1, 2017) (emphasis added).

[14]  V. Holden, Society for Historians of the Early American Republic (SHEAR), "Firearms and the Violent Transformation of Native America," (Dec. 27, 2016) (emphasis added.)

musket."[15]  By 1795, eight years before Jefferson's Louisiana Purchase brought the Great Plains into the United States, "French traders along the upper Missouri reported that all of the tribes, but especially the Mandans and Hidatsas, were well-armed with muskets and pistols, and possessed ample supplies of ammunition."  *Id.* at 111.

While it is true that colonists sought to prevent Native people from acquiring firearms, it is also true that these efforts were largely unsuccessful. Professor Silverman reports:  "'There's a widespread assumption that Native people were subjugated by European Americans because of a disadvantage in arms, and that's just not true....  **They routinely got the very best of firearms** technology and used those guns more effectively than white settlers.  And white governments routinely struggled to control the trade in arms to Native people.'"[16]

Thus, it appears that the district court was quite generous to California by "assuming" without deciding that the "nuanced approach" was required.

---

[15]  D. Worcester and T. Schilz, "The Spread of Firearms Among the Indians on the Anglo-French Frontiers" at 108, AMERICAN INDIAN QUARTERLY (Spring 1984).

[16]  K. Agarwal, *supra* (emphasis added).

23

**B.    Restrictions on Sale to Native Americans.**

Using the "nuanced approach," the district court then examined the four types of laws offered by California — (1) gunpowder regulations; (2) restrictions on the sale of firearms to Native Americans; (3) restrictions on "deadly weapons;" and (4) taxing and licensing regulations.  It found that California had failed to meet even the lower "nuanced" bar on any of these categories.  *Nguyen* at *29-36.  These *amici* offer two additional thoughts only on the restrictions on sale to Native Americans.

First, as shown *supra*, the Founding generation, beset by British, Spanish, and French foes, all of whom happily armed hostile tribes, faced its own concerns of weapons proliferation and leaps in technology that spawned numerous regulations against trading with hostile tribes.  Yet, as the district court pointed out, California could not produce even a lone example of a "quantity nor time limitation" on the acquisition of arms even by Native Peoples, even if considered "presumptively dangerous."  *See id*. at *31.

Finally, white settlers and Native Americans may have occupied adjacent lands, but they did not co-exist within the same political system.  They had allegiances to different nations and were rivals regularly engaged in hostilities

24

against the other. It is impossible to view restrictions on the sale of arms to Native people — members of hostile foreign nations – as providing a relevant historical analogue for restricting the sale of arms to Californians. *See Duarte* at *59-60.

## III. THIS COURT IS DUTY BOUND TO FOLLOW *BRUEN* AND REJECT CALIFORNIA'S CONTINUED HOSTILITY TO THE SECOND AMENDMENT.

The complaint in this case was filed in December 2020, a year and a half before *Bruen* was decided in June 2022, when this circuit was employing its two-step test. The district court's decision was not issued until March 2024, giving the court ample time to consider the *Bruen* methodology. Despite California's urging it to chart a path around *Bruen*, the district court faithfully followed the analytical method. These *amici* urge this Court to affirm the lower court's decision, even though it may require it to overcome its historic reticence to overturn a California gun law.

### A. California Has Long Embraced an Extreme, Narrow Reading of the Second Amendment.

The *Bruen* decision has done nothing to dampen California's long-standing hostility to the Second Amendment. Before *Heller*, California did not believe the Second Amendment even protected the right of an individual to possess a

25

handgun in the home.[17]  When *Heller* was being briefed in the Supreme Court, then-San Francisco District Attorney Kamala Harris led a group of California district attorneys (for Marin, San Diego, and Alameda counties), and some from other states, in filing an *amicus* brief which urged that the Second Amendment be viewed in an extreme and narrow fashion:

> (i) the Second Amendment provides only a militia-related right to bear arms, (ii) the Second Amendment does not apply to legislation passed by state or local governments, and (iii) the restrictions [against a handgun in the home at issue in *Heller*] bear a reasonable relationship to protecting public safety and thus do not violate a personal constitutional right.[18]

When the Supreme Court was considering *Bruen* on the merits, California and a number of other states filed an *amicus* brief urging the Supreme Court to grant the states virtually unlimited latitude to restrict the right to "bear arms."[19] California continued to urge the same judicial interest balancing rejected by the

---

[17]  Before *Heller*, California apparently took the "collective rights" position that the Second Amendment only authorized arming a state-controlled militia, and did not establish any individual right whatsoever.  *See Silveira v. Lockyer*, 312 F.3d 1052 (9th Cir. 2002) (cert. denied).

