No. 24-2036

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

————————————

MICHELLE NGUYEN, ET AL.,

*Plaintiffs-Appellees*,

v.

ROB BONTA, IN HIS OFFICIAL CAPACITY AS THE
CALIFORNIA ATTORNEY GENERAL, ET AL.,

*Defendants-Appellants.*

————————————

**On Appeal from the United States District Court
for the Southern District of California**
No. 3:20-cv-02470-WQH-MMP
The Honorable William Q. Hayes, Judge

————————————

## APPELLANTS' REPLY BRIEF

————————————

ROB BONTA
*Attorney General of California*
THOMAS S. PATTERSON
*Senior Assistant Attorney General*
ANTHONY R. HAKL
*Supervising Deputy Attorney General*

JERRY T. YEN
*Deputy Attorney General*
 1300 I Street, Suite 125
 P.O. Box 944255
 Sacramento, CA 94244-2550
 Telephone: (916) 210-7836
 Fax: (916) 324-8835
 Email:  Jerry.Yen@doj.ca.gov
*Attorneys for Defendants-Appellants Rob
Bonta and Allison Mendoza, in their
official capacities*

June 17, 2024

# TABLE OF CONTENTS

**Page**

Introduction ................................................................... 1

Argument ...................................................................... 2

I.  Plaintiffs Have Not Established That Purchasing Multiple Firearms Within a 30-Day Period Is Presumptively Protected by the Second Amendment's Text ........................................... 2

II.  The Challenged Laws Are a Presumptively Lawful Regulation on the Commercial Sale of Firearms .................................... 8

III.  California's Law Is Consistent with the Nation's Historical Tradition of Firearms Regulation ....................................... 12

    A.  Plaintiffs Misconstrue the Required Historical Analysis ........ 13

    B.  *Bruen*'s "More Nuanced Approach" Is Warranted in This Case ............................................................... 16

    C.  California's Law Is Consistent with the Historical Tradition of Regulating the Sale of Weapons to Ensure Dangerous Individuals Do Not Obtain Them ...................... 19

Conclusion .................................................................... 25

Certificate of Compliance .................................................... 26

# TABLE OF AUTHORITIES

**Page**

## CASES

*Antonyuk v. Chiumento*
    89 F.4th 271 (2d Cir. 2023) ............................................. *passim*

*B&L Prods., Inc. v. Newsom*
    __ F.4th __, 2024 WL 2927734 (9th Cir. June 11, 2024) ............... *passim*

*Consumer Fin. Prot. Bureau v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*
    601 U.S. 416 (2024) ................................................................ 15

*District of Columbia v. Heller*
    554 U.S. 570 (2008) ......................................................... *passim*

*McCullen v. Coakley*
    573 U.S. 464 (2014) .............................................................. 19

*McDonald v. City of Chicago*
    561 U.S. 742 (2010) ......................................................... 11, 12

*McRorey v. Garland*
    99 F.4th 831 (5th Cir. 2024) ......................................... 3, 4, 5, 7

*New York State Rifle & Pistol Ass'n v. Bruen*
    597 U.S. 1 (2022) ............................................................. *passim*

*Oakland Tactical Supply, LLC v. Howell Twp., Mich.*
    __ F.4th __, 2024 WL 2795571 (6th Cir. May 31, 2024) .................... 5, 6

*Pena v. Lindley*
    898 F.3d 969 (9th Cir. 2018) ..................................................... 9

*Teixeira v. Cnty. of Alameda*
    873 F.3d 670 (9th Cir. 2017) (en banc) ................................. 3, 4, 10, 22

*United States v. Alaniz*
    69 F.4th 1124 (9th Cir. 2023) ......................................... 13, 19

# TABLE OF AUTHORITIES
## (continued)

**Page**

*United States v. Duarte*
    101 F.4th 657 (9th Cir. 2024) ..................................................... 10, 11, 21

*United States v. Holton*
    639 F. Supp. 3d 704 (N.D. Tex. 2022) ............................................. 19, 21

*United States v. King*
    646 F. Supp. 3d 603 (E.D. Pa. 2022) ......................................................... 5

*United States v. Perez-Garcia*
    96 F.4th 1166 (9th Cir. 2024) ......................................... *passim*

*United States v. Salerno*
    481 U.S. 739 (1987) .................................................................................. 7

*United States v. Serrano*
    651 F. Supp. 3d 1192 (S.D. Cal. 2023) ........................................... 20, 21

## STATUTES

California Penal Code
    § 27535 ........................................................................................... 1, 9
    § 27540(f) ........................................................................................ 1, 9

## CONSTITUTIONAL PROVISIONS

United States Constitution
    Second Amendment ....................................................................... *passim*
    Fourteenth Amendment ................................................................... 13, 14

**INTRODUCTION**

The text of the Second Amendment plainly does not guarantee a right to purchase an unlimited number of firearms within a 30-day period. Nevertheless, plaintiffs advance an unduly broad understanding of the Second Amendment that cannot be reconciled with Supreme Court precedent. In their view, any regulation that touches on firearm sales requires the government to proffer identical historical analogues from the founding era only, regardless of whether previous generations encountered the problem addressed by the regulation.