[18]  *See Amici Curiae* Brief of District Attorneys in Support of Petitioners in *District of Columbia v. Heller,* No. 07-290 (Jan. 11, 2008) at 5-6.

[19]  *See* Brief for the States of California, *et al.* as *Amici Curiae* in Support of Respondents in *New York State Rifle & Pistol Ass'n. v. Bruen*, No. 20-843 (Sept. 21, 2021).

*Heller* decision, but embraced in dissent by Justice Breyer, arguing: "Intermediate Scrutiny Is the Proper Form of Means-Ends Analysis for Public Carry Regulations." *Id*. at 23. Nevertheless, the *Bruen* decision again soundly rejected interest balancing.

After the *Bruen* decision was issued, California Governor Newsom roundly criticized both it and the High Court:

> Newsom slammed [2022's] landmark US Supreme Court decision expanding gun rights and criticized lower circuit courts that have since overturned gun control measures.[20]

> This Supreme Court is that bad…. The Bruen decision was that bad. When I say code red, this is code red. California's led the nation on common sense gun safety laws.[21]

In fact, Governor Newsom has gone so far as to urge the other states to help undo *Bruen* by calling for an Article V Constitutional Convention to adopt his proposed 28th Amendment, *inter alia*, to abolish gun rights now protected by the Second Amendment. The details of the proposed amendment were not identified, but it would include a prohibition on the sale, loan, or transfer of so-

---

[20] J. Campbell and L. Mascarenhas, "California governor signs gun control measures into law, including nation's first state tax on firearms and ammunition," *CNN* (Sept. 27, 2023).

[21] D. Walters, "Gavin Newsom channels Jerry Brown with constitutional amendment proposal," *Cal Matters* (Aug. 21, 2023).

called "assault weapons" and other pejoratively labeled "weapons of war" to private civilians.[22]  Not wanting to wait for the Article V constitutional amendment process to play out, California now asks this Court to limit the Second Amendment as written.  Before *Heller*, after *Heller*, in *Bruen*, and now after *Bruen*, California is unchanged in pursuing a very narrow view of the type of rights which the Second Amendment protects.

In the aftermath of *Heller*, many federal judges found it difficult to believe the Second Amendment really protected a robust individual right.  To dampen the impact of *Heller*, many courts adopted the two-step approach, which resulted in many serious restrictions on gun rights being said not even to "implicate" Second Amendment protections.  *See Chovan* at 1136-37.  This two-step approach was inconsistent with *Heller* and was expressly repudiated in *Bruen*.  Now, California is urging this Court to find a way around *Bruen* by viewing its OGM law as presumptively lawful as a regulation imposing conditions and qualifications on the commercial sale of arms, and thus neither implicating the text of the Second Amendment nor requiring California to  provide historical analogues.  Following California's lead would do a grave disservice to *Bruen*.

---

[22]  *See* California Senate Joint Resolution 7 (passed Sept. 21, 2023).

## B. Restricting the Ability of Californians to Resist State Tyranny.

California apparently believes that the personal self-defense right protected by the Second Amendment is no more robust than calling 911 and waiting for the police to arrive — often to write a report after the crime occurs. Certainly, California does not seem to appreciate the broader self-defense right of Americans not just to defend our government against terrorism or other external threat, but also to resist our government, should it someday become tyrannical, to preserve a "free state." *See Heller* at 597-98.

The lawful purpose of defense against tyrannical government and foreign attackers is something that *Heller* made clear. There are many reasons why the militia was thought to be "necessary to the security of a free State" including that, "when the able-bodied men of a nation are trained in arms and organized, they are better able to resist tyranny." *Id*. at 598. As Justice Story noted in his Commentaries:

> The **right of the citizens** to keep and bear arms has justly been considered as **the palladium of the liberties** of a republic, since it offers a strong moral check against the usurpation and **arbitrary power of rulers**, and will generally, even if these are successful in the first instance, enable the people to **resist and triumph** over them. [Cited in *Heller* at 667-668 (emphasis added).]

29

The Second Amendment memorializes the Framers' belief that the "right to keep and bear arms" is absolutely "necessary" to the maintenance of a "free State." The corollary is also true. It is no coincidence that the same state whose legislature and governor each year compete to identify new ways to restrict the freedom of their citizens would want to prevent the citizens from having the ability to resist tyranny.