Plaintiffs misconstrue the requisite analysis on multiple fronts. Under a proper application of Supreme Court precedent, plaintiffs fail to establish that California Penal Code Sections 27535 and 27540(f) regulate conduct that is presumptively protected by the Second Amendment. In fact, as commercial regulations on the sale of firearms, the challenged laws are presumptively *lawful*. And even if this Court were to assume that purchasing multiple firearms within a 30-day period were presumptively protected, the record shows that the challenged laws are "consistent with the Nation's historical tradition of firearm regulation," especially when applying a "more nuanced approach." *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 24, 27 (2022).

1

## ARGUMENT

### I. PLAINTIFFS HAVE NOT ESTABLISHED THAT PURCHASING MULTIPLE FIREARMS WITHIN A 30-DAY PERIOD IS PRESUMPTIVELY PROTECTED BY THE SECOND AMENDMENT'S TEXT

At the threshold stage of the *Bruen* inquiry, "a litigant invoking the Second Amendment must first establish that 'the Second Amendment's plain text covers an individual's conduct.'" *B&L Prods., Inc. v. Newsom*, __ F.4th __, 2024 WL 2927734, at *7 (9th Cir. June 11, 2024) (quoting *Bruen*, 597 U.S. at 24). The conduct protected by the Second Amendment's text is the "keep[ing] and "bear[ing]" of arms (U.S. Const. amend. II), which means the right to possess and carry arms in the case of confrontation. *See District of Columbia v. Heller*, 554 U.S. 570, 583-584 (2008); *see also B&L Prods.*, 2024 WL 2927734, at *7 ("The plain text of the Second Amendment directly protects one thing—the right to 'keep and bear' firearms."). Plaintiffs have not shown that their proposed course of conduct—purchasing an unlimited number of firearms within a 30-day period—implicates that right. *See Bruen*, 597 U.S. at 17; *see also* AB 15-16 (plaintiffs' proposed course of conduct).[1] In fact, the challenged law undisputedly does not prevent law-abiding citizens from owning or possessing firearms. It only requires

---

[1] "AB" refers to the answering brief; "OB" refers to the opening brief.

2

that an individual who *has* purchased a firearm wait 30 days before purchasing an additional firearm.  Indeed, plaintiffs admit that they already own firearms for self-defense and can purchase additional firearms subject to the requirements of the challenged regulation.  *See* 2-ER-130–131; 2-ER-139–140; 2-ER-148–149.

Instead of tying the challenged law to the Second Amendment's plain text, plaintiffs argue that the right "is *infringed* when the ability to acquire firearms is restricted" in any way, AB 14, based on the "the ancillary right to acquire arms," AB 11.  The State does not dispute that the ability to purchase a firearm is an ancillary right to "keep[ing]" and "bear[ing]" arms as defined in *Heller*.  *See Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017) (en banc).  However, the text of the Second Amendment protects ancillary rights only "to the extent necessary" to "realiz[e] . . . the core right to possess a firearm for self-defense."  *B&L Prods.*, 2024 WL 2927734, at *7 (quoting *Teixeira*, 873 F.3d at 677); *McRorey v. Garland*, 99 F.4th 831, 838 (5th Cir. 2024) (while the right to "keep" and "bear" arms

3

can implicate the right to purchase, "such an implication is not the same thing as being covered by the plain text of the amendment").[2]

Thus, plaintiffs' attempts to render *any* "law restricting someone from acquiring a firearm" as infringing presumptively protected conduct go too far and cannot be squared with either the Second Amendment's text or precedent. AB 14. That is especially true here, where the challenged law does not prevent anyone from acquiring firearms at all; it simply requires that an individual who has already purchased a firearm wait 30 days before purchasing another one.