According to one analysis of freedom in the 50 states, California ranks 48th in economic freedom, including ranking 48th in fiscal freedom (including "taxes, government employment, spending, debt, and fiscal decentralization") and ranking 49th in regulatory freedom (including "the liability system, property rights, health insurance, and the labor market").[23] According to this study of economic freedom, the most free state, New Hampshire, has a rating of +0.5, while California has a rating of -0.71. Only New York is ranked lower in economic freedom. New York, not surprisingly, was the state whose onerous restrictions on the right to bear arms were struck down in *Bruen*.

Legislative attacks on parental rights also have driven Californians away. California State Senator Scott Wilk has warned families to leave California, as

---

[23] *See* Freedom in the 50 States: California, *CATO Institute*.

30

new state laws threaten child abuse charges against parents who do not wish their minor children to have sex change drugs or surgeries. Wilk described the legislature's "'taking away parents' choice in how their children are going to be educated to the detriment, particularly of children of color.... [W]e have put government bureaucrats between parents, children, and doctors when it comes to medical care — and now we have [AB 957] where if a parent does not support the ideology of the government, [children are] going to be taken away from the home,'" Wilk warned.[24]

Even before that warning, increasing restrictions on personal liberty have also seen hundreds of thousands of Californians voting with their feet, and leaving the state. "Residents have been fleeing states like California with high taxes, expensive real estate and school mask mandates and heading to conservative strongholds like Idaho, Tennessee and Texas. More than one of every 10 people moving to Texas during the pandemic was from California."[25]

---

[24] T. Bunker, "California GOP Legislator Tells Parents to 'Flee' the State," *Newsmax* (June 16, 2023).

[25] J. Burnett, "Americans are fleeing to places where political views match their own," *NPR* (Feb. 18, 2022).

Multiple separationist movements have even sprung up in more rural areas of the state, as residents of rural counties attempt to create new states within the current bounds of California.  In northern California, the "New California" statehood movement has developed over the last several years.  "The New California proposal includes a statement that people who are 'suffering the long train of abuses and usurpations at the hands of a tyrannical government' have the right to make a new government."[26]  A similar movement is underway in San Bernardino County in southeastern California.[27]  California's rulers would do well to grant more freedom to their people, but instead their efforts to disarm them continue unabated.

The People — not just those whom Justice Story called our "rulers" who are protected by armed guards — have a right to be armed.  California has no "interest" in public safety which outweighs the constitutional right of the People of the State to protect themselves.  As the Supreme Court has explained, the

---

[26] L. Sanders and J. Gedeon, "What Is New California? Rural Counties Want Independence From 'Tyrannical Government'," *Newsweek* (Jan. 17, 2018).

[27] A. Koseff, "Forget the first 220 failures to split California. This developer has a new plan to secede," *CalMatters.org* (June 3, 2024).

Second Amendment was the "very *product* of an interest balancing by the people." *Heller* at 635.

## CONCLUSION

The decision of the district court should be affirmed.

Respectfully submitted,

_/s/Jeremiah L. Morgan_

JOHN I. HARRIS III  JEREMIAH L. MORGAN*
 SCHULMAN, LEROY & BENNETT, P.C. WILLIAM J. OLSON
 3310 West End Avenue  WILLIAM J. OLSON, P.C.
 Suite 460  370 Maple Avenue W., Suite 4
 Nashville, TN 37203  Vienna, VA 22180-5615
  (703) 356-5070
  wjo@mindspring.com
  *Attorneys for Amici Curiae*
  *Attorney of Record
  June 4, 2024

33

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 24-203

I am the attorney or self-represented party.

**This brief contains** | 6,924 | **words,** including | 0 | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

○ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

● is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.
☐ a party or parties are filing a single brief in response to multiple briefs.
☐ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated [        ].

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/Jeremiah L. Morgan | **Date** | 6/4/24

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8**             *Rev. 12/01/22*

## CERTIFICATE OF SERVICE

IT IS HEREBY CERTIFIED that service of the foregoing Brief *Amicus Curiae* of Gun Owners of California, Inc., *et al.*, in Support of Plaintiffs-Appellees and Affirmance, was made, this 4th day of June 2024, by the Court's Case Management/Electronic Case Files system upon the attorneys for the parties.

*/s/Jeremiah L. Morgan*
Jeremiah L. Morgan
Attorney for *Amici Curiae*