Courts have addressed when a regulation on the acquisition of firearms rises to the level of impacting the right to keep or bear arms both pre- and post-*Bruen*. In *Teixeira*, this Court looked to whether a regulation on the sale of firearms "meaningfully inhibit[ed] residents from acquiring firearms within their jurisdiction." 873 F.3d at 680. In *B&L Productions*, this Court reaffirmed *Teixeira*'s holding that "the plain text of the Second Amendment

---

[2] Plaintiffs attempt to distinguish *McRorey* because it concerned regulations involving a 10-day delay in taking possession of a firearm to allow for completion of a background check. AB 18 n.5. However, the purpose of those regulations as well as the challenged laws here is to ensure that dangerous individuals do not obtain firearms. Both laws involve a delay in taking possession of a firearm. While the waiting period here is longer, the delay is triggered only if the purchaser already purchased a firearm within the previous 30 days.

only prohibits meaningful constraints on the right to acquire firearms." 2024 WL 2927734, at *7; *see also id.* at *7 n.18 (noting that *Teixeira*'s holding "remains good law" post-*Bruen*). And the Fifth Circuit recently rejected equating all "restrictions on purchase" with "functional prohibitions on keeping." *McRorey*, 99 F.4th at 838. Whatever the formulation, the central question is not whether any "'implicit' rights that may be lurking beneath the surface of the plain text" are implicated, but whether the right to keep or bear arms is itself implicated. *United States v. King*, 646 F. Supp. 3d 603, 607 (E.D. Pa. 2022); *see also Oakland Tactical Supply, LLC v. Howell Twp., Mich.*, __ F.4th __, 2024 WL 2795571, at *6 (6th Cir. May 31, 2024) (in applying *Bruen*, courts must first ask "whether the regulation infringes the right to own and bear arms in the case of confrontation"). Here, the challenged laws do not prevent law-abiding individuals from possessing or carrying firearms in case of confrontation. OB 14-15, 17.

Plaintiffs' invocation of the definition of "infringe" has no bearing on whether their proposed conduct is presumptively protected by the text of the Second Amendment. *See* AB 14-15. Plaintiffs also mischaracterize the State's position as requiring "a total deprivation of the right" before "triggering the text of the Amendment." AB 14. The plain text of the Second Amendment protects "conduct necessary to effectuate" the right to

5

own and bear arms. *Oakland Tactical Supply*, 2024 WL 2795571, at *6; *see also B&L Prods.*, 2024 WL 2927734, at *7. Since *Bruen*, courts have almost universally required plaintiffs to demonstrate that a challenged law has some impact on the right expressly set forth in the Second Amendment's text to meet *Bruen*'s threshold requirement. *See, e.g.*, *B&L Prods.*, 2024 WL 2927734, at *7; *Oakland Tactical Supply*, 2024 WL 2795571, at *7 (finding that plaintiffs did not establish the challenged regulation interfered with their Second Amendment right to keep and bear arms); *United States v. Perez-Garcia*, 96 F.4th 1166, 1178 (9th Cir. 2024) (courts first consider whether the Second Amendment's text covers an individual's proposed course of conduct before the government bears the burden of justifying the challenged regulation). Plaintiffs fail to do so here.

In short, plaintiffs' proffered construction of the Second Amendment's text—that it necessarily incorporates an unfettered ancillary right to purchase arms—would eviscerate *Bruen*'s first-step textual analysis. That analysis does not ask whether the challenged law has *any* tangential effect on anything to do with firearms, but instead specifically looks to the conduct prohibited by the challenged law in relation to the Second Amendment's right to "keep and bear" weapons for self-defense. *See B&L Prods.*, 2024 WL 2927734, at *7-8. And plaintiffs' proposed construction would directly

6

contravene Supreme Court precedent by rendering any commercial regulation that touches on the purchase of a firearm presumptively *un*constitutional, when the Supreme Court has said the very opposite. *Infra* pp. 11-12.

Plaintiffs secondarily argue (and the district court similarly reasoned, *see* 1-ER-18) that the Second Amendment's use of "Arms" in the plural means that they must have the right to purchase multiple firearms within a 30-day period. AB 15-17. As discussed above and in the State's opening brief, such a right cannot be read into the plain text of the Second Amendment. OB 14-16; *McRorey*, 99 F.4th at 836-837 ("*Bruen* continued to distinguish the treatment of prohibitions on 'keep[ing] and bear[ing]'—such as the law at issue in *Bruen*—and other ancillary firearm regulations."). Plaintiffs' argument also does not comport with the Second Amendment's "historical background," *Bruen*, 597 U.S. at 20, since purchasing multiple firearms within a 30-day period was not the norm in the founding era, OB 15, 22-23. In any event, because this case presents a facial constitutional challenge, plaintiffs must establish "that no set of circumstances exists under which the [law] would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987); *see Antonyuk v. Chiumento*, 89 F.4th 271, 315 (2d Cir. 2023) ("Since at least some possible applications of the [challenged firearms

7

regulation] would not violate the Constitution, it is not unconstitutional on its face.").  They cannot do so here because, for individuals who already own a firearm—like most of the plaintiffs—the challenged laws have no impact on their ability to "keep" or "bear" *multiple* firearms.  *See* 2-ER-130–131; 2-ER-139–140; 2-ER-148–149 (plaintiffs admitting they currently own at least one firearm).  And because the challenged laws do not impose any limit on the number of firearms that a person may possess, individuals who do not already own a firearm may keep and bear multiple firearms consistent with the challenged law—so long as they wait 30 days between each purchase.

Because the challenged law does not prevent plaintiffs (or any other law-abiding citizen) from keeping or bearing arms, plaintiffs have not met, and cannot meet, their burden at the first stage of the *Bruen* inquiry.

## II.  THE CHALLENGED LAWS ARE A PRESUMPTIVELY LAWFUL REGULATION ON THE COMMERCIAL SALE OF FIREARMS

In addition to failing to demonstrate that their conduct is covered by the Second Amendment's text, as originally understood, plaintiffs fail to rebut the presumption that the challenged laws are a lawful regulation on the commercial sale of firearms.  *See Heller*, 554 U.S. at 626-627.  The challenged laws prohibit firearm dealers from delivering a firearm to a

purchaser who "has made another application to purchase" a firearm "within the preceding 30-day period," Cal. Penal Code § 27540(f), and state that purchasers "shall not make [such] an application," *id.* § 27535. The laws have no bearing on *who* can purchase a firearm or *what* firearm they can purchase. *See Pena v. Lindley*, 898 F.3d 969, 1009 (9th Cir. 2018) (Bybee, J., concurring in part and dissenting in part), *abrogated on other grounds by Bruen*, 597 U.S. 1. They address only "*when* such . . . sales can take place," *id.*—every 30 days *after* a purchase of a firearm. The challenged laws are thus "presumptively lawful." *Heller*, 554 U.S. at 626-627 & n.26; *B&L Prods.*, 2024 WL 2927734, at *8.

Plaintiffs assert that the presumptive constitutionality of commercial regulations announced in *Heller* is a presumption in "name only." AB 19. This characterization of *Heller* ignores key limiting principles set by courts. Both before and after *Bruen*, courts have asked whether the commercial regulation operates as a "functional prohibition" on, or "meaningfully impairs," an individual's ability to acquire a firearm, in determining whether that regulation is presumptively lawful. OB 17-18 (collecting cases); *B&L Prods.*, 2024 WL 2927734, at *8. In fact, the "most reasonable interpretation of [*Heller*'s presumptively lawful regulatory measures] is that commercial restrictions presumptively do not implicate the plain text of the

9

Second Amendment at the first step of the *Bruen* test" unless the restrictions

"'meaningfully constrain' the right to keep and bear arms for the purpose of

self-defense." *B&L Prods.*, 2024 WL 2927734, at *8 (quoting *Teixeira*, 873

F.3d at 680).

Plaintiffs go on to claim that applying *Heller*'s presumption to the

challenged law would mean that "the State could enact a purchase ban

limiting the number of commercial purchases to one per year, or even one

per decade." AB 20-21. This discussion of extreme hypothetical laws not

before the Court is irrelevant to the question of whether the laws challenged

in this case "meaningfully impair[]" the ability to acquire firearms. *B&L

Prods.*, 2024 WL 2927734, at *8.

Plaintiffs' next argument—that presumptively lawful commercial

regulations must have existed before the twentieth century in order to be

considered "longstanding," AB 23-24—is inconsistent with *Heller*. As

noted in the opening brief, OB 19-20, *Heller* considered firearm possession

bans on felons and the mentally ill to be "longstanding" even though these

kinds of restrictions were not enacted until the 1960s. *See* 554 U.S. at 626-

627. Plaintiffs' reliance on statements from *United States v. Duarte*, 101

F.4th 657 (9th Cir. 2024), that the outcome in *Bruen* would be different if

the Supreme Court simply accepted New York's attempt to characterize its

proper-cause requirement as a longstanding sensitive-place regulation, AB 24, also misses the mark.[3] As an initial matter, *Bruen* involved New York's licensing regulations for carrying a handgun in public, not any sensitive-place restriction. *Bruen*, 597 U.S. at 11, 30. More importantly, *Bruen*'s discussion of New York's characterization of its law focused more on the definition of "sensitive places" than on whether a regulation was "longstanding" or presumptively lawful. *See id.* at 30-31.

In short, nothing about presuming commercial regulations as lawful is "inconsistent with *Bruen*." AB 19 (quoting 1-ER-15). Indeed, after *Heller*, the Supreme Court reiterated its "assurances" about the lawfulness of such regulations in *McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010) (plurality opinion), and reaffirmed *Heller* again in *Bruen*, *see, e.g.*, 597 U.S. at 17, 24, 26 ("keeping with *Heller*," "reiterat[ing]" *Heller*'s "approach,"

---

[3] A petition for rehearing en banc in *Duarte* has been fully briefed and is pending. *See* No. 22-50048, Dkt. Nos. 72-74. As noted in the opening brief, *see* OB 12 n.6, *Duarte* concerns an entirely different category of presumptively lawful regulation—"longstanding prohibitions on the possession of firearms by felons." *Heller*, 554 U.S. at 626; *see Duarte*, 101 F.4th at 669. And the conduct at issue in that case is distinct from the law challenged here because the law challenged in *Duarte* operates as a flat prohibition on keeping and bearing firearms. Indeed, this Court recently reaffirmed that conditions and qualification on the commercial sale of arms remain presumptively lawful post-*Bruen*. *B&L Prods.*, 2024 WL 2927734, at *8.

and "apply[ing]" *Heller*'s "test").  Two justices required to reach a majority in *Bruen* were even more explicit, quoting at length what "Justice Scalia wrote in his opinion for the Court in *Heller*, and Justice Alito reiterated in relevant part in the principal opinion in *McDonald*"—namely, that "'laws imposing conditions and qualifications on the commercial sale of arms'" are "'examples'" of "'presumptively lawful regulatory measures.'"  *Id.* at 80-81 (Kavanaugh, J., concurring) (quoting *Heller*, 554 U.S. at 626-627 & n.26).  And presuming that laws imposing conditions and qualifications on the commercial sale of arms are lawful fully comports with *Bruen*, since many such laws (including the laws challenged here) "do not implicate the plain text of the Second Amendment."  *B&L Prods.*, 2024 WL 2927734, at *8.

## III.  CALIFORNIA'S LAW IS CONSISTENT WITH THE NATION'S HISTORICAL TRADITION OF FIREARMS REGULATION

Plaintiffs make three principal arguments in response to the vast historical record presented in this case.  First, plaintiffs contend that only a narrow subset of historical regulation is relevant under *Bruen*.  AB 26-32.  Second, plaintiffs reject the application of *Bruen*'s "more nuanced" approach for analyzing laws that address "unprecedented societal concerns or dramatic technological changes."  *Bruen*, 597 U.S. at 27; AB 32-40.  Third, plaintiffs employ a "divide and conquer approach" (*Perez-Garcia*, 96

F.4th at 1191) by isolating the numerous cited historical analogues, which demonstrate a broad historical tradition of regulating sales to keep firearms out of dangerous hands, to identify purported differences with the challenged laws. AB 40-57. Plaintiffs' approach cannot be squared with *Bruen* or this Court's precedents.

### A. PLAINTIFFS MISCONSTRUE THE REQUIRED HISTORICAL ANALYSIS

Plaintiffs claim that this Court is "bound to look to 1791" as the only relevant timeframe for *Bruen*'s historical inquiry, AB 27, such that "all of the State's proffered analogues from the mid to late 1800s necessarily fail as valid comparisons right out of the gate," AB 30. But *Bruen* did not limit the historical analysis required in Second Amendment cases in that way, *see* 597 U.S. at 34-38 (describing various "periods" bearing on the historical inquiry), and neither has this Court, *see, e.g.*, *Perez-Garcia*, 96 F.4th at 1189 n.17; *United States v. Alaniz*, 69 F.4th 1124, 1129 n.2 (9th Cir. 2023).

In arguing otherwise, plaintiffs overlook that *Bruen* itself considered "[e]vidence from around the adoption of the Fourteenth Amendment" in its historical analysis; the Court merely determined that the proffered evidence did not support a tradition of disarming individuals who lacked a special

need for self-defense. 597 U.S. at 60-66.[4] Indeed, the Court acknowledged the importance of the ratification of the Fourteenth Amendment in 1868 in determining the "prevailing understanding" of the Second Amendment's scope. *Id.* at 37-38.

Instead of delineating one era as the only relevant timeframe, *Bruen* focused on evidence of an "enduring American tradition" in its historical analysis. *Id*. at 67. For instance, historical evidence predating either the founding or Reconstruction can be informative if circumstances did not meaningfully change in the intervening years, as can post-enactment history that does not "contradict" and is not "'*inconsistent* with the original meaning of'" the Second Amendment. *Id.* at 35-36, 39.[5]

In short, the Court may look to any historical practice that remains an enduring historical tradition. *See, e.g.*, *Perez-Garcia*, 96 F.4th at 1187-1189 & n.17 (looking to "English tradition," "early American laws," "[p]ost-

---

[4] Justice Barrett's concurrence—which notes "the lack of support for" the challenged law "in either" the founding or Reconstruction eras, 597 U.S. at 82 (Barrett, J., concurring)—is in accord. AB 30.

[5] The same is true of municipal laws. AB 25. *Bruen* "does not suggest that local laws are not persuasive in illuminating part of the nation's tradition of firearm regulation." *Antonyuk*, 89 F.4th at 321 (quoting *Bruen*, 597 U.S. at 67).

ratification practice," and "post-Civil War practice" to determine "historical tradition" and "understanding"); *Antonyuk*, 89 F.4th at 319 n.32 ("[L]aws which otherwise might be too recent when considered in isolation nonetheless reflect previously settled practices and assumptions, they remain probative as to the existence of an American tradition of regulation.").[6]  As set forth below, nothing in the historical record in this case "contradicts" the Second Amendment's text or early evidence of its scope.  AB 29-30 (quoting *Bruen*, 597 U.S. at 36, 66 n.28).

 *Bruen* set forth some "principles" that might inform the historical analysis but "d[id] not [] provide an exhaustive survey of the features that render regulations relevantly similar under the Second Amendment." 597 U.S. at 29, 34-38.  So long as the Court looks at the history as a whole and gleans a relevant tradition, the law passes constitutional muster.  *See Perez-Garcia*, 96 F.4th at 1191 ("[W]e do not isolate each historical precursor and ask if it differs from the challenged regulation in some

---

[6] A recent concurrence joined by two of the justices crucial to the *Bruen* majority (Justices Barrett and Kavanaugh) confirms as much.  *See Consumer Fin. Prot. Bureau v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*, 601 U.S. 416, 442, 445 (2024) (Kagan, J., concurring) (noting "a continuing tradition" supported the law at issue where "[t]he founding-era practice" identified in the majority opinion "became the 19th-century practice, which became the 20th-century practice, which became today's").

way. . . . We instead examine the historical evidence as a whole, determining whether it establishes a tradition of permissible regulation . . . .").  And the history presented here establishes a consistent, enduring tradition of commercial firearm regulations aimed at preventing individuals perceived to pose a danger to the public from obtaining weapons.

### B.  *Bruen*'s "More Nuanced Approach" Is Warranted in This Case

Today's "societal concerns" regarding firearms trafficking and straw purchasing stems from the increase in commercial availability of firearms today as compared to the founding era.  AB 37.  In particular, the proliferation of firearms trafficking and straw purchasing today have been brought on by "dramatic technological changes" in manufacturing and distribution that have made firearms less expensive and more widely available for bulk purchase.  OB 21-24.  Thus, *Bruen*'s "more nuanced approach" is warranted here.  597 U.S. at 27.

Instead of addressing these societal concerns head on, plaintiffs mischaracterize the State's position as seeking "favorable treatment" and "leniency," going back to "interest-balancing," and advocating for a position outside of "the contours of the relevant history under *Bruen*."  AB 32-34. But the standard relied on by the State comes directly from *Bruen* itself:

16

"cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach." 597 U.S. at 27. And *Bruen* further instructs courts to look to "why" firearms regulations were enacted as one metric for determining whether they are "relevantly similar." 597 U.S. at 29. Plaintiffs' claim that the inquiry should not differ for "cases 'implicating unprecedented societal concerns'" and that consideration of "the government's stated policy justifications" amounts to "prohibited interest-balancing" cannot be squared with *Bruen*. AB 2, 34-35; *see also* AB 38 (arguing that, during the founding era, there were "*no* general restrictions on *either* the frequency or the quantity of firearms law-abiding citizens could commercially acquire). *Bruen* made clear that the historical analysis was not meant to impose "a regulatory straightjacket" and that there is no need to identify "a dead ringer" for purposes of the "analogical inquiry." *Bruen*, 597 U.S. at 30. And *Bruen* expressly calls for consideration of the legislative purpose of the challenged law (the "why") when comparing it with historical analogues. *See id.* at 29.

Beyond taking issue with the "more nuanced approach" itself, plaintiffs do not meaningfully contest that the modern concerns of straw purchasing and firearms trafficking resulted from the advances in manufacturing and distribution of firearms. *See* AB 35-39. Instead, plaintiffs primarily offer

17

strawman arguments that "keep[ing] firearms out of the hands of those who cannot legally own or possess them" and "the general problem of firearm violence" are not "anything new or unprecedented." AB 35-36. While those are the general goals of the challenged laws, the record in this case shows that the Legislature passed the laws in response to specific "societal concerns" resulting from the advancement in manufacturing and distribution of firearms, beyond what was available during the founding and Reconstruction. *See* OB 21-24. Recognizing this, plaintiffs next claim that "*economic* factors and *market* conditions during the Founding era and Reconstruction era, which may have limited the free citizenry's ability to acquire 'multiple firearms in single transactions'" cannot inform the historical analysis. AB 38-39. But these underlying factors (in addition to the identified changes in manufacturing technology) provide important historical context as to *why* the identified "societal concerns" are "unprecedented," such that past governments would not have had occasion to regulate them—and thus why more nuance is required here. *See Bruen*, 597 U.S. at 27-28; OB 22-24. After all, governments do not "regulate for

18

problems that do not exist," *McCullen v. Coakley*, 573 U.S. 464, 481 (2014),

so neither will identical historical analogues.[7]

The challenged laws are "animated by unprecedented contemporary

concerns," so "the government's proposed analogues" must be viewed

through a more nuanced "lens." *Alaniz*, 69 F.4th at 1129-1130.[8]

### C. CALIFORNIA'S LAW IS CONSISTENT WITH THE HISTORICAL TRADITION OF REGULATING THE SALE OF WEAPONS TO ENSURE DANGEROUS INDIVIDUALS DO NOT OBTAIN THEM

When the more nuanced approach is properly applied, the challenged

laws "fit[] squarely within th[e] category of" laws regulating sales and

possession of firearms to ensure they do not end up in dangerous hands, and

the "analogues show a longstanding tradition" of the same. *Alaniz*, 69 F.4th

at 1130. State and local governments have long "controll[ed] and trac[ed]

the sale of firearms" and "ensur[ed] dangerous individuals did not obtain

firearms" by regulating "where and to whom individuals could sell guns."

*United States v. Holton*, 639 F. Supp. 3d 704, 711-712 (N.D. Tex. 2022); *see*

---

[7] Even if a more nuanced approach were not called for here, "*Bruen* does not require the Government to identify a 'historical twin' or an 18th century 'dead ringer,'" regardless of whether the more nuanced approach applies. *Perez-Garcia*, 96 F.4th at 1191.

[8] Plaintiffs take issue with the State's citation to *Alaniz* because it "concerned sentencing enhancements for those convicted of perpetrating violent crime with a firearm." AB 40 n.9. However, *Alaniz* sets forth how to apply *Bruen*'s more nuanced approach as a general matter.

*also United States v. Serrano*, 651 F. Supp. 3d 1192, 1212 (S.D. Cal. 2023). The State has proffered regulations ranging from vendor licensing to taxation to possession restrictions (and more) that serve those same purposes, in a similarly—and often more—burdensome way than the challenged laws. OB 24-32.

Plaintiffs respond to the extensive historical record first by claiming that "the bulk of the proffered analogues fail right out of the gate because they come too late in time to serve as relevant comparators." AB 41; *see also* AB 30. As set forth above, *Bruen* did not limit the historical analysis required in Second Amendment cases to a particular time period, and later-in-time regulations that do not contradict prior practice inform historical tradition. *Supra* pp. 13-16. And the analogues cited here do not "[s]tand[] alone," AB 29; rather, they confirm the overarching tradition of regulating to ensure that firearms do not end up in dangerous hands. *See Perez-Garcia*, 96 F.4th at 1186; *Antonyuk*, 89 F.4th at 319 n.32.

Plaintiffs also claim that the tradition underlying the challenged laws is "sweepingly broad" and, "on one level or another, could conceivably be used to justify virtually all firearm regulations." AB 32. But courts, including this one, have endorsed looking at historical tradition "more generally" and relied on "broad history" in describing our nation's tradition

of firearm regulation.  *See, e.g.*, *Perez-Garcia*, 96 F.4th at 1181, 1191;
*Holton*, 639 F. Supp. 3d at 711-712; *Serrano*, 651 F. Supp. 3d at 1212.

Turning to the analogues themselves, plaintiffs separately address each
category of relevantly similar analogues and attempt to distinguish each on
differing bases (mischaracterizing the relevantly similar aspects of the laws
throughout), and in some cases take issue with the "small handful" of
analogs cited by the State.  AB 45-57.  *Perez-Garcia* expressly denounced
plaintiffs' "divide-and-conquer approach to the historical evidence."  96
F.4th at 1191; AB 45-57.  Nor is it "dispositive whether *comparable*
historical regulations exist in significant numbers."  *Antonyuk*, 89 F.4th at
303; AB 25, 52-53.  The Court looks to "whether the historical precedent
and the modern regulation are relevantly similar, so as to evince a
comparable tradition of regulation," but it does not "isolate each historical
precursor and ask if it differs from the challenged regulation in some way."
*Perez-Garcia*, 96 F.4th at 1191 (cleaned up).[9]

As one example of plaintiffs' flawed approach, plaintiffs attempt to
distinguish restrictions on sales to and trading with Native Americans—

---

[9] Contrary to plaintiffs' assertion, *Duarte* does not require an individualized
analysis of the categories of proffered analogues.  AB 57.  *Duarte* came after
*Perez-Garcia*, so it could (or should) not have done otherwise.

restrictions that regulated activities by *colonists* (not Native Americans), and at least one of which specifically limited the number of firearms a colonist could carry, which plaintiffs essentially concede (and the district court agreed) is relevantly similar.  AB 37-38 (citing 2-ER-079), 1-ER-024. Plaintiffs argue that these restrictions had "bigoted or racist motives" and "'targeted only a narrow subset of the population perceived as dangerous.'" AB 46-48 (quoting 1-ER-023–024).[10]  But this Court has considered such odious enactments in determining the historical scope of the Second Amendment.  *See Teixeira*, 873 F.3d at 685.  And the particular motives for those analogues are not the relevant comparative justification to consider under *Bruen*—the purpose of those restrictions was to ensure that individuals considered to be dangerous at the time (regardless of whether those same individuals could or would be considered dangerous today) did not have the ability to acquire firearms.  In fact, plaintiffs acknowledge that founding-era governments regulated sales of firearms to ensure Native Americans, whom they perceived as dangerous, would not possess them. AB 37.  Plaintiffs also admit that "the 17th century regulations designed to disarm Native Americans during early colonial times" are indicative of a

---

[10] The challenged laws are not "based on similarly bigoted or racist motives" as these analogues.  AB 47.

historical tradition of "keep[ing] firearms out of the hands of those who cannot legally own or possess them," and that the challenged laws address the same.  AB 35-36.

In another example, plaintiffs fail to engage with the relevant feature of the many licensing laws in the record—namely, that licensing was another mechanism by which states and localities aimed to prevent dangerous individuals from carrying firearms by imposing requirements on law-abiding citizens.  OB 26-27.  Plaintiffs instead write off "blanket prohibitions on carrying or bearing firearms without any requirement of criminal or wrongful intent" as "simply unconstitutional."[11]  AB 49-50.  Regardless of whether such restrictions are constitutional, neither the cited licensing laws nor the challenged laws include any such prohibition.

Plaintiffs' description of the "backdrop" of "prevailing general traditions" is telling.  AB 41-45 (capitalization standardized).  Plaintiffs cite a lack of restriction on "arms possession by males who were too young or too old for the militia, nor by females," AB 41-42; retail advertisements

---

[11] Plaintiffs' citations to multiple parts of *Bruen* on this point are unclear, as *Bruen* took issue with only one aspect of New York's licensing scheme—the requirement that an applicant demonstrate a "special need for self-defense" to obtain a license.  *See* 597 U.S. at 11-16.  The Court otherwise endorsed the constitutionality of "shall-issue" licensing schemes, which did not include that requirement.  *See id.* at 38 n.9.

indicating that multiple firearms were available for sale, AB 42-43; and the prevalence of firearm ownership among certain demographics, AB 43-44. Even taking these claimed "traditions" at face value, they do not show that it was common for private individuals to purchase multiple firearms in a single transaction, nor do they "affirmatively *preclude*" firearm regulations like the challenged laws, as plaintiffs claim. AB 45. Any law-abiding individual may still own or possess any number of firearms. Thus, the challenged laws are not inconsistent with such "general traditions" at all.

The historical evidence, examined "as a whole" (as it must be), *Perez-Garcia*, 96 F.4th at 1191, reflects a robust tradition of commercial regulations—whether through sales restrictions, tracking and registration, licensing requirements, taxation, or otherwise—to ensure that firearms do not fall into dangerous hands. OB 24-32. These regulations were aimed at otherwise law-abiding people. While the mechanics of the regulations have varied over time, they are all part of the same regulatory tradition.

## CONCLUSION

The judgment of the district court should be reversed, and this Court should remand for entry of judgment in favor of the Attorney General.

Dated:  June 17, 2024                Respectfully submitted,


ROB BONTA
Attorney General of California
THOMAS S. PATTERSON
Senior Assistant Attorney General
ANTHONY R. HAKL
Supervising Deputy Attorney General

*/S/ JERRY T. YEN*

JERRY T. YEN
Deputy Attorney General
*Attorneys for Defendants-Appellants Rob Bonta and Allison Mendoza, in their official capacities*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 24-2036

I am the attorney or self-represented party.

**This brief contains** | 5,190 | **words,** including | 0 | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◉ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

○ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
☐ it is a joint brief submitted by separately represented parties.
☐ a party or parties are filing a single brief in response to multiple briefs.
☐ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated [          ].

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | /s/ Jerry T. Yen | **Date** | June 17, 2024
*(use "s/[typed name]" to sign electronically-filed documents)*